UNITED STATES DISTRICT COURT
FOR THE
WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| JAKE M. REINHARDT, TAYLOR M. SCHMIEDER, KEVIN R. HARRINGTON, CASEY E. CARMINATI, and KRYSTYNA KIMBRELL,<br><br>Plaintiffs,<br><br>v.<br><br>THE CITY OF BUFFALO, BYRON LOCKWOOD, individually and in his capacity as Police Commissioner of the Buffalo Police Department, JOHN DOES Nos. 1-7, individually and in their capacities as City of Buffalo Police Officers, BAIL SHOP, LLC, AGENT D. WHITE, individually and in his capacity as agent for Bail Shop, LLC, JOHN DOE No. 8, individually and in his/her capacity as bail recovery agent for Bail Shop, LLC, FINANCIAL CASUALTY & SURETY, INC., and CORPORATION X, a bail bond service company organized and existing under the laws of the State of New York,<br><br>Defendants. | Case No. 1:21-cv-206 |

**ORDER ON CITY DEFENDANTS' MOTION TO DISMISS**
**(Doc. 4)**

Alleging violations of federal constitutional rights and state tort law, Plaintiffs Jake M. Reinhardt, Taylor M. Schmieder, Kevin R. Harrington, Casey E. Carminati, and Krystyna Kimbrell have sued several groups of defendants: (1) the City of Buffalo and Buffalo Police Commissioner Byron Lockwood ("City Defendants"), (2) Buffalo Police officers John Does 1–7; (3) Bail Shop, LLC, Agent D. White, and John Doe 8 ("Bail Shop Defendants"); and (4) Financial Casualty & Surety, Inc. and Corporation X. (Doc. 1.) Plaintiffs' claims arise from events on the nights of January 9, 2021 and January 10–11, 2021, when bail recovery agents

from Pennsylvania, allegedly aided by City of Buffalo police officers, "burst into Plaintiffs' homes . . . at gunpoint and engaged in a violent, terrifying, warrantless search[] of the premises while trying to locate an alleged bond-jumper who was not present and did not reside" there. (Doc. 1 ¶ 1.) City Defendants have filed a Rule 12(b)(6) motion for partial dismissal directed at Plaintiffs' claims under 42 U.S.C. § 1983. (Doc. 4.)

## Background

Plaintiffs are five individuals who reside in Erie County. Plaintiffs' claims relate to the searches of two residences in Buffalo, New York: 31 Oakdale Place and 1329 Clinton Street. The following facts relating to the searches and the involvement of Defendants are drawn from the Complaint.

### A. Search of 31 Oakdale Place

At all relevant times, Plaintiffs Reinhardt and Schmieder resided with their three-year-old daughter in the lower apartment at 31 Oakdale Place, Buffalo, New York. (Doc. 1 ¶¶ 5–6, 29–31.) At the time of the incident, Plaintiff Schmieder was eight months pregnant. (*Id.* ¶ 32.) Jake Reinhardt owns the two-family home at 31 Oakdale Place. (*Id.* ¶ 31.) Plaintiffs Harrington and Carminati rented and resided in the upper apartment at the time of the incident, along with their 18-month-old son and five-year-old daughter. (*Id.* ¶¶ 7–8, 33.)

At about midnight on January 10–11, 2021, Defendants White and Does 1–8 engaged in a joint operation at 31 Oakdale Place. (*Id.* ¶ 35.) Does 1–7 are—or were at the relevant time—Buffalo Police Department ("BPD") officers. (*Id.* ¶¶ 16–22.) Defendant White and Doe 8 are bail recovery agents employed by Defendant Bail Shop. (*Id.* ¶¶ 24–25.) The object of the search was Luke Reinhardt, the brother of Plaintiff Reinhardt, whose bond had been revoked for failing to appear in a Pennsylvania court. (*Id.* ¶¶ 36–40.)

Defendant White and Doe 8 attempted to open and then loudly pounded the locked front door of 31 Oakdale Place. (*Id.* ¶¶ 42–43.) The pounding awakened Plaintiffs Reinhardt, Schmieder, Harrington, and Carminati. (*Id.* ¶ 47.) Defendant White loudly, forcefully, and repeatedly directed the residents of 31 Oakdale place to "Open it up or we'[ll] . . . kick it in!" (*Id.* ¶¶ 48, 50, 52, 54.) Defendant White and Does 1–8 "act[ed] in coordinated fashion," "wearing face masks with weapons drawn as well as holstered, attired in police uniforms, jackets, gear, and bulletproof vests." (*Id.* ¶ 35.) In particular, Defendant White and Doe 8 "were attired in gear designed to make them look like police officers. At least one of them was wearing a jacket with the logo 'United States Fugitive Task Force' on the back that also sported a shield emblem resembling a police badge or shield." (*Id.* ¶ 65.)

Throughout this time, Does 1–7 were standing on the sidewalk or street in front of the residence. (*Id.* ¶¶ 44–45.) Because of the presence of BPD officers, "Plaintiff Reinhardt thought it would be safe for him to open his door. In doing so, he did not intend to allow or give consent for anyone to enter his property. He cautiously opened the door and told Defendants: 'My hands are up, man.'" (*Id.* ¶ 55.)

After Plaintiff Reinhardt opened the door, Defendant White and Doe 8 pointed shotguns at him and forced him out of his home, shirtless and shoeless. (*Id.* ¶¶ 56–57.) Defendant White asked Plaintiff Reinhardt for his name and the location of Luke Reinhardt. (*Id.* ¶¶ 59, 62.) Plaintiff Reinhardt explained that Luke Reinhardt does not reside at the residence, and that Plaintiff Reinhardt's three-year-old daughter was inside. (*Id.* ¶ 63.) Plaintiff Reinhardt repeatedly asked Defendants to put their guns down. (*Id.* ¶¶ 61, 63, 70.)

Defendants directed Plaintiff Reinhardt to secure his family. (*Id.* ¶ 71.) However, when Plaintiff Reinhardt asked whether Defendant White had a search warrant and, if so, to show it (*id.* ¶¶ 72, 74), Defendant White ordered Reinhardt to remain outside (*id.* ¶ 75). Defendant White

said that Plaintiff Reinhardt would see the search warrant "soon." (*Id.* ¶ 74.) Without a warrant, Defendant White and Does 1, 2, and 8 entered and began to search the premises, armed with flashlights and guns. (*Id.* ¶¶ 67–68, 77, 81.) Other BPD officers entered the home through the front and back doors and participated in the search. (*Id.* ¶ 81.)

Plaintiff Reinhardt remained outside, held at gunpoint. (*Id.* ¶ 78.) He asked the BPD officers outside, "Are you Buffalo? You guys are letting this happen?" (*Id.* ¶ 78.) Plaintiff Reinhardt also directed Does 1 and 2 to "[g]et off [his] property!" and show him their warrant. (*Id.* ¶ 80.)

Inside the house, Defendant White and Doe 8 were startled when they encountered Plaintiff Schmieder holding Schmieder and Reinhardt's three-year-old daughter. (*Id.* ¶¶ 82–83.) They pointed their weapons and flashlights at plaintiff Schmieder, ordered her to put down her daughter, and held the two at gunpoint. (*Id.* ¶¶ 84–85.)

Defendant White and Doe 8 also broke the door to the upstairs residence occupied by Plaintiffs Harrington and Carminati, who have no relation to Luke Reinhardt. (*Id.* ¶ 92.) Defendant White and Doe 8 searched the upstairs apartment armed with flashlights and guns. (*Id.*) At one point, Defendant White and Doe 8 pointed a weapon directly at the five-year-old daughter of Plaintiffs Harrington and Carminati. (*Id.* ¶ 93.) Defendant White and Doe 8 also brandished firearms and held Plaintiffs Reinhardt, Schmieder, Harrington, and Carminati at gunpoint while questioning them about Luke Reinhardt. (*Id.* ¶ 88.)

While Defendant White and Doe 8 searched, BPD officers Does 1 and 2 stood on the front porch and did not intervene. (*Id.* ¶ 94.) Eventually, BPD officers entered the residence and participated in the search. (*Id.* ¶ 94–95.) Doe 1 and Doe 2 said to each other: "I don't even know what agency they are part of" and "Me neither. I think they're from PA." (*Id.* ¶ 95.)

After the search, Plaintiff Reinhardt again demanded to see a warrant. (*Id.* ¶¶ 97–98.) Defendant White responded, "When I get to the car, I'll give it to you." (*Id.* ¶ 99.) Plaintiff Reinhardt repeated this demand as Defendant White and Does 1–7 started to walk away. (*Id.* ¶ 100.) Defendants ignored Plaintiff Reinhardt's demand, and, when he walked towards them, instructed Plaintiff Reinhardt "not to walk up on them." (*Id.* ¶¶ 101–103.) The only document Defendants showed Plaintiff Reinhardt was a bail bond contract signed by Luke Reinhardt. (*Id.* ¶ 104.) Does 1–7 did not arrest Defendant White or Doe 8 when it became clear that they lacked a warrant for the search. (*Id.* ¶ 106.)

After Defendants left, Plaintiffs Reinhardt, Schmieder, Harrington, and Carminati tried to comfort their children. (*Id.* ¶ 107.) Plaintiffs were unable to fall asleep because they were too upset and shocked by the experience. (*Id.* ¶ 108.) Plaintiff Reinhardt suffered emotional and psychological distress from watching Defendant White and Doe 8 question his fiancée, Plaintiff Schmieder, and their three-year-old daughter at gunpoint. (*Id.* ¶ 90.)

The morning after the search of 31 Oakdale Place, Defendant White stalked Plaintiff Schmieder when she left the home to get coffee. (*Id.* ¶ 120.) Plaintiffs followed Defendants' vehicle and Defendants fled when they were discovered. (*Id.* ¶ 121.)

**B.    Search of 1329 Clinton Street**

Plaintiff Kimbrell resides at 1329 Clinton Street, Buffalo New York. (*Id.* ¶ 9.) Kimbrell is the mother of Luke Reinhardt. (*Id.* ¶ 111.) On the night of January 9, 2021, without displaying a warrant, giving warning, or obtaining the consent of Plaintiff Kimbrell, Defendant White and Doe 8 entered and searched Kimbrell's residence. (*Id.* ¶¶ 112, 115.) Defendant White and Doe 8 wore apparel and gear designed to make them look like police officers. (*Id.* ¶ 113.) At least one

5

of the two wore "a jacket with the logo 'United States Fugitive Task Force' on the back that also sported a shield emblem in the nature of a police badge or shield." (*Id.*)

### C. City of Buffalo Involvement

Defendant Lockwood is the current Police Commissioner of the Buffalo Police Department ("BPD"). (*Id.* ¶ 13.) Lockwood is responsible for hiring, training, and supervising BPD officers, and setting, reviewing, or enforcing BPD policies and regulations. (*Id.* ¶¶ 14–15.)

The Complaint alleges that the searches of 31 Oakdale Place and 1329 Clinton Street were part of a preexisting agreement and conspiracy between Defendants to enter and search Plaintiffs' homes without probable cause or search warrants. (*Id.* ¶ 124.) The Complaint alleges that Does 1–7 had the power and ability to prevent the violation of Plaintiffs' constitutional rights by failing to do so. (*Id.* ¶¶ 126–127.)

The Complaint further alleges that the City Defendants maintained a policy of providing BPD officer assistance to bail recovery agents, and allowed bail recovery agents to "direct, coordinate, and perform searches" of homes in the City in their pursuit of alleged bond-jumpers. (*Id.* ¶ 131.) The Complaint alleges that City Defendants knew, or with reasonable diligence should have known, that limited oversight of bail recovery agents made those individuals dangerous and likely to violate the rights of Buffalo residents. (*Id.* ¶ 133.)

Plaintiffs reported the incidents to the BPD. (*Id.* ¶ 139.) Although the BPD interviewed Plaintiff Reinhardt and some of the other plaintiffs, the Department does not seem to have taken further action. (*Id.*)

### D. Relationship Between Bail Shop Defendants and City Defendants

The Complaint alleges that Bail Shop, LLC ("Bail Shop") is a surety bail bonds company with a principal place of business in Lebanon, Pennsylvania. (*Id.* ¶ 23.) Bail Shop employed

6

Defendants D. White and John Doe 8 as bail recovery agents at the time of the incidents, and that the actions Plaintiffs complain of were undertaken in the course of their employment. (*Id.* ¶¶ 23–25, 209, 219.) The Complaint further alleges that Financial Casualty & Surety, Inc. ("FCSI") is a Texas insurance company that issued the bail bond at issue in the case, and which retained, hired, and supervised Defendant bail recovery agents in the actions giving rise to Plaintiffs' claims. (*Id.* ¶ 26.)

The Complaint alleges that Bail Shop, FCSI, and Corporation X failed to adequately train or supervise Defendant White and Doe 8 in the constitutional requirements of the Fourth Amendment, despite knowing that they would perform searches and seizures in the course of their employment. (*Id.* ¶¶ 136–137.) At the time of the incident, Defendant White and Doe 8 were impersonating law enforcement and working with the BPD to make their actions appear official. (*Id.* ¶¶ 66, 113–114.) Defendant White and Doe 8 met with Does 1–7 and their supervisors prior to the search to discuss the target and location of the search. (*Id.* ¶ 150.) However, some of the individual BPD officers who participated in the search were unaware of the identities of Defendant White and Doe 8. (*Id.* ¶ 95.)

### E. Harm to Plaintiffs

In addition to alleging violations of Plaintiffs' constitutional rights, the Complaint alleges the following injuries arising from the searches of 31 Oakdale Place and 1329 Clinton Street. Defendants' actions damaged Plaintiffs' property, including the destruction of the door to the upstairs residence at 31 Oakdale Place. (*Id.* ¶ 143.) Plaintiffs have suffered severe emotional distress. (*Id.* ¶ 144–145.)

## Analysis

The Complaint includes fourteen counts: five counts under 42 U.S.C. § 1983 against all defendants (Counts I–V); a *Monell* claim under § 1983 against City Defendants (Count VI); and

7

eight claims under state tort law against Bail Shop Defendants (Counts VII–XIV).[1] City Defendants' pending motion seeks dismissal of all of Plaintiffs' § 1983 claims against City Defendants as well as dismissal of the § 1983 conspiracy claim against Does 1–7.[2]

I.   **Standard of Review**

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In evaluating a motion to dismiss, the court accepts all plausible allegations in the complaint as true and draws all reasonable inferences in favor of the plaintiff. *Lanier v. Bats Exch., Inc.*, 838 F.3d 139, 150 (2d Cir. 2016). However, "[t]hreadbare recitals of elements of a cause of action, supported by mere conclusory statements, do not suffice." *Empire Merchants, LLC v. Reliable Churchill LLLP*, 902 F.3d 132, 139 (2d Cir. 2018) (quoting *Iqbal*, 556 U.S. at 678). The court will grant a motion to dismiss only where "it is clear from the face of the complaint, and matters of which the court may take judicial notice, that the plaintiff's claims are barred as a matter of law." *Parkcentral Glob. Hub Ltd. v. Porsche Auto. Holdings SE*, 763 F.3d 198, 208–09 (2d Cir. 2014) (per curiam) (quoting *Conopco, Inc. v. Roll Int'l*, 231 F.3d 82, 86 (2d Cir. 2000)).

---

[1] The state-law claims against Bail Shop Defendants are not the subject of a pending motion to dismiss and include the following claims: trespass (Count VII); false imprisonment (Count VIII); assault (Count IX); battery (Count X); intentional infliction of emotional distress (Count XI); negligent infliction of emotional distress (Count XII); negligence (XIII); and negligent hiring, supervision, and training (Count XIV).

[2] As discussed *infra* Section II.C, the parties agree that City Defendants do not have standing to sue for Does 1–7 who have not yet been identified or served. However, City Defendants argue that the Complaint's factual allegations are insufficient to state a plausible claim for relief against any of the defendants, and thus that the claim must be dismissed.

## II. Section 1983 Liability

Section 1983 provides a federal damages action to redress violations of constitutional rights by local officials acting under color of state law. 42 U.S.C. § 1983; *Monroe v. Pape*, 365 U.S. 167, 186 (1961). A municipality may be liable under § 1983 where the "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the [constitutional] injury." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978). The Complaint alleges four distinct theories of a Fourth Amendment violation,[3] a conspiracy to violate civil rights under § 1983, and a *Monell* claim against City Defendants. City Defendants seek dismissal of all these claims; the pending motion does not seek dismissal of the four Fourth Amendment claims against Does 1–7.

### A. Claims Against Commissioner Lockwood

The City Defendants seek to dismiss all claims against Defendant Lockwood, arguing that the Complaint states neither official-capacity nor individual-capacity claims against the BPD Commissioner. (Doc. 4-1 at 7–8.)

The Supreme Court has made clear that an official-capacity suit against a municipal official is properly a suit against the official's office and is duplicative of a suit against the municipality itself. *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989) (citations omitted). Courts routinely dismiss official-capacity claims against individual officials when the complaint asserts the same claims against the municipal entity. *E.g.*, *Odom v. Matteo*, 772 F. Supp. 2d 377, 392 (D. Conn. 2011); *Barmore v. Aidala*, 419 F. Supp. 2d 193, 202 (N.D.N.Y. 2005); *Baines v. Masiello*, 288 F. Supp. 2d 376, 384 (W.D.N.Y. 2003). Here, the Complaint

---

[3] The Fourth Amendment claims are for unreasonable search and seizure (Count I), false imprisonment (Count II), excessive force (Count III), failure to intervene (Count IV).

names Lockwood as a defendant in both his individual and official capacities, and all official-capacity claims against Defendant Lockwood are also asserted against the City of Buffalo. Consequently, the court dismisses all official-capacity claims against Defendant Lockwood as duplicative of the claims against the City.

For Plaintiffs' individual-capacity claims against Defendant Lockwood to withstand City Defendants' motion to dismiss, the Complaint must plausibly allege that Lockwood was personally involved in the alleged deprivations of Plaintiffs' constitutional rights. *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020) ("[A]fter *Iqbal*, there is no special rule for supervisory liability. Instead, a plaintiff must plead and prove 'that each Government-official defendant, through the official's own individual actions, has violated the Constitution.' (quoting *Iqbal*, 556 U.S. at 676)); *Spavone v. N.Y. State Dep't of Corr. Servs.*, 719 F.3d 127, 135 (2d Cir. 2013). However, the Complaint's factual allegations pertaining to Lockwood's involvement in the alleged violations are coextensive with the Complaint's factual allegations regarding the existence of a City policy that caused the constitutional deprivations. (*E.g.*, Doc. 1 ¶¶ 14–15, 129–135, 193–201.) The Complaint lacks additional allegations regarding Lockwood's individual participation that could provide a basis on which to hold him *individually* liable for those deprivations. Consequently, the Complaint fails to state a personal-capacity claim against Defendant Lockwood, and Plaintiffs' claims must be dismissed as against him. Dismissal is without prejudice and does not preclude a motion to amend if discovery reveals evidence of Lockwood's personal involvement.

**B.     Claims Against the City of Buffalo**

The City Defendants next seek to dismiss Plaintiffs' claims against the City of Buffalo, arguing that § 1983 does not allow the city to be liable under a *respondeat superior* theory and

that the Complaint otherwise fails to plead a *Monell* claim against the City. (Doc. 4-1 at 8–15.) Defendants are correct that § 1983 does not encompass a *respondeat superior* theory of liability. *Connick v. Thompson*, 563 U.S. 51, 60 (2011); *Monell*, 436 U.S. at 694. Consequently, Counts I, II, III, and IV must be dismissed as to the City. The court accordingly focuses on the *Monell* claim against the City in Count VI.

    A municipality can be sued directly under § 1983 for constitutional deprivations that arise from a municipal policy or "governmental custom so permanent and well settled as to constitute a custom or usage with the force of law." *Monell*, 436 U.S. at 690 (cleaned up). A municipal policy giving rise to *Monell* liability may take the form of "formal rules or understandings . . . intended to . . . establish fixed plans of action to be followed under similar circumstances, consistently and over time," but may also be the "decision to adopt [a] particular course of action [that] is properly made by the government's authorized decisionmakers," regardless of "whether the action is to be taken only once or to be taken repeatedly." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986). Such a policy "may be pronounced or tacit and reflected in either action or inaction." *Cash v. Cnty. of Erie*, 654 F.3d 324, 334 (2d Cir. 2011). In either case, the municipality must be the "moving force" behind the constitutional violation. *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 404 (1997).

    In Count VI, the Complaint articulates two theories of how the City might be liable under *Monell* for maintaining a municipal policy that caused the alleged constitutional deprivations.[4] First, the Complaint alleges that the City inadequately supervised and trained BPD officers in the appropriate policies and procedures governing residential searches and that the City's practice

---

[4] The Complaint describes its *Monell* claim as a claim for relief from "Policy, Custom, and Practice of Defendants and Failure to Supervise and Train under 42 U.S.C. § 1983 . . ." (Doc. 1 at 32.)

rose to the level of deliberate indifference. (*See* Doc. 1 ¶¶ 130, 191–196.) Second, the Complaint alleges that the City of Buffalo maintained a policy of "provid[ing] Buffalo Police assistance to bail recovery agents and allow[ing] bail recovery agents to direct, coordinate, and perform searches of homes in the City of Buffalo" accompanied by BPD officers. (*Id.* ¶¶ 131, 133, 197–201). According to the Complaint, this practice involved inadequate regulations and oversight on bail recovery agents, which "made the individuals dangerous and likely to violate the rights of City of Buffalo Citizens." (*Id.* ¶ 199.)

These two theories reflect different routes to *Monell* liability. Whereas the first theory challenges municipal inaction, the second theory challenges an affirmative municipal policy—City practices relating to the regulation, oversight, and support of bail recovery agents. The legal standards for establishing *Monell* liability correspondingly differ, and the court separately analyzes the parties' arguments for and against each theory. Though City Defendants' motion to dismiss focuses on Plaintiffs' failure-to-train argument, the court begins by addressing Plaintiffs' allegations regarding the existence of an affirmative policy.

    1.    **Policy of Supporting Bail Recovery Agents**

The Complaint identifies a municipal policy that, Plaintiffs allege, directly caused their injuries. Specifically, the Complaint asserts that the City of Buffalo "maintained a policy or custom and practice that provid[ed] Buffalo Police assistance to bail recovery agents and allowed bail recovery agents to direct, coordinate, and perform searches of homes in the City of Buffalo." (Doc. 1 ¶ 131.)  In contrast to *Monell* claims based on municipal inaction, it is "straightforward" to resolve issues of fault and causation "[w]here a plaintiff claims that a particular municipal action itself violates federal law, or directs an employee to do so." *Brown*, 520 U.S. at 404. "[T]he conclusion that the action taken or directed by the municipality or its authorized

decisionmaker itself violates federal law will also determine that the municipal action was the moving force behind the injury of which the plaintiff complains." *Id.* at 405.

For the following reasons, the court concludes that the Complaint plausibly alleges (1) that the City maintained such a policy, (2) that the policy itself violates federal law or directs City employees to violate federal law, and (3) that the policy directly caused the constitutional deprivations for which Plaintiffs seek redress. The court addresses these components in reverse order.

First, the Complaint plausibly alleges that BPD officers assisted and participated in a warrantless search of Plaintiffs' dwellings pursuant to the City's policy. The Complaint alleges that seven *uniformed* BPD officers (Does 1–7) accompanied Defendant White and Doe 8 to Plaintiffs' dwelling in the middle of the night. (Doc. 1 ¶¶ 35, 55.) The Complaint alleges that Defendant White and Doe 8 wore apparel that could lead a reasonable person to believe that Defendant White and Doe 8 were also law enforcement officers. (*Id.* ¶¶ 35, 65.) Indeed, the Complaint alleges that the presence of uniformed BPD officers caused Plaintiff Reinhardt to believe that "it would be safe for him to open his door" even though "he did not intend to allow or give consent for anyone to enter the property." (Doc. 1 ¶ 55; *see also id.* ¶ 114.) Despite being present at the scene of the incident, Does 1–7 allegedly "failed to instruct, supervise, control, [or] discipline Defendant Agent D. White and bail recovery agent[] John Doe No. 8 who entered Plaintiffs' homes without probable cause, without a search warrant, and without consent from any of the Plaintiffs." (*Id.* ¶ 125.) When Plaintiff Reinhardt requested assistance from BPD officers, they allegedly took no action. (*Id.* ¶¶ 78–80.) Accepted as true, these allegations support the inference that BPD officers, acting in the course of their employment, supported bail

recovery agents in the warrantless search of Plaintiffs' residence, thereby violating Plaintiffs' rights under the Fourth Amendment.

Second, to the extent that the Complaint alleges the City maintained a policy of providing law enforcement support to assist bail enforcement or recovery agents in the warrantless searches of dwellings, the Complaint plausibly alleges that the City's policy is either facially unconstitutional or was enforced in an unconstitutional manner. Although the Second Circuit has not held the actions of bail agents to constitute state action in and of themselves, most circuits that have considered the issue have held that the actions of bail agents become "state action" for purposes of § 1983 where local police provide "significant, affirmative assistance or joint action is alleged." *Lopez v. Zouvelos*, No. 13-CV-6474 (MKB), 2015 WL 5657361, at *8 (E.D.N.Y. Sept. 23, 2015) (summarizing case law from various circuits).[5] Consequently, a City policy that provides active law enforcement support for bail agents—as alleged here—may transform what would otherwise be private conduct into state action subject to the Fourth Amendment. Supporting bail agents in the execution of warrantless searches thus appears to be a facially unconstitutional policy. Because the Complaint alleges that the City's policy entails "assisting" bail agents and letting bail agents "direct" assisting BPD officers in the execution of warrantless searches, the Complaint plausibly alleges that the City's policy is facially unconstitutional.

Finally, the Complaint plausibly alleges that the joint participation of BPD officers and the bail recovery agents in the allegedly warrantless search of Plaintiffs' dwellings was directed by a City policymaking official or undertaken pursuant to existing City policy. *See City of Oklahoma City v. Tuttle*, 471 U.S. 808, 824 (1985) ("A single incident of unconstitutional

---

[5] Similarly, the Second Circuit has held that a police officer's "active" participation in a repossession may transform otherwise private conduct into "state action" under § 1983. *Barrett v. Harwood*, 189 F.3d 297, 302 (2d Cir. 1999).

activity is not sufficient to impose liability under *Monell*, *unless* proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker." (emphasis added)); *Jones v. Town of E. Haven*, 691 F.3d 72, 81 (2d Cir. 2012) ("A plaintiff alleging that she has been injured by the actions of a low-level municipal employee can establish municipal liability by showing that a policymaking official ordered or ratified the employee's actions—either expressly or tacitly."). The Complaint further alleges that the City of Buffalo, through its Common Council, City Counsel, or City agents, "promulgate[s], implement[s], review[s], and/or enforce[s] . . . policies regarding the actions of police officers employed by the City of Buffalo." (*Id.* ¶ 12.)

Plaintiffs have described the warrantless searches of their three residences by a combined team of bail agents and police officers in detail. They have not produced a written policy or a verbal practice allowing such conduct. But how could they do so prior to obtaining discovery? It is a reasonable inference that private citizens cannot summon the assistance of seven municipal police officers for the search of a residence at midnight in the absence of some policy allowing such a practice. To assemble and dispatch such a team is very likely to require some form of supervisory planning and approval that follows departmental policy.

Alternatively, if the seven Buffalo officers decided on their own initiative to assist in the warrantless search of three residences, their conduct likely reflects a lack of training and guidance. In either event, the conduct described in the Complaint, including the allegations that the City Defendants maintained a policy of providing police assistance to bail recovery agents, is sufficient to support a *Monell* claim for purposes of the motion to dismiss.

### 2. Policy of Failing to Adequately Train BPD Officers

In the alternative, Plaintiffs have alleged a viable failure-to-train claim. A failure-to-train claim arises where, "in light of the duties assigned to specific officers or employees[,] the need for more or different training is so obvious, and the inadequacy [in training] so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need" for better training. *City of Canton v. Harris*, 489 U.S. 378, 390 (1989). The Second Circuit has held that a municipality is deliberately indifferent "where it fails to act when it has actual or constructive notice, generally from a pattern of similar constitutional violations" of deficiencies in training or supervision. *Hernandez v. United States*, 939 F.3d 191, 207 (2d Cir. 2019); *see also Jones v. Town of E. Haven*, 691 F.3d 72, 85 (2d Cir. 2012) (rejecting *Monell* claim where the plaintiff identified at most three instances of abusive conduct over several years and produced no evidence of supervisory awareness).

In addition, the Supreme Court has indicated that there is "a narrow range of circumstances" in which "a pattern of similar violations might not be necessary to show deliberate indifference." *Connick*, 563 U.S. at 63. To fall within this exception, "the unconstitutional consequences of failing to train" must be "so patently obvious that a city could be liable under § 1983 without proof of a pre-existing pattern of violations." *Id.* As one such example, the Court described a city that arms its police officers with firearms and deploys them to capture fleeing felons, observing:

> Given the known frequency with which police attempt to arrest fleeing felons and the predictability that an officer lacking specific tools to handle the situation will violate citizens rights, . . . a city's decision not to train the officers about constitutional limits on use of deadly force could reflect the city's deliberate indifference to the highly predictable consequence, namely, violations of constitutional rights.

*Id.* (citing *Bryan Cnty.*, 520 U.S. at 409).

City Defendants argue that the Complaint fails to state a failure-to-train claim because it does not cite related incidents or other circumstances to suggest that the City was on notice of its deficient training, and that Plaintiffs fail to allege a specific deficiency in training. (*See* Doc. 4-1 at 11–12, 14.) As the court has explained, however, identifying a pattern of similar incidents is not the only path to establishing that a municipality's failure to train constitutes deliberate indifference. Based on Plaintiffs' response to City Defendants' motion to dismiss (*see* Doc. 5-2 at 8 n.1), the court interprets Plaintiffs' failure-to-train argument as implicating the "patently obvious" exception to the general pattern requirement of the deliberate indifference standard. In particular, Plaintiffs allege that the City maintained a policy of failing to train its officers in the rights and protections guaranteed by the Fourth Amendment, "including the prohibition against warrantless searches of a citizen's home or dwelling." (Doc. 5-2 at 8 n.1; Doc. 1 ¶¶ 126–129, 193.)[6] Because the Complaint also alleges that the City maintained a policy of providing law enforcement support to bail recovery agents in operations likely to involve the searches of dwellings (Doc. 1 ¶¶ 126–127), failing to adequately train BPD officers in the nature of the warrant

---

[6] Contrary to City Defendants' suggestion, the Complaint identifies seven specific deficiencies in the City's training of BPD officers regarding the warrant requirement: "(i) procedure to determine when officers have probable cause to enter an individual's home; (ii) procedure to announce an officer's presence when an officer seeks to enter an individual's home; (iii) procedure to enter an individual's home once an officer determines there is probable cause to enter the home; (iv) procedure to not enter an individual's home once an officer determines there is no probable cause to enter the home and an individual in the home tells the officer they cannot enter without a warrant; (v) procedure for the use of force or threat to use force by officers when seizing an individual; (vi) procedure for waiting for a properly obtained search warrant before searching and seizing an individual and his home; and (vii) procedure for investigating an individual's claim that officers and bounty hunters illegally entered his or her home, illegally searched and seized him, and unlawfully was threatened with physical violence while in the custody of the defendants." (Doc. 1 ¶ 195.).

requirement "could reflect the city's deliberate indifference to the highly predictable consequence" of warrantless searches by bail recovery agents, supported by BPD officers. *See Connick*, 563 U.S. at 63; *Bryan Cnty.*, 520 U.S. at 409.

Plaintiffs' failure-to-train theory thus analogizes the risk of warrantless searches and the City's failure to instruct officers in the warrant requirement to the risk of deadly force and a city's failure to train its officers in the constitutional limits on deadly force in the Supreme Court's "patently obvious" hypothetical discussed in *Connick* and *Bryan County*. Although *Connick* described the range of "patently obvious" examples of deliberate indifference as "narrow," the court agrees that the risk of unconstitutional consequences from inadequately training police officers in the Fourth Amendment's warrant requirement is "so patently obvious" that a pattern of pre-existing violations would not be needed for the City's failure to train to constitute deliberate indifference to the constitutional rights of its citizens.

In addition to identifying a failure to train that implicates the "patently obvious" exception, the Complaint contains sufficient factual allegations to state a plausible claim that this failure to train directly caused Plaintiffs' constitutional injuries. In particular, the Complaint contains specific allegations regarding the behavior of up to seven BPD officers alleged to have participated in the search of Plaintiffs' residence at 31 Oakdale Place. The Complaint plausibly alleges that the officers supported Bail Shop Defendants in a warrantless search of the property and that they failed to intervene or desist when Plaintiff Reinhardt repeatedly asked for a search warrant. The allegations' specificity and the sizable number of BPD officers alleged to have participated in the search support an inference that the BPD officers acted pursuant to a City policy, practice, or custom of inadequately training BPD officers in the requirements of the Fourth Amendment.

### C. Section 1983 Conspiracy Claim

City Defendants seek dismissal of Plaintiffs' § 1983 conspiracy claim because "Plaintiffs fail to plead no more than wholly conclusory and unsupported factual allegations of an agreement between the City Defendants, unidentified John Doe police officer defendants, and apparent bail bondsmen to engage in what they term a 'joint police/private operation.'" (Doc. 4-1 at 16–17 (quoting Doc. 1 ¶ 46).) In response, Plaintiffs clarify that the Complaint does not allege a conspiracy involving the City or Defendant Lockwood, and instead alleges "an agreement entered into by the on-scene officers and bounty hunters to enter and search Plaintiffs' homes in violation of Plaintiffs' constitutional rights." (Doc. 5-2 at 12.) Plaintiffs contend that it is premature to dismiss their § 1983 conspiracy claim, when Does 1–7 have not yet been identified or served. (*Id.*) In response, City Defendants clarify that they do not claim standing on behalf of Does 1–7. (Doc. 7 at 8.) Because City Defendants claim standing only on their own behalf, and because the parties agree that the Complaint does not state a § 1983 conspiracy claim against City Defendants, the court will grant City Defendants' motion to dismiss the claim against the City of Buffalo.

### Conclusion

City Defendants' motion to dismiss (Doc. 4) is DENIED IN PART and GRANTED IN PART. The court dismisses all claims against Defendant Lockwood, without prejudice, and dismisses Counts I, II, III, IV, and V against the City of Buffalo. The only remaining claim against the City of Buffalo is the *Monell* claim (Count VI).

Dated this 25th day of May, 2021.

_____
Geoffrey W. Crawford, Judge
United States District Court