UNITED STATES DISTRICT COURT
FOR THE
WESTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| JAKE M. REINHARDT, TAYLOR M. SCHMIEDER, KEVIN R. HARRINGTON, CASEY E. CARMINATI, and KRYSTYNA KIMBRELL, | ) ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | Case No. 1:21-cv-206 |
| THE CITY OF BUFFALO, CLAYTON REED, MELISSA KURDZIEL, JAE S. MURPHY, SPENCER T. GEORGE, ROBERTO J. TORRES, COLIN KEENAN, DEVON SALTER-BROWN, BAIL SHOP, LLC, ADEL MIKHEAIL, BUFFALO BAIL BONDS AGENCY, INC., DENNIS WHITE, and WAYNE BRYANT, | ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

**OPINION AND ORDER**
**(Docs. 64, 165, 173, 174)**

This civil rights action arises out of incidents in January 2021 when, while searching for alleged bond jumper Luke Reinhardt, armed bail recovery agents entered the separate Buffalo residences of Luke Reinhardt's mother, Krystyna Kimbrell, and Luke Reinhardt's brother, Jake Reinhardt. Plaintiffs are the individuals whose homes were searched: Ms. Kimbrell; Jake Reinhardt and his partner, Taylor Schmieder; and Kevin Harrington and Casey Carminati, two tenants in the upper unit of the two-family home that Jake Reinhardt owned. Luke Reinhardt was not found at any of the searched residences.

Plaintiffs allege that defendant Adel Mikheail was involved in the incidents as an agent for defendant Bail Shop, LLC, and that defendants Dennis White and Wayne Bryant were involved as bail recovery agents for defendant Buffalo Bail Bonds Agency, Inc. Plaintiffs

further allege that, before the searches, Dennis White notified the City of Buffalo Police Department ("BPD") of his intention to search for Luke Reinhardt at Ms. Kimbrell's Clinton Street residence and at Jake Reinhardt's Oakdale Place residence. BPD officers Clayton Reed and Melissa Kurdziel were present outside the Clinton Street residence during the search there. BPD officers Jae Murphy, Spencer George, Roberto Torres, Colin Keenan, and Devon Salter-Brown were present outside the Oakdale Place residence when Mr. White and his associate announced their presence there. The City of Buffalo (the "City") is also a named defendant. (*See* Doc. 111.) The court refers to the City and to the defendant BPD officers collectively as the "City Defendants."

The Second Amended Verified Complaint includes six counts under 42 U.S.C. § 1983 for violations of Plaintiffs' rights under the Fourth and Fourteenth Amendments: (1) unreasonable search and seizure; (2) false imprisonment; (3) excessive force; (4) failure to intervene; (5) conspiracy to violate constitutional rights; and (6) a *Monell* claim against the City of Buffalo. The remaining counts are brought under New York state law: (7) trespass; (8) false imprisonment; (9) assault; (10) battery; (11) intentional infliction of emotional distress; (12) negligent infliction of emotional distress; (13) negligence; and (14) negligent hiring, supervision, retention, and training. For relief, Plaintiffs seek compensatory and punitive damages. (*See* Doc. 111.)

Defendants White and Bryant failed to appear and the Clerk has entered default against them under Fed. R. Civ. P. 55(a). (Doc. 138.) Three dispositive motions are currently pending. The first, filed in July 2022, is Buffalo Bail Bonds Agency, Inc.'s motion to dismiss, subsequently converted to a motion for summary judgment. (Doc. 64; *see* Doc. 68 (converting motion to summary judgment).) The second is Plaintiffs' motion for partial summary judgment,

filed in June 2024.  (Doc. 173.)  The third pending motion, also filed in June 2024, is the City

Defendants' motion for summary judgment.  (Doc. 174.)[1]

The court heard argument on the motions on April 21, 2025.  The court has also

considered the parties' post-hearing submissions.  (Docs. 201, 203, 204.)

## Background

The following facts are undisputed except where noted.  The court has drawn on all of the

available statements of fact in the competing summary judgment motions.[2]  A significant portion

of the facts are beyond dispute because many of the events are captured on audio and visual

recordings that comprise part of the summary judgment record.  (*See* Docs. 177, 183.)

Additional evidence is set forth as necessary in the analysis below.

### The Bondsmen and Bounty Hunters Initiate a Search for Luke Reinhardt

Luke Reinhardt was released from custody in Pennsylvania on a misdemeanor charge

after posting bond.  (*See* Doc. 173-26 at 23; *see also* Doc. 163-2 at 104 (May 2020 "Surety Bail

Bond Agreement" as to Luke Reinhardt); Doc. 173-42.)  He failed to appear in court and, by

December 11, 2020, Bail Shop, LLC—a Pennsylvania company—was aware that a bench

warrant had been issued for Luke Reinhardt.  (Doc. 173-26 at 39.)  After determining that it was

necessary to proceed with a bail enforcement agent, Bail Shop contacted Michael Mikheail and

his father, Adel Mikheail.  (*Id.* at 47–53.)

---

[1] A fourth pending motion, Document 165, is Plaintiffs' request to strike exhibits from
Bail Bonds Agency, Inc.'s reply memorandum (Doc. 164) filed in support of the July 2022
motion.

[2] There is a significant quantity of written, deposition, and audiovisual evidence in this
case.  Attorney Davenport's declaration (Doc. 173-1) provides a helpful index of many of the
exhibits.

After reviewing the criminal docket sheet and confirming that a bench warrant had been issued for Luke Reinhardt, Adel Mikheail ("Mr. Mikheail") looked for Luke Reinhardt in Pennsylvania but did not find him there. (Doc. 173-14 at 34–35, 58, 64–65.) Mr. Mikheail told Bail Shop that he could not find Luke Reinhardt in Pennsylvania, and that Luke Reinhardt "could be in New York." (*Id.* at 58, 69.) Mr. Mikheail advised Bail Shop that he would not personally go to New York to search for Luke Reinhardt "because I'm not licensed in New York." (*Id.* at 69.)

Bail Shop then asked Mr. Mikheail for help finding a New York bounty hunter. (*Id.* at 75, 80–81.) After a phone conversation with the owner of Buffalo Bail Bonds Agency, Inc. ("BBBA"), Mr. Mikheail advised Bail Shop that BBBA "wanted to help" and that it was Bail Shop's decision as to whether to use BBBA. (*Id.* at 97–98.) According to Mr. Mikheail, Bail Shop approved the use of BBBA and approved sending a file on Luke Reinhardt to BBBA. (*Id.* at 103–104.) Mr. Mikheail attempted to email the materials using an email address that BBBA provided. (*Id.* at 104.) Mr. Mikheail then received a call from Dennis White advising that the material in the email was illegible. (*Id.* at 108.) Mr. White asked for the material to be sent by fax. (*Id.*)

Mr. Mikheail provided Bail Shop with the fax number that Mr. White supplied, and Bail Shop faxed a file on Luke Reinhardt to that number. (*Id.* at 104, 113, 119; *see also* Doc. 163-2 at 101 (fax cover sheet).) After receiving the fax, Mr. White advised Mr. Mikheail that he would attempt to find out if Luke Reinhardt was in New York. (Doc. 173-14 at 123.) A few days later, Bail Shop called Mr. Mikheail seeking an update. (*Id.* at 147.) Mr. Mikheail contacted Mr. White, who advised that he was still looking for Luke Reinhardt. (*Id.*) Mr. Mikheail told Mr.

White that "we just need to locate him to see if he's in New York" and that "[i]f he's in New York, just let us know." (*Id.*)

The City Defendants do not dispute that, at the relevant times, BBBA "employed" Dennis White and Wayne Bryant as bail recovery agents. (Doc. 173-77 ¶ 67; Doc. 181 ¶ 67.) However, the affidavit of BBBA's owner, George Adu-Gyamfi, indicates that BBBA was not Mr. White's or Mr. Bryant's employer in the legal sense. (*See* Doc. 64-1 at 65, ¶¶ 6–7.) The City Defendants also do not dispute that BBBA is not licensed to work as a bail recovery agency in New York, and that Dennis White is not licensed as a bail recovery agent in New York. (Doc. 173-77 ¶¶ 68–69; Doc. 181 ¶¶ 68–69.)

Also, there is no dispute that Pennsylvania law includes the following provision regarding "bail pieces":

(1) A surety or bail agency may apply to the court for a bail piece.

(2) If the court is satisfied that a bail piece is required, it may issue a bail piece authorizing the surety or bail agency to apprehend and detain the defendant, and to bring the defendant before the bail authority without unnecessary delay.

Pa. R. Crim. P. 536(B). Citing the testimony of Mr. Mikheail and Bail Shop's secretary-treasurer Sheila Smith, Plaintiffs assert that a bail piece is separate from a bench warrant and that bail bondsmen and bounty hunters must obtain a bail piece to have authority to apprehend a person who has failed to appear in court. (*See* Doc. 173-77 ¶¶ 127–128.) The City Defendants do not assert that Dennis White or Wayne Bryant ever obtained a bail piece to apprehend Luke Reinhardt, but instead assert that the bounty hunters had legal authority to do so under New York and federal law. (*See* Doc. 174 at 20–21.)

**Search of 1329 Clinton Street**

Dennis White called the Buffalo Police Department in the late morning of January 9, 2021.[3]  (*See* Doc. 174-1.)  Computer-aided dispatch ("CAD") records indicate that White requested BPD's assistance with "serving [a] warrant" and that BPD officers Reed and Kurdziel were dispatched to Clinton Street.  (*Id.*)  Officer Reed was the sole occupant of his marked patrol vehicle at the time the dispatcher directed him to Clinton Street.  (Doc. 174-2 at 20.)  He testified that the dispatcher informed him that they did not know what "agency" was requesting BPD's assistance.  (*Id.* at 19.)  The dispatcher did not tell Officer Reed that he would be assisting an agency with "serving a warrant," and at the time he was dispatched Officer Reed did not know the nature of the requested assistance.  (*Id.*)

Officers Reed and Kurdziel arrived separately on the scene, with Officer Reed arriving first.  (Doc. 180-1 ¶ 5.)  When he arrived on the scene, Officer Reed spoke with an individual who identified himself as a "bondman" or bail enforcement.  (*Id.* ¶ 6.)  The bondman told Officer Reed that he was there to apprehend Luke Reinhardt on a warrant and that Luke may be residing at 1329 Clinton Street.  (*Id.* ¶ 7.)  Officer Reed ran a warrant check with the National Crime Information Center ("NCIC") system and confirmed the existence of a warrant for Luke Reinhardt due to his failure to appear in Lebanon County Court.  (*Id.* ¶ 8.)  Officer Reed called his supervisor and advised that the request for assistance came from bondsmen, not another police or law enforcement agency; the supervisor decided, and Officer Reed agreed, that BPD's involvement would be "ornamental"—meaning "[n]o physical involvement" by BPD officers. (Doc. 174-2 at 27, 43; *see also* Doc. 177, Ex. RRR (Officer Kurdziel asked Officer Reed,

_____

[3] Plaintiffs seek to raise a dispute over whether White called BPD's emergency line (911) or the non-emergency line.  (Doc. 180-1 ¶ 3.)  Any dispute on that point is not material to the issues here.

"should we go in with them?" and Officer Reed replied that they were instructed to "not get involved").)

Dennis White and his associate both carried firearms. (Doc. 111 ¶ 132.) At least one of the two men was wearing a jacket with the logo "United States Fugitive Task Force" on the back that also displayed a shield resembling a police badge. (*Id.* ¶ 137.) Mr. White's associate was wearing a dark coat or overshirt bearing the letters "W Bryant" in white. (*See* Doc. 183, Ex. D, 05:51–54.) Mr. White's unmarked and heavily tinted white Ford Crown Victoria was parked on the street in front of Ms. Kimbrell's home. The car was fitted with a spotlight beside the driver's side mirror. (Doc. 180-1 ¶ 11.) It had a Pennsylvania license plate. (Doc. 183 Ex. D, 00:38.)

Officers Reed and Kurdziel remained positioned on the sidewalk in front of Ms. Kimbrell's home as the bounty hunters searched inside the home for Luke Reinhardt. (*Id.* ¶ 12; *see also* Doc. 177, Ex. RRR.) The bounty hunters did not find Luke Reinhardt inside Ms. Kimbrell's home. (Doc. 180-1 ¶ 13.) Ms. Kimbrell was present in the home during the search.

There is conflicting evidence as to whether Ms. Kimbrell consented to the search. Mr. White testified that she did. (Doc. 173-16 at 146.) Ms. Kimbrell stated in her June 2024 declaration that the bounty hunters entered her home without her consent. (Doc. 173-74 ¶¶ 6–7.) She further stated that she noticed the BPD vehicles across the street when she first opened the door and that "[t]he presence of these police vehicles led me to believe the bounty hunter was working with the Buffalo police, which made me think his entry into my home was lawful and that I did not have the right to refuse him entry." (*Id.* ¶ 4.)

There is also conflicting evidence as to whether Ms. Kimbrell told the bounty hunters that they might find Luke by contacting his brother Jake Reinhardt. According to Mr. White's testimony, Ms. Kimbrell told him that Luke's brother would know where to find him.

(Doc. 174-10 at 11–12.)  According to Ms. Kimbrell's August 2024 declaration, she did not tell Mr. White or any other bounty hunter to contact Jake or otherwise "suggest that they check Jake's house to find Luke." (Doc. 180-2 ¶ 5.)  Notwithstanding that dispute, it is undisputed that Mr. White went to Jake Reinhardt's residence at 31 Oakdale Place the day after they searched Ms. Kimbrell's home.  (Doc. 180-1 ¶ 15.)

**Search of 31 Oakdale Place**

Jake Reinhardt ("Mr. Reinhardt") owns the two-family home at 31 Oakdale Place. (Doc. 173-72 ¶ 2; Doc. 180-1 ¶ 16.)  He and his fiancée, Taylor Schmeider, resided in the lower apartment with their young daughter.  (Doc. 173-72 ¶ 3; Doc. 180-1 ¶ 16)  Ms. Schmeider was eight months pregnant with the couple's second child at the time.  (Doc. 173-72 ¶ 3; Doc. 173-75 ¶ 2.)  Mr. Reinhardt's tenants, Kevin Harrington and Casey Carminati, resided in the upper apartment with their two young children.  (Doc. 173-72 ¶ 4; Doc. 180-1 ¶ 16.)

On his way to 31 Oakdale Place, like he did the day before, Mr. White called BPD shortly before midnight on January 10, 2021, and requested assistance from the police in executing a warrant.[4]  (Doc. 180-1 ¶ 17.)  BPD officers Jae Murphy, Roberto Torres, Spencer George, Colin Keenan, and Devon Salter-Brown were dispatched or responded to the scene of "bail enforcement asking for assistance with a search warrant for Luke Reinhardt."[5]  (*Id.* ¶ 18; *see also* Doc. 177, Ex. UUU.)  Officers Torres and George were the first to arrive at the scene,

---

[4] Similar to above, Plaintiffs seek to raise a dispute over whether White called BPD's emergency line (911) or the non-emergency line.  (Doc. 180-1 ¶ 17.)  Any dispute on that point is not material to the issues here.

[5] Although it is undisputed that this is what is reflected in the CAD notes for the police response, it is also undisputed that none of the defendants had a judicially issued warrant to search any of the residences at issue.  The only relevant warrant was the warrant for Luke Reinhardt's arrest.

but all the officers arrived in marked police vehicles at roughly the same time. (Doc. 180-1 ¶¶ 20–21.)

Like the day before, Mr. White and his associate were wearing "tactical gear and attire"; Mr. White was wearing a jacket with a shield resembling a police badge and with the "United States Fugitive Task Force" logo on the back. (*Id.* ¶ 23.) Officer Murphy testified that Mr. White "introduced himself as Agent White of – he was a bounty hunter looking for Luke Reinhardt with a warrant out of PA." (Doc. 174-5 at 51.)[6]

Officer Murphy further testified that Mr. White "specifically" told him that he (White) had a "search warrant." (*Id.* at 54.) Officer Torres testified that Mr. White provided the officers with a "briefing" and that Mr. White used the word "warrant," but that Torres could not recall exactly what Mr. White said or whether he stated what type of warrant was at issue. (Doc. 174-6 at 44–48.) Officer George testified that he recalled being dispatched to assist with a "search warrant" but that he did not recall any discussion with the bounty hunters about whether they had a "search warrant." (Doc. 174-7 at 28–29.) Officer Keenan similarly testified that dispatch advised him that the officers would be assisting with a "search warrant" but that he could not recall whether the bail agents ever mentioned a search warrant. (Doc. 174-8 at 39–40.) Officer Salter-Brown testified that the issue of a warrant came up when the BPD officers first met the bounty hunters at the scene, but that he did not know whether it was an arrest warrant or a search warrant. (Doc. 174-9 at 58–59.) Officer Salter-Brown also testified that Mr. White explained at the pre-search "rundown" that the residence to be searched was that of the fugitive's brother. (*Id.* at 48–59.)

---

[6] Plaintiffs dispute that White introduced himself as "Agent" White. It is unclear whether Officer Murphy's testimony is that White introduced himself using the word "Agent." The court concludes that any dispute on this point is not material.

White, his associate, and the five BPD officers walked toward 31 Oakdale Place. (Doc. 180-1 ¶ 27.)  Armed with long guns,[7] the two bounty hunters went onto Mr. Reinhardt's front porch.  (*Id.* ¶ 28.)  Facing the house, Officer Murphy initially positioned himself at the left front of the residence.  (*Id.* ¶ 29.)  Facing the house, Officer Salter-Brown remained positioned at the left side of the residence, and Officer Keenan positioned himself at the right front of the residence.  (*Id.* ¶¶ 30–31.)  Officers Torres and George were positioned at the right and left rear of the residence, respectively.  (*Id.* ¶¶ 32–33.)

Mr. White pounded on the front door of lower apartment and then loudly and forcefully announced, "Open it up or [we'll] kick it in."  (Doc. 111 ¶ 68.)[8]  Inside the apartment, Mr. Reinhardt asked from behind the closed door, "Who's that?"  (*Id.* ¶ 69.)  Mr. Reinhardt glanced out the hall window and noticed BPD officers in front of his house and in his neighbor's driveway, as well as a BPD vehicle parked on the street.  (Doc. 173-72 ¶ 15.)  Mr. White raised his shotgun and repeated, "Open up or [we'll] kick it in."  (Doc. 111 ¶ 70.)  Mr. Reinhardt again asked, "Who is that?"  (*Id.* ¶ 71.)  Mr. White responded: "Come down.  Open the door."  (*Id.* ¶ 72.)  Mr. White repeated, "Open the door, now!"  (*Id.* ¶ 74.)  By that time, Mr. Reinhardt had seen BPD officers on and near his property; he opened the front door and stated: "My hands are up, man."  (*Id.* ¶ 75.)

The bounty hunters both raised their guns and pointed them at Mr. Reinhardt as he opened the door.  (*Id.* ¶ 76.)  Mr. Reinhardt walked onto the front porch.  (Doc. 180-1 ¶ 35.)

---

[7] Mr. White had a 12-gauge Remington shotgun and his associate had an assault rifle (Doc. 174-10 at 34, 78).

[8] The BPD officers' body camera recordings document the events of the bounty hunters' announcement of their presence and the subsequent events from the officers' perspectives during the bounty hunters' search of the residence.  (Doc. 177, Ex. SSS.)

Officers Murphy and Keenan both moved closer to the front porch steps.  Officer Keenan went onto the porch steps but stepped off the steps about 15 seconds later.  (*Id.* ¶ 36.)  Mr. White told Mr. Reinhardt to secure his family.  Mr. Reinhardt walked back inside his house.  (*Id.* ¶ 37.)

Inside the house, Mr. White asked Mr. Reinhardt if he had any weapons inside the house. He responded, "I own a firearm, I do own a firearm." (*Id.* ¶ 38.)  Mr. White told Mr. Reinhardt, "If you have a firearm, you need to step back out" onto the porch.  Mr. Reinhardt remained inside the house.  (*Id.*)  When Mr. Reinhardt stated that he owned a firearm, Officer Keenan went back onto the porch steps.  (*Id.* ¶ 39.)

Mr. Reinhardt asked Mr. White, "Do you have a search warrant for this house?"  (*Id.* ¶ 40.)  Mr. White responded, "Yes I do."  (*Id.*)  Mr. White said to Mr. Reinhardt: "You're harboring a fugitive."  (*Id.* ¶ 41.)  Mr. Reinhardt denied that accusation and told Mr. White, "My brother is not here."  (*Id.*)  The bounty hunters walked inside Mr. Reinhardt's house over his objection.  (*Id.* ¶ 42.)  At the same time, Mr. Reinhardt asked the officers outside, "Are you Buffalo Police?" and Officers Murphy and Keenan walked up to the front door.  (*Id.* ¶ 43.)  One officer remarked, "this is their [the bounty hunters'] show, not ours."  (Doc. 183, Ex. O, 05:03–06.)

Officer Keenan moved past the outer front door into an entryway, believing that he was standing in a common area of a multi-unit house.  (Doc. 180-1 ¶¶ 44–45.)  Mr. Reinhardt asked, "Are you Buffalo?  You guys are letting this happen?"  (Doc. 111 ¶ 98.)  He told Officers Murphy and Keenan, "Get off my property!" and "Show me your search warrant!"  (*Id.* ¶ 100.)  The officers did not leave the front of the house.  While Mr. Reinhardt went to the back of the house, one of the officers on the front porch remarked to the other, "I'm surprised they [the

bounty hunters] only got like two guys with them. I guess that's why we're here." (Doc. 183, Ex. O, 09:33–39.)

Mr. Reinhardt returned to the front of the house and said to Officer Keenan, "At least get on the porch so I can shut my [expletive] door." (Doc. 180-1 ¶ 48.) Officer Keenan responded: "Leave the door open, those guys [the bounty hunters] are in there, just leave the door open." (*Id.*) Mr. Reinhardt slammed the inner front door shut. Officer Keenan joined Officer Murphy on the front porch. (*Id.* ¶ 49.) Talking with Officer Murphy, Officer Keenan remarked: "They [the bounty hunters] didn't say to come in with them. They just said to hold the perimeter." (Doc. 183, Ex. O, 10:43–50.) Officer Keenan further stated to Officer Murphy: "I don't even know what agency that is, either." (*Id.* 12:15–17.) Officer Murphy agreed, "Me either. They're from PA?" (*Id.* 12:18–22.)

Around the same time, Officer George thought that he heard a noise, so he opened a back door and stepped into a small hallway. The hallway had two staircases, one leading up and the other leading down to the basement. (Doc. 180-1 ¶ 50.) Officer George told Mr. Reinhardt, "I'm sitting here pulling security, man, that's all I'm doing." (*Id.* ¶ 51.) Mr. Reinhardt responded, "Pull security from outside, just cross that threshold, that's all." (*Id.*) Officer George stayed in the hallway.

The bounty hunters searched the lower and upper apartments at 31 Oakdale Place. According to Mr. Reinhardt, the bounty hunters damaged the back upstairs door during their search. (Doc. 173-72 ¶ 28.) They did not find Luke Reinhardt. After the search, they exited the house via the front door. (Doc. 180-1 ¶ 56.) The only paperwork they showed Mr. Reinhardt was a "Contingent Promissory Note." (Doc.173-72 ¶ 29.)

The BPD officers walked away from the building. (Doc. 180-1 ¶ 57.) During the events described above, neither Officer Torres nor Officer Salter-Brown entered the dwelling. (*Id.* ¶ 52.) None of the BPD officers drew a weapon on Plaintiffs. (*Id.* ¶ 53.) None of the BPD officers physically touched Plaintiffs. (*Id.* ¶¶ 53–54.) None of the BPD officers themselves damaged any of Plaintiffs' property. (*Id.* ¶ 55.)

**Aftermath and Subsequent Events**

In a recorded conversation with Mr. Reinhardt after the search at 31 Oakdale Place, BPD Lieutenant Joseph Nigro remarked that the incident was "a shame" and apologized on behalf of the BPD; he indicated that the incident was "a failure on our part." (*See* Doc. 173-22 at 66–67, 88, 91; Doc. 173-77 ¶¶ 120–124; Doc. 181 ¶¶ 120–124; Doc. 177, Ex. VVV.) In a statement to local media in February 2021, BPD Captain Jeffrey Rinaldo said that he had reviewed the surveillance footage available to him and concluded that the officers on the scene did not violate any BPD policy or procedure. (Doc. 173-20 at 32–34.) In Captain Rinaldo's view at that time, "it appeared to me that the officers were simply there to ensure that the situation did not spiral out of control." (*Id.* at 34; Doc. 177, Ex. XXX.)

Buffalo Police Commissioner Byron Lockwood became aware of the incident soon after the events. (*See* Doc. 173-15 at 22.) At his 2023 deposition in connection with this case, Commissioner Lockwood agreed that there were "failures" at BPD for not requiring the bounty hunters to provide information about their authority, not determining whether the bounty hunters were licensed, and telling the homeowners that there was a search warrant without confirming that there was. (*See id.* at 85–88.)

Later, Mr. White pled guilty to 10 misdemeanor charges stemming from the incident. He was sentenced to 60 days in jail and three years' probation. (Doc. 180-1 ¶ 58; *see also* Doc. 64-1

at 61.)  The BPD Internal Affairs Division ("IAD") investigated the incidents at Clinton Street and Oakdale Place.  (Doc. 180-1 ¶ 62; *see also* Doc. 177, Ex. QQQ (audio recordings of IAD statements).)  The IAD investigation resulted in discipline against Officers Keenan and George consisting of a "conference" with a deputy commissioner.  (Doc. 173-15 at 33, 36; Doc. 174-11 at 23.)  The deputy commissioner assigned to that conference did not schedule it until the first quarter of 2024.  (*See* Doc. 174-11 at 141–42 (February 2024 testimony regarding intent to "rectify" the lack of a conference).)

In March 2021, BPD issued a General Order entitled "Bail Enforcement Agent (Bounty Hunter) Policy" that included the following provisions, among others:

> (1) Officers shall not assist a bail enforcement agent in the recovery of a subject based on a bail bond contract, bail recovery contract, client contract, or any other type of surety contract, or personally engage in the recovery and surrender of a subject. Further, officers shall not be visibly present during any attempted recovery of a subject.

> (2) In accordance with § 74-a of the New York State General Business Law, any bail enforcement agent attempting the recovery of a subject within the municipal boundaries of the City of Buffalo shall notify the Buffalo Police Department on a form (P-1392) provided at Buffalo Police Headquarters. . . .

(Doc. 173-33 at 1.)  The referenced statute, § 74-a, took effect two decades before the incidents at issue in this case, in April 2001; it states:

> Prior to taking or attempting to take into custody a person, a bail enforcement agent shall notify a local law enforcement agency having jurisdiction over the area in which the person is believed to be located of such bail enforcement agent's intentions.  The notification shall be provided on a form prescribed by the local law enforcement agency.  Notwithstanding, the form shall include information including but not limited to name, address, local address and motor vehicle registration of said agent.  The local law enforcement agency in prescribing such form may consult with the division of criminal justice services.  A representative of a local law enforcement agency may accompany a bail enforcement agent when the bail enforcement agent enters what is believed to be an occupied structure to search for or to apprehend a person.

N.Y. Gen. Bus. Law § 74-a.

In May 2021, BPD officers went to Wayne Bryant's home in Buffalo and asked him some questions. (Doc. 173-32 at 9, 22; Doc. 177, Ex. WWW.) One of Mr. White's two Crown Victoria cars was parked in the driveway. (Doc. 173-32 at 42–43.) Mr. Bryant told the officers he did not know about the January 2021 incident with Dennis White. (*Id.* at 40.) He refused the officers' request to go with them for questioning. (*Id.* at 25, 40.)

### Summary Judgment Standard

"The summary judgment standards are well established." *Lewis v. Siwicki*, 944 F.3d 427, 431 (2d Cir. 2019). Summary judgment may be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When reviewing a motion for summary judgment, a court must "constru[e] the evidence in the light most favorable to the non-moving party and draw[] all reasonable inferences in [its] favor." *Edwards v. Arocho*, 125 F.4th 336, 346 (2d Cir. 2024) (quoting *Williams v. N.Y.C. Hous. Auth.*, 61 F.4th 55, 68 (2d Cir. 2023)). Where, as here, the court is faced with cross-motions for summary judgment, the court analyzes each motion separately, "in each case construing the evidence in the light most favorable to the non-moving party." *Capitol Records, LLC v. Vimeo, Inc.*, 125 F.4th 409, 418 (2d Cir. 2025) (quoting *Schwebel v. Crandall*, 967 F.3d 96, 102 (2d Cir. 2020)).

### Analysis

The court addresses the pending dispositive motions in reverse order, beginning with the issues raised in the City Defendants' Motion for Summary Judgment.

## I.    City Defendants' Motion for Summary Judgment (Doc. 174)

All of the claims against the City Defendants are brought under 42 U.S.C. § 1983 for alleged violations of Plaintiffs' rights under the Fourth and Fourteenth Amendments.

Section 1983 is not itself a source of substantive rights, but instead "allows an action at law against a 'person who, under color of [law] subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws.'" *Williams v. N.Y.C. Hous. Auth.*, 61 F.4th 55, 70 (2d Cir. 2023) (alterations in original; quoting 42 U.S.C. § 1983).[9]  The City Defendants seek summary judgment on each of the six § 1983 counts asserted in the Second Amended Verified Complaint. The court considers each of the City Defendants' arguments in turn.

A.      **State Action (All § 1983 Claims Against the Individual City Defendants)**

Before proceeding to the City Defendants' particular arguments against the individual claims, the court considers the City Defendants' argument that "absent state action, the officers committed no constitutional violation." (Doc. 174 at 24 n.10.)  As the Second Circuit has observed: "[I]n a § 1983 action brought against a state official, 'the statutory requirement of action "under color of state law" and the "state action" requirement of the Fourteenth Amendment are identical.'" *Barrett v. Harwood*, 189 F.3d 297, 301 (2d Cir. 1999) (quoting *Lugar v. Edmonson Oil Co.*, 457 U.S. 922, 929 (1982)).  If there was no "state action" (or action "under color of state law"), then all the § 1983 claims against the individual City Defendants would fail because deprivation by a person acting under color of state law is an essential element of all § 1983 claims.  *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 88 (2d Cir. 2015) (quoting *Feingold v. New York*, 366 F.3d 138, 159 (2d Cir. 2004)).

The City Defendants argue that "the officers' actions amounted to no more than carrying out their duties to prevent violence if the situation between Jake and the bounty hunters

---

[9] Section 1983 also applies to deprivations against any "other person within the jurisdiction" of the United States.  Plaintiffs' citizenship is not an issue in this case.

escalated." (Doc. 174 at 24 n.10.)  Under that view, the only relevant "action" was the purportedly *private* action of the bounty hunters, and the BPD officers' mere presence at the scene was not "state action" in aid of the private search for Luke Reinhardt.  On this point, the court considers the guidance available in *Barrett*.[10]

*Barrett* involved "the repossession of plaintiffs' truck by a tow truck operator who was acting at the behest of the seller of the vehicle"; a police officer was dispatched to the scene "to prevent a breach of the peace," and the officer's presence raised a question of "state action." *Barrett*, 189 F.3d at 298.  The *Barrett* court recognized that "no bright line has been drawn delineating the exact point at which an officer's presence and activities at the scene of a repossession become state action in aid of the repossession." *Id.* at 302.  But the court identified "a spectrum of police involvement," ranging from "mere presence at the scene (insufficient to constitute state action) to more "active" participation ("a point may be reached at which police assistance at the scene of a private repossession may cause the repossession to take on the character of state action"). *Id.*

### 1.    Events at 1329 Clinton Street

The City Defendants urge the court to conclude that the presence of Officers Reed and Kurdziel at 1329 Clinton Street on January 9, 2021, was on the "mere presence at the scene" range of the spectrum.  When Officer Reed relayed to his supervisor the fact that the request for assistance came from a bondsman, not a law enforcement officer, the supervisor instructed the officers on the scene that their role would be "ornamental" only.  Officers Reed and Kurdziel remained positioned on the sidewalk during the search.  Like the officer in *Barrett*, the actions of

---

[10] *Barrett* did not analyze the state action requirement as it applies to bounty hunters, but the court agrees that *Barrett* is "instructive" on the topic. *Lopez v. Zouvelos*, No. 13-CV-6474, 2015 WL 5657361, at *9 (E.D.N.Y. Sept. 23, 2015).

officers Reed and Kurdziel could be seen as "amount[ing] to no more than the carrying out of [their] duty to prevent violence in the event of a breach of the peace" such that there was no "state action" to facilitate the private search of Ms. Kimbrell's home. *Barrett*, 189 F.3d at 303.

However, this case is distinguishable on its facts from *Barrett* because it involves not a repossession of property, but an intrusion into a private residence. Moreover, under Rule 56, the court must view the evidence in the light most favorable to Plaintiffs. Ms. Kimbrell's testimony indicates that she saw both BPD police vehicles parked directly across the street when she opened the door for the bounty hunter. (Doc. 173-74 ¶ 4.) *See Barrett*, 189 F.3d at 302 (citing *United States v. Coleman*, 628 F.2d 961 (6th Cir. 1980), for the proposition that there was "no state action where police parked around [the] corner from [the] scene of repossession and were simply standing by in case of trouble"). And it appeared to Ms. Kimbrell from the outset that the bounty hunter was "working with the Buffalo police." (Doc. 173-74 ¶ 4.) *See Barrett*, 189 F.3d at 302 (citing *Menchaca v. Chrysler Credit Corp.*, 613 F.2d 507 (5th Cir. 1980), where repossessors did not summon police until *after* the debtor resisted them). Ms. Kimbrell also stated that the BPD officers' presence made her think that the bounty hunter's entry into her home was "lawful and that I did not have the right to refuse him entry." (Doc. 173-74 ¶ 4.) *See Barrett*, 189 F.3d at 302 (citing *Booker v. City of Atlanta*, 776 F.2d 272 (11th Cir. 1985), where police officer's arrival simultaneously with the repossessor gave the repossession a "cachet of legality" and intimidated the debtor into not exercising his rights). The court is not persuaded that the City Defendants are entitled to summary judgment on the § 1983 claims against Officers Kurdziel and Reed for lack of "state action" at 1329 Clinton Street.

18

### 2.    Events at 31 Oakdale Place

The evidence in the light most favorable to Plaintiffs indicates that the events at

31 Oakdale Place went even further along the spectrum described in *Barrett*.  Five BPD officers

were at the scene, and they surrounded the residence.  Officers Murphy and Keenan walked up to

the front door.  Officer Keenan moved into the home's entryway, and Officer George entered the

small hallway via the back door.  This was a significantly more "active role" in the search of the

residence.  *Barrett*, 189 F.3d at 303.  With respect to the events at 31 Oakdale Place, the City

Defendants are not entitled to summary judgment on the § 1983 claims for lack of "state action."

The court proceeds to consider the City Defendants' arguments for summary judgment on the

particular § 1983 claims in turn.  Because Officers Reed and Kurdziel—the only officers present

for the events at 1329 Clinton Street—are only named in Counts 4 and 5, the court focuses on the

events at 31 Oakdale Place for the majority of the claims.

### B.    Unreasonable Search and Seizure and False Imprisonment (Counts 1 and 2)

The Fourth Amendment protects "[t]he right of the people to be secure in their persons,

houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend IV.

Here, the BDP officers did not engage in the same kind of physical search of the residence that

White and Bryant did.  But the evidence in the light most favorable to Plaintiffs is that Officers

Keenan and George both moved into the home at 31 Oakdale Place.  That is a "search" for

purposes of the Fourth Amendment.  *See Batt v. Buccilli*, 725 F. App'x 23, 25 (2d Cir. 2018)

(summary order) ("A police officer's physical intrusion into an individual's home constitutes a

Fourth Amendment 'search.'"); *see also Kyllo v. United States*, 533 U.S. 27, 37 (2001) (a

"search" includes "any physical invasion of the structure of the home, 'by even a fraction of an inch'" (quoting *Silverman v. United States*, 365 U.S. 505, 512 (1961))).[11]

A search or seizure conducted without a warrant is "presumptively unreasonable." *United States v. Hines*, 140 F.4th 105, 112 (2d Cir. 2025) (quoting *Ruggiero v. Krzeminski*, 928 F.2d 558, 563 (2d Cir. 1991)). The same presumption applies to the warrantless arrest of a person in his own home. *United States v. Cattouse*, 846 F.2d 144, 146 (2d Cir. 1988) (citing *Payton v. New York*, 445 U.S. 573, 586 (1980)); *see also Forbes v. Doe*, No. 18-CV-06700, 2024 WL 329080, at *4 (W.D.N.Y. Jan. 29, 2024) (a § 1983 claim for false arrest or false imprisonment "rest[s] on the Fourth Amendment right of an individual to be free from unreasonable seizures" (quoting *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996)). "To surmount this presumption of unreasonableness, the government must show that one of the 'reasonable exceptions' to the warrant requirement applies." *Alexander v. City of Syracuse*, 132 F.4th 129, 147 (2d Cir. 2025) (quoting *United States v. Iverson*, 897 F.3d 450, 458 (2d Cir. 2018)). Here, as in *Alexander*, "two exceptions potentially come into play—consent and exigent circumstances." *Id.*

### 1.    Consent

The City Defendants assert that "Jake consented to Officers Murphy and Keenan entering and standing on the front porch of his home." (Doc. 174 at 21.) It is undisputed that Officer Keenan joined Officer Murphy on the front porch after Mr. Reinhardt told Officer Keenan to

---

[11] Moreover, a reasonable jury could find that the significant police presence at Mr. Reinhardt's home was sufficient to constitute a "seizure." *Cf. United States v. Weaver*, 9 F.4th 129, 142 (2d Cir. 2021) (en banc) ("[U]nder Fourth Amendment seizure law, a person has been seized if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." (cleaned up)); *United States v. Allen*, 813 F.3d 76, 85–86 (2d Cir. 2016) ("The protections of the home extend beyond instances of actual trespass.").

"get on the porch so I can shut my [expletive] door." (Doc. 180-1 ¶¶ 48–49.) To the extent that

Mr. Reinhardt gave his consent for those two officers to be on the porch, however, he

specifically objected to Officer George's presence in the small hallway behind the back door.

(*Id.* ¶¶ 50–51.) Mr. Reinhardt also told Officer Murphy to "Get off my property!" and

demanded, "Show me your search warrant!" (Doc. 111 ¶ 100.) More generally, no evidence

indicates that Mr. Reinhardt consented to a team of five officers surrounding his home. The

"consent" exception to the warrant requirement is not a basis on which to grant summary

judgment to the City Defendants.

### 2.      Exigent Circumstances

"The exigent circumstances exception applies when 'the exigencies of the situation make

the needs of law enforcement so compelling that a warrantless search is objectively reasonable.'"

*Alexander*, 132 F.4th at 147 (quoting *Kentucky v. King*, 563 U.S. 452, 460 (2011)). The City

Defendants assert that the circumstances in this case "were sufficiently exigent, tense, uncertain,

and quickly evolving, or at least arguably so, especially considering the guns involved and Jake's

hostility toward the bounty hunters and Officer Keenan." (Doc. 174 at 22.) Plaintiffs maintain

that "[a]ny 'exigency' was entirely of the BPD officers' own making." (Doc. 180 at 10 (citing

*Chamberlain v. City of White Plains*, 960 F.3d 100, 109–10 (2d Cir. 2020)).) In reply, the City

Defendants argue that, unlike the police in *Chamberlain*, the BPD officers in this case did not

demand entrance to the residence; instead, it was Mr. White who threatened to kick in the door if

Mr. Reinhardt did not open it. (Doc. 186 at 5.)

"Exigent circumstances exist when a reasonable person would believe that entry was

necessary to prevent physical harm to the officers or other persons, the destruction of relevant

evidence, the escape of the suspect, or some other consequence improperly frustrating legitimate

law enforcement efforts." *United States v. Porter*, No. 92-CR-88, 1993 WL 276958, at *8

(W.D.N.Y. July 20, 1993) (cleaned up). The facts in the light most favorable to Plaintiffs do not

indicate that any of those conditions were present here. The court is not persuaded that a merely

"tense" or "uncertain" situation qualifies.

A bounty hunter's search of a residence for a fugitive may frequently be tense, but the

Fourth Amendment does not grant a blanket exception for police officers at the scene to conduct

searches and seizures in every such context. The fact that Mr. White and his associate had guns

is not dispositive. *Cf. Kelly v. Las Vegas Metro. Police Dep't*, No. 12-cv-02074, 2014 WL

3725927, at *5 n.12 (D. Nev. July 25, 2014) (no exigency justified police's warrantless entry

where police responded that 911 call about a domestic disturbance after boyfriend—a bounty

hunter by trade who had been drinking and who had a handgun in the bedroom closet—broke

down the door at the couple's residence); *State v. Gutierrez*, 2008-NMCA-018, ¶ 19, 143 N.M.

422, 176 P.3d 1154 (no exigent circumstances where, accompanied by bail bondsman, police

made a warrantless entry into a third party's home); *Washington v. Commonwealth*, 496 S.E.2d

135, 138 (Va. Ct. App. 1998) (no exigent circumstances for officers' warrantless entry with a

bondsman; rejecting generalized argument of "potential for danger").

### 3. "Reasonable Suspicion" / *Terry*

Apart from the "consent" and "exigent circumstances" exceptions to the warrant

requirement, the City Defendants argue that "the officers had reasonable suspicion (or arguable

reasonable suspicion) to detain the plaintiffs under *Terry* [*v. Ohio*, 392 U.S. 1 (1968)] because

the officers reasonably believed that Jake was harboring a fugitive inside his residence."

(Doc. 174 at 21.) There is no dispute that, "[u]nder *Terry*, a police officer may briefly detain an

individual for questioning if the officer has 'a reasonable suspicion that the individual is, has

22

been, or is about to be engaged in criminal activity.'" *United States v. Padilla*, 548 F.3d 179, 186 (2d Cir. 2008) (quoting *United States v. Villegas*, 928 F.2d 512, 516 (2d Cir. 1991)). But Plaintiffs urge the court not to accept the City Defendants' "attempt to reframe this egregious home invasion as a mere *Terry* stop." (Doc. 180 at 7.) Citing *Maryland v. Buie*, 494 U.S. 325 (1990), the City Defendants insist the *Terry*'s principles apply in this case. (Doc. 186 at 4.)

Any investigatory stop under *Terry* "must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity." *United States v. Cortez*, 449 U.S. 411, 417 (1981). "Based upon [the] whole picture the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity." *Id.* at 417–18. It is true that New York law makes it a crime to harbor or conceal a person "who he knows or believes has committed a crime or is being sought by law enforcement officials for the commission of a crime." N.Y. Penal Law § 205.50(1). But here, the officers enabled the search of both apartments at 31 Oakdale Place; even if there was a basis to suspect Mr. Reinhardt of harboring his fugitive brother, there is no evidence of any basis to search the upper unit. *Cf. United States v. Segoviano*, 30 F.4th 613, 621 (7th Cir. 2022) (alleged "suspicion" cannot be "generalized to the building as a whole").

Moreover, even assuming that the officers had reasonable suspicion that Mr. Reinhardt was harboring his fugitive brother, no authority indicates that *Terry* applies to stops within a private residence under circumstances like this. Some circuits have held that "a *Terry* stop is inapplicable to stops in a home or its curtilage." *Segoviano*, 30 F.4th at 619. But, like the Seventh Circuit, the Second Circuit "has held that such a stop within a home's curtilage can be constitutional at least in some circumstances." *Id.* As explained below, however, this case is

23

unlike any of the limited circumstances where the Second Circuit has applied *Terry* in the context of a private residence.

The court agrees with the City Defendants that "a security sweep incident to a lawful arrest" is a potential exception to the warrant requirement. *See United States v. Oguns*, 921 F.2d 442, 446 (2d Cir. 1990) ("[F]ollowing an in-home arrest, officers may conduct a limited security sweep of the premises if they possess a 'reasonable belief based on specific and articulable facts that the area to be swept harbors an individual posing a danger to those on the arrest scene'" (quoting *Buie*, 494 U.S. at 325)); *United States v. Anderson*, No. 06-CR-6229, 2007 WL 4232706, at *4 (W.D.N.Y. Nov. 6, 2007) (recognizing "protective sweep" exception; citing *Buie*).[12]

And, more recently, the Second Circuit has gone further. The court held in *United States v. Gori* that *Terry* "must encompass" an encounter where "police standing in the hallway come face to face with the suspects through a door opened voluntarily by the suspects in response to a knock by an invitee"; in those circumstances, "the police should have the authority to briefly question and frisk the suspects." *United States v. Gori*, 230 F.3d 44, 56 (2d Cir. 2000).[13] Five years later, the court held that "specific, articulable facts giving rise to a reasonable inference of danger may justify a protective sweep in circumstances other than during the in-home execution of an arrest warrant." *United States v. Miller*, 430 F.3d 93, 100 (2d Cir. 2005).

---

[12] Two Justices dissented in *Buie*, describing the majority's holding as representing an improper extension of *Terry* "into the home." *Buie*, 494 U.S. at 339 (Brennan, J., dissenting)

[13] Then-Judge Sotomayor dissented in *Gori*, reasoning that "[t]he majority's authorization of *Terry* stops and investigations of individuals within the boundaries of a home is an unprecedented expansion of *Terry*." *Gori*, 230 F.3d at 63 (Sotomayor, J., dissenting).

24

The court accepts that *Terry*, *Buie*, *Gori*, and *Miller* stem from "the common understanding that the Fourth Amendment's reasonableness requirement is sufficiently flexible to allow officers who have an objectively credible fear of danger to take basic precautions to protect themselves." *Miller*, 430 F.3d at 98. But this case does not match *Terry* or any of the subsequent expansions. Here, five officers (together with two armed bondsmen) surrounded Mr. Reinhardt's private residence at night. *Cf. Terry*, 391 U.S. at 4 (daytime confrontation on the street, not a home). Although some of the officers might have believed that there was a search warrant or an arrest warrant, the only warrant—confirmed by Officer Reed in connection with the activities at Ms. Kimbrell's home—was an arrest warrant for Luke Reinhardt. But the residence in this case was Luke's brother Jake's home. *Cf. Buie*, 494 U.S. at 330 (arrest warrant authorized officers to search anywhere in Buie's (own) house; once inside, "the potential for danger justified a standard of less than probable cause for conducting a limited protective sweep"); *Steagald v. United States*, 451 U.S. 204, 205–06 (1981) (search for the subject of an arrest warrant in the home of a third party requires exigent circumstances or consent).

The *Gori* decision "depend[ed] on the fact that the officers' surveillance was interrupted by the arrival of the delivery person, which led the officers to observe the suspects through a door that had been opened independent of any action or request by the police." *Allen*, 813 F.3d at 85. Unlike the residence in *Gori*, Mr. Reinhardt's home was not a "known stash house." *Gori*, 230 F.3d at 46. Moreover, the officers in *Gori* made only a very limited intrusion that consisted of seeing the occupants of the stash house (who voluntarily exposed themselves to public view by opening the door), and by directing the occupants to step outside and submit to a brief investigatory detention. Even on those facts, *Gori* was a "close[]" case. *Allen*, 813 F.3d at 85. This case, by contrast, involves actual physical intrusion without a warrant into the home

of a third party. Last, but not least, *Miller* is distinguishable because none of the officers in this case had authority to enter the home. *Cf. Miller*, 430 F.3d at 95 ("[A]n officer in a home under lawful process, such as an order permitting or directing the officer to enter for the purpose of protecting a third party, may conduct a protective sweep" under *Buie*). The City Defendants cannot obtain summary judgment based on *Terry* or the "security sweep" exception in this case.

### 4.    Qualified Immunity

As a final argument for summary judgment on Counts 1 and 2, the City Defendants assert that they "should have qualified immunity on those claims because the officers reasonably believed that the bounty hunters entered Jake's house pursuant to a search warrant and for legitimate bail enforcement purposes." (Doc. 174 at 22.) Plaintiffs argue that "[t]he BPD officers' failure to verify the bounty hunters' credentials or legal authority before assisting in the raid of a private home is precisely the type of conduct that strips officers of qualified immunity." (Doc. 180 at 6.) And they maintain that the officers' conduct was "so clearly unconstitutional that any reasonably competent officer would have recognized the violation." (*Id.*) The City Defendants oppose each of Plaintiffs' points on this topic. (*See* Doc. 186 at 3–4.)

The qualified immunity doctrine has been the subject of significant criticism and debate, especially as it applies to the conduct of law enforcement officers.[14] Nevertheless, qualified immunity remains available as a defense to claims under § 1983. As the Second Circuit has recently explained:

---

[14] *See, e.g.*, *Hoggard v. Rhodes*, 141 S. Ct. 2421, 2421 (2021) (Thomas, J., statement respecting denial of certiorari) ("[O]ur qualified immunity jurisprudence stands on shaky ground."); *Green v. Thomas*, 129 F.4th 877, 890 (5th Cir. 2025) ("We readily acknowledge the legal, social, and practical defects of the judicially contrived qualified-immunity doctrine, but we are powerless to scrap it."); *McKinney v. City of Middletown*, 49 F.4th 730, 756 (2d Cir. 2022) (Calabresi, J., dissenting) ("[T]he doctrine of qualified immunity—misbegotten and misguided—should go.").

> [Qualified immunity] shields public officials, including law enforcement officers, from liability for civil damages under that statute insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. Because qualified immunity is an affirmative defense, it is for the official to claim that his conduct was justified by an objectively reasonable belief that it was lawful. In other words, it is incumbent upon the defendant to plead and adequately develop a qualified immunity defense.

*Linton v. Zorn*, 135 F.4th 19, 30–31 (2d Cir. 2025) (cleaned up). "In general, '[q]ualified immunity is applicable unless the official's conduct violated a clearly established constitutional right.'" *Id.* (alteration in original; quoting *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)). "The qualified immunity question is subject to a two-prong analysis to determine whether: (1) 'the facts that a plaintiff has alleged . . . or shown . . . make out a violation of a constitutional right' and (2) 'the right at issue was 'clearly established' at the time of the defendant's alleged misconduct.'" *Id.* (omissions in original; quoting *Pearson*, 555 U.S. at 232).

For the reasons discussed above, the evidence in the light most favorable to Plaintiffs indicates that the individual City Defendants violated Mr. Reinhardt's Fourth Amendment rights in connection with the events at 31 Oakdale Place. To the extent that the officers believed there was a warrant for Luke Reinhardt's arrest, the law was clearly established that a *search warrant* is generally necessary to enter the home of a third party when attempting to effectuate the arrest. *Steagald v. United States*, 451 U.S. 204, 205–06 (1981). To the extent that the officers thought that the exigent circumstances or consent exceptions applied, the court finds that a jury should evaluate the reasonableness of that conclusion. *See Outlaw v. City of Hartford*, No. 07-cv-01769, 2015 WL 1538230, at *5 (D. Conn. Apr. 6, 2015) (citing *Higazy v. Templeton*, 505 F.3d 161 (2d Cir. 2007), for the proposition that, "where facts concerning availability of qualified immunity defense are disputed, jury consideration is required"); *see also Eaton v. Estabrook*, 144 F.4th 80, 89 (2d Cir. 2025) ("In the qualified immunity context, pre-trial resolution of the defense of qualified immunity may be thwarted by a factual dispute." (cleaned up)). To the

27

extent that the officers believed that there was a *search warrant* for 31 Oakdale Place, the court similarly concludes that a jury should evaluate the reasonableness of that belief.

All of the discussion above regarding Counts 1 and 2 against the City Defendants concerns issues of *liability*.  The court does not address here any issue of *damages* that might flow from any finding of liability on these counts.  Plaintiffs conceded at the April 2025 hearing that damages for the officers' relatively brief entries just past the front and back entrances of the home would be "minimal."  But Plaintiffs assert that the violation is relevant to help prove liability against the City itself for failing to train the officers.[15]  The court considers the City's potential liability in the context of the *Monell* claim, below.

### C.    Excessive Force (Count 3)

The City Defendants' argument for summary judgment on the excessive-force count is concise: they assert that "it is undisputed that the officers used no force on the plaintiffs during the search of 31 Oakdale Place" and that "[n]o officer touched any plaintiff."  (Doc. 174 at 22.)  The City Defendants therefore contend that they are entitled to summary judgment on Count 3 because they were not personally involved in the use of any excessive force.  Citing *Hicks v. Craw*, 405 F. Supp. 3d 374, 385 (N.D.N.Y. 2019), Plaintiffs maintain that, even if BPD officers did not personally apply any force, they can be liable for excessive force because "they enabled and actively assisted armed bounty hunters who did use force and threaten Plaintiffs with weapons."  (Doc. 180 at 12.)  The City Defendants assert that *Hicks* is distinguishable.  (Doc. 186 at 5.)[16]

---

[15] Plaintiffs also advocate for joint and several liability among the City Defendants and defendants White and Bryant.  The court addresses that issue below.

[16] Referencing *Gerard v. City of New York*, 843 F. App'x 380 (2d Cir. 2021) (summary order), the City Defendants also asserted at the April 2025 hearing that even the bounty hunters' conduct—including pointing guns at Mr. Reinhardt—was not excessive force.  But the *Gerard*

As the Second Circuit has explained, "a plaintiff must establish a given defendant's personal involvement in the claimed violation in order to hold that defendant liable in his individual capacity under § 1983." *Patterson v. County of Oneida*, 375 F.3d 206, 229 (2d Cir. 2004). Direct participation in the use of force is one way that an officer can be "personally involved." Here, the evidence even viewed in the light most favorable to Plaintiffs does not indicate that any BPD officer directly used physical force during the events at 31 Oakdale Place.

However, as this court has noted, a police officer can also be personally involved in the use of excessive force if he was "present during the assault, yet failed to intercede on behalf of the victim even though he had a reasonable opportunity to do so." *Heyliger v. Krygier*, 335 F. Supp. 3d 482, 498 (W.D.N.Y. 2018) (quoting *Jeffreys v. Rossi*, 275 F. Supp. 2d 463, 474 (S.D.N.Y. 2003)); *see also Ogunbekun v. Town of Brighton*, No. 15-CV-6332, 2025 WL 1413211, at *9 (W.D.N.Y. May 15, 2025) ("[I]n actions involving multiple police-officer defendants, a defendant officer may be personally involved either because he directly violated the plaintiff's rights or because he failed to intervene to prevent another officer from violating such rights.").

This case differs from cases where the claim against officers is that they failed to intervene in the excessive force of other law enforcement officers. Here, the purported excessive force was employed by bounty hunters: Mr. White and his associate. The parties disagree as to whether Mr. White and his associate were private actors or should be deemed state actors. If they were private actors, the court notes that Count 3 invokes the Fourteenth Amendment, which imposes upon officers an obligation to the victim of private violence where the state had a

_____

court did not decide whether the detective who threatened to shoot the plaintiff in that case used excessive force because the court determined that the detective was entitled to qualified immunity. *Id.* at 382.

"special relationship" with the victim or where the officers "assisted in creating or increasing the danger to the victim." *Matican v. City of New York*, 524 F.3d 151, 155 (2d Cir. 2008). If either of those exceptions applied, or if White and Bryant were state actors, then the BPD officers could potentially be personally involved in any excessive force applied by White and Bryant on a theory of failing to intercede.

Under any of those scenarios, however, Plaintiffs have not explained how this theory of excessive force differs from the failure-to-intervene claim in Count 4. Indeed, the analysis in *Hicks* upon which Plaintiffs rely concerned a failure-to-intervene claim. The court therefore concludes that Plaintiffs' excessive-force claim against the individual BPD officers must rise or fall with the failure-to-intervene claim.[17] The court considers that claim next.

### D.    Failure to Intervene (Count 4)

The City Defendants cite *O'Neill v. Krzeminski*, 839 F.2d 9, 11 (2d Cir. 1988), for the proposition that "[p]olice officers have a duty to intervene and prevent constitutional violations committed by 'other officers,' not by private actors." (Doc. 174 at 23.) On that premise, the City Defendants' initial argument against the failure-to-intervene claim is that Mr. White and his associate were private actors, not state actors, because the BPD officers who were involved did not have in common with the bounty hunters a goal to violate Plaintiffs' rights. (*Id.*) In the City Defendants' view, "[t]he bounty hunters deceived the officers and gave the officers false information to secure the officers['] unwitting participation in their scheme." (*Id.* at 24.)

As the Second Circuit has recognized, "all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement *by other law*

---

[17] Plaintiffs agreed at the April 2025 hearing that Counts 3 and 4 should be evaluated together.

*enforcement officers* in their presence." *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994)

(emphasis added; citing *O'Neill*, 839 F.2d at 11).  Here, there is no dispute that Mr. White and

his associate were not law enforcement officers.  However, nominally "private" action can be

deemed "state action" if a plaintiff establishes both that: (1) his "alleged constitutional

deprivation was caused by the exercise of some right or privilege created by the State or by a rule

of conduct imposed by the State or by a person for whom the State is responsible"; and (2) "the

party charged with the deprivation is a person who may fairly be said to be a state actor."

*Grogan v. Blooming Grove Volunteer Ambulance Corps*, 768 F.3d 259, 264 (2d Cir. 2014)

(cleaned up); *see also Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982) (discussing two-

part "fair attribution" approach).

### 1.    Exercise of State-Created Right or Privilege

This element of the "fair attribution" test can be satisfied "when the private actor 'is a

willful participant in joint activity with the State or its agents.'"  *Betts v. Shearman*, 751 F.3d 78,

84 (2d Cir. 2014) (quoting *Ciambriello v. County of Nassau*, 292 F.3d 307, 324 (2d Cir. 2002)).[18]

To prove such willful participation, the private actor(s) and the state agent(s) must "share some

common goal to violate the plaintiff's rights."  *Id.* at 85 (citing *Cunningham v. Southlake Ctr. for

Mental Health, Inc.*, 924 F.2d 106, 107 (7th Cir. 1991)).  The City Defendants assert that the

evidence does not support any such "common goal" on the basis that "[t]he bounty hunters

deceived the officers and gave the officers false information to secure the officers['] unwitting

---

[18] Under these circumstances, the "fairly attributable" element may also be
simultaneously satisfied.  *See Lugar*, 457 U.S. at 932 n.15 (even without allegations of
unconstitutional statute or custom, "joint action of the private party and the police officer was
sufficient to support a § 1983 suit against that party").

participation in their scheme." (Doc. 174 at 24.)  Plaintiffs insist that the BPD officers were "active participants in the unconstitutional raid." (Doc. 180 at 14.)

The court concludes that it is unnecessary to determine here whether Mr. White, his associate, and the BPD officers shared a "common goal" to violate Plaintiffs' rights.  Instead, the first element of the "fair attribution" test is established because Plaintiffs do not dispute that Mr. White and his associate were (or at least purported to be) exercising rights or privileges created by the State of New York.  The Second Amended Verified Complaint alleges that, at all relevant times, Mr. White and his associate were acting within the scope of their employment and in their capacities as bail recovery agents for Buffalo Bail Bonds, a New York company.  (Doc. 111 ¶¶ 23–24.)[19]  New York law contemplates that bail enforcement agents are involved in "enforcing the terms and conditions of a person's release from custody on bail in a criminal proceeding, including locating, apprehending and returning any such person released from custody on bail who has failed to appear at any stage of a criminal proceeding."  N.Y. Gen. Bus. Law § 71(1-a).  There is, at minimum, a triable issue as to whether the bounty hunters were exercising state-created rights or privileges.  *Cf. Jackson v. Pantazes*, 810 F.2d 426, 429 (4th Cir. 1987) ("In seeking to apprehend Frank R. Jackson, a fugitive from justice, Pantazes, the bondsman, was exercising powers conferred on him by state law.").

---

[19] It appears to be undisputed that Mr. White and his associate did not individually hold licenses as New York bail enforcement agents, and that Buffalo Bail Bonds also did not hold such a license at the relevant times.  The lack of licensure arguably created potential liability under New York law.  *See* N.Y. Gen. Bus. Law § 70-a(3) ("Any person, firm, company, partnership or corporation who violates any provision of this section shall be guilty of a class B misdemeanor.").  But in the court's view, the lack of New York licensure does not alter the analysis as to the exercise of state-created rights or privileges.

32

## 2.    Unconstitutional Conduct "Fairly Attributable" to the State

The second element of the state-action test is satisfied upon a showing that the "allegedly unconstitutional conduct is fairly attributable to the State." *Grogan*, 768 F.3d at 264 (quoting *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50 (1999)); *see also Lugar*, 457 U.S. at 937 (defendant's conduct must be in some way "chargeable to the State"). A plaintiff makes that showing "by demonstrating that there is such a close nexus between the State and the challenged action that seemingly private behavior may be fairly treated as that of the State itself." *Grogan*, 768 F.3d at 264 (internal quotation marks omitted). "[T]here are a host of factors that can bear on the fairness of an attribution of a challenged action to the State." *Id.* (quoting *Fabrikant v. French*, 691 F.3d 193, 207 (2d Cir. 2012)); *see also Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 296 (2001) (listing examples); *see also Int'l Soc'y for Krishna Consciousness, Inc. v. Air Canada*, 727 F.2d 253, 255 (2d Cir. 1984) (per curiam) (observing that every inquiry into the question of state action is "fact-intensive").

As noted above, one such fact pattern is "when a private actor operates as a 'willful participant in joint activity with the State or its agents.'" *Brentwood*, 531 U.S. at 296 (quoting *Lugar*, 457 U.S. at 941); *see also Betts v. Shearman*, 751 F.3d 78, 84 (2d Cir. 2014) (same, quoting *Ciambriello v. County of Nassau*, 292 F.3d 307, 324 (2d Cir. 2002)). Other courts have held that the "fairly attributable" prong is satisfied "where the nature of the relationship between the state and private actors is one of interdependence, or 'symbiosis.'" *Jackson*, 810 F.2d at 430 (quoting *Burton v. Wilmington Parking Auth.*, 365 U.S. 715 (1961)).[20] The court concludes that Plaintiffs do not need to rely on either of these expansive theories.

---

[20] The *Jackson* court held that there was a "symbiotic relationship between bail bondsmen and the Maryland court system" sufficient to render the bondsman's conduct "state action." 810 F.2d at 430. Other circuits have declined to adopt a general rule that bondsmen are

As discussed above, the evidence in the light most favorable to Plaintiffs indicates that the events at 1329 Clinton Street and 31 Oakdale Place were on the "state action" end of the spectrum articulated in *Barrett*. More specifically as to whether Mr. White and his associate could be deemed state actors, the evidence supports a conclusion that the bounty hunters "acted together with [and] obtained significant aid from state officials." *Lugar*, 457 U.S. at 937. Indeed, the relevant events began when Mr. White called BPD and requested police assistance. *Cf. Ho v. City of Long Beach*, No. 19-cv-09430, 2022 WL 17682677, at *33 (C.D. Cal. Oct. 24, 2022) (summary judgment evidence supported conclusion that private neighbors acted under color of law, including evidence that they "frequently sought the aid of City officials"), *report and recommendation adopted* 2022 WL 17670401 (C.D. Cal. Dec. 13, 2022).

The bounty hunters were dressed and outfitted very similarly to law enforcement officers. *Cf. id.* (private neighbors "sought to clothe themselves with City authority"). Before announcing themselves at Mr. Reinhardt's residence, the bounty hunters and the BPD officers met, and the bounty hunters provided a "briefing." BPD officers surrounded the home. Officer Keenan thought that they were "holding the perimeter" because the two-man team (the bounty hunters) searching inside the home was not big enough to simultaneously perform the search and secure the perimeter. Officers interacted with Mr. Reinhardt verbally; in one instance Officer Keenan instructed Mr. Reinhardt to leave the door open. The facts in the light most favorable to Plaintiffs support their characterization of the events as a planned "raid" in which the bounty hunters and BPD officers acted in concert and the bounty hunters obtained significant aid from

---

necessarily in a "symbiotic relationship" with the state. *See, e.g.*, *Dean v. Olibas*, 129 F.3d 1001, 1006 n.4 (8th Cir. 1997) ("As a general matter, bondsmen are private citizens who interact with the state in the course of pursuing their private interests. Their conduct is therefore not attributable to the state."). For the reasons discussed below, the court need not take a position on this split of authority.

the officers. *See Ginsberg v. Healy Car & Truck Leasing, Inc.*, 189 F.3d 268, 272–73 (2d Cir. 1999) (evidence of a "concerted effort or plan" could support state action).

The court therefore concludes that Plaintiffs have adduced sufficient facts to prove that Mr. White and his associate should be deemed state actors. As such, the court rejects the City Defendants' argument that they had no duty to intervene to protect Plaintiffs' constitutional rights from infringement by the bounty hunters.

### 3.    Qualified Immunity

The final issue to consider is the City Defendants' alternative argument that they are entitled to qualified immunity on the failure-to-intervene claim "because the officers reasonably believed that the plaintiffs' rights were not being violated." (Doc. 174 at 24–25.) The qualified immunity principles outlined above apply to the City Defendants' motion for summary judgment on the failure-to-protect claim. For the same reasons as stated above with respect to the Fourth Amendment claim, the court concludes that the question of qualified immunity should be evaluated in the context of factfinding, not on summary judgment. Therefore, the City Defendants are not entitled to summary judgment on Counts 3 and 4.

### E.    Conspiracy (Count 5)

The essential elements of a conspiracy claim under § 1983 are: "(1) an agreement between a state actor and a private party; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Ciambriello*, 292 F.3d at 324–25; *see also Mitchell v. Chappius*, 750 F. Supp. 3d 123, 150 (W.D.N.Y. 2024) (same; quoting *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999)). "In order to sustain a conspiracy claim under 42 U.S.C. § 1983, a plaintiff must demonstrate that a defendant acted in a willful manner, culminating in an agreement, understanding or meeting of the minds, that

violated the plaintiff's constitutional rights." *Dill v. Village of Gowanda*, 952 F. Supp. 989, 995

(W.D.N.Y. 1997) (internal quotation marks omitted); *see also Kim v. Saccento*, No. 21-2865,

2022 WL 9583756, at *2 (2d Cir. Oct. 17, 2022) (summary order) (section 1983 conspiracy

claim against otherwise private defendants requires that they "acted in concert" with state actors

to commit an unconstitutional act; meaning there must be "a meeting of the minds, such that the

defendants entered into an agreement, express or tacit, to achieve the unconstitutional end"

(cleaned up)).

The City Defendants argue that there was no meeting of the minds because "the bounty

hunters, in essence, tricked the police officers." (Doc. 174 at 26.) In their memorandum in

support of their cross-motion, Plaintiffs concede that "the BPD officers genuinely believed they

were assisting another legitimate law-enforcement agency." (Doc. 173-78 at 13.) But Plaintiffs

maintain that the evidence demonstrates each of the elements of a § 1983 conspiracy and that

there was a "meeting of the minds." (Doc. 180 at 17–18.) Here, there appears to be no dispute

that the BPD officers agreed to be present at the scene with the bounty hunters and to provide the

level of assistance that they did. And, as discussed above, Plaintiffs have adduced sufficient

evidence of constitutional injuries in connection with the search. But the evidence, even in the

light most favorable to Plaintiffs, does not indicate that the BPD officers agreed to act in concert

with the bounty hunters *to achieve an unconstitutional end*.

The court rejects Plaintiffs' assertion that the officers' own testimony contradicts their

claim that the bounty hunters deceived them. The evidence does indicate that the bounty hunters

did not present the BPD officers with any search warrant before entering the residence at

31 Oakdale Place, and the officers did not ask to see a search warrant. (Doc. 173-17 at 50;

Doc. 173-19 at 56–57; Doc. 173-30 at 40–42; Doc. 173-31 at 28–29.) Officer Keenan testified

36

that, in response to Jake Reinhardt's assertion that there was no search warrant, Officer Keenan stated that "they have one." (Doc. 173-30 at 135.) But, even in the light most favorable to Plaintiffs, this evidence only establishes that the officers acted without verifying with the bounty hunters the assertion from the officers' dispatcher that the officers were sent to assist "bail enforcement" with a "search warrant."

The evidence would support a conclusion that the officers could have done more to ascertain the bounty hunters' identity and authority. But it does not contradict the notion that the bounty hunters deceived the officers. And, where the bounty hunters tricked the officers into participating in an unconstitutional search, the officers could not be said to have agreed in a joint plan to violate constitutional rights. *Cf. Tornheim v. Eason*, 175 F. App'x 427, 429 (2d Cir. 2006) (summary order) ("Because Tornheim claims that defendants Feder and Spindel submitted to Sheriff Eason an affidavit misrepresenting Tornheim's actions—in essence, tricking the Sheriff—it cannot be said that there had been a meeting of the minds between the private and state actors such that they had been 'jointly engaged' in a plan to deprive Tornheim of any rights.").

Plaintiffs offer a second theory in opposition to the City Defendants' motion for summary judgment on the conspiracy claim. Citing *United States v. Reyes*, 302 F.3d 48 (2d Cir. 2002), Plaintiffs contend that even if the officers were initially misled, they were "willful[ly] blind[] to the obvious illegality of the raid." (Doc. 180 at 18.) The City Defendants reply that, under *Reyes*, conscious avoidance can be used to prove a defendant's "knowledge" of a conspiracy's unlawful objective, but it cannot be used to prove "intent" to participate in a conspiracy. (Doc. 186 at 7.)

37

Analyzing conspiracy in the criminal context, the *Reyes* court noted that there are "two separate inquiries" as to intent to participate in such a conspiracy: (1) intent "to engage in the charged scheme," and (2) "knowledge of the unlawful aims of the conspiracy." *Reyes*, 302 F.3d at 54. To the extent that the elements of criminal and civil conspiracy are similar,[21] the court has already held that the evidence does not support a conclusion that the BPD officers agreed to act in concert with the bounty hunters to achieve an unconstitutional end. In other words, they officers lacked knowledge of any unlawful objective.

The evidence also fails to support a conclusion that the officers intended to engage in a conspiracy with the bounty hunters. The "conscious avoidance doctrine" may indeed apply equally in civil and criminal conspiracy cases. *See Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 84 n.14 (2d Cir. 2005) (noting, in the context of a discrimination claim, that "a party's knowledge of a disputed fact may also be proved though evidence that he consciously avoided knowledge of what would otherwise have been obvious him"). And the doctrine "may be invoked to prove defendant had *knowledge* of the unlawful conspiracy." *Reyes*, 302 F.3d at 54. The conscious-avoidance doctrine therefore applies to prevent a defendant from escaping justice "by deliberately refusing to confirm the existence of one or more facts that he believes to be true." *Id.*

But here, there is no evidence that at any time during the search the officers believed the bounty hunters lacked authority to enter and search the home. To the contrary, Officer Keenan's testimony indicates that he believed there was a warrant. (Doc. 173-30 at 135.) And even if any of the officers had some reason to suspect the authority of the bounty hunters, the most that the

---

[21] At least one court has held that the elements are identical. *Pizzuto v. County of Nassau*, 239 F. Supp. 2d 301, 309 (E.D.N.Y. 2003).

conscious-avoidance theory could do would be "to establish the defendant's knowledge of the aims of the conspiracy"; the doctrine cannot be used "to establish the defendant's intent to participate in the conspiracy." *Reyes*, 302 F.3d at 55.

For these reasons, the court concludes that the City Defendants are entitled to summary judgment on the conspiracy claim in Count 5. This conclusion makes it unnecessary to reach the City Defendants' alternative argument for qualified immunity on this claim.

### F.    *Monell* Claim (Count 6)

The sole claim against the City of Buffalo itself is the *Monell* claim in Count 6. Plaintiffs assert in Count 6 that the City failed to properly screen, supervise, train, and discipline BPD officers, and that City policies "allow[ed] individual bail recovery agents from New York and elsewhere to coordinate, direct, and perform searches of the homes and properties of City of Buffalo citizens." (Doc. 111 ¶ 238.) The City attacks the failure-to-train theory as unsupported by deliberate indifference to any pattern of similar violations by untrained employees, and also unsupported by failure to train for a particular "highly predictable constitutional danger." (Doc. 174 at 27.) The City further contends that "there is no proof that BPD had an unconstitutional policy of assisting bounty hunters" because "in fact, at the time of the incidents, there was no policy in place at all governing how officers should deal with bounty hunters." (*Id.* at 28.)

Plaintiffs insist that there is "overwhelming evidence of the City of Buffalo's deliberate indifference to the constitutional rights of its citizens." (Doc. 180 at 18.) They assert that the City: (A) had an unconstitutional policy or custom of assisting bounty hunters without proper oversight; (B) failed to train its officers on proper procedures for interacting with bail recovery agents; and (C) failed to discipline the BPD officers involved. (*Id.* at 19–22.) The City

maintains that it is entitled to summary judgment on the *Monell* claim for the reasons stated in its opening brief and in its brief in opposition to Plaintiffs' motion for summary judgment. (Doc. 186 at 7.)

As the *Monell* Court explained, a local government is liable under § 1983 "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). Plaintiffs concede that the asserted "policy" in this case is a "complete lack of any policy . . . regarding interactions with bounty hunters." (Doc. 180 at 19.) That is not sufficient because the absence of a policy "is not a policy and is not actionable under *Monell*." *Kiss v. Torres*, No. 21-CV-10391, 2024 WL 1210941, at *22 n.31 (S.D.N.Y. Mar. 19, 2024) (quoting *Zachary v. City of Newburgh*, No. 13-CV-5737, 2014 WL 1508705, at *5 (S.D.N.Y. Apr. 1, 2014)).[22] However, Plaintiffs rely on several alternative bases for *Monell* liability. The court discusses each in turn.

### 1.    Pattern of Misconduct

As the Second Circuit has explained, "*Monell*'s policy or custom requirement is satisfied where a local government is faced with a pattern of misconduct and does nothing, compelling the conclusion that the local government has acquiesced in or tacitly authorized its subordinates' unlawful actions." *Reynolds v. Giuliani*, 506 F.3d 183, 192 (2d Cir. 2007). "Such a pattern, if sufficiently persistent or widespread as to acquire the force of law, may constitute a policy or custom within the meaning of *Monell*." *Id.* Plaintiffs seek to establish a pattern of misconduct with reference to Mr. White's prior activities as a bounty hunter in the City. (Doc. 180 at 19.)

---

[22] This case therefore differs from *Little v. City of Saginaw*, 674 F. Supp. 3d 376 (E.D. Mich. 2023), where there was a written "Arrest, Search, and Transport Policy" at issue.

40

Dennis White testified that, before the incidents in January 2021, he was involved as a bounty hunter in more than 10 cases in the City of Buffalo. (Doc. 173-16 at 99–100.) He further testified that he contacted the City ahead of time in each case. (*Id.* at 100.) Of those instances, officials asked him for identification or proof of licensure only "two or three times." (*Id.* at 99.) Plaintiffs assert that "[t]his demonstrates a pattern of providing assistance to bounty hunters without proper verification." (Doc. 180 at 19.) The City maintains that "there is no proof that Buffalo police officers actually assisted White on these other recoveries, or that similar conduct to that challenged here occurred on the other recoveries." (Doc. 181 at 28.)

As to proof of BPD assistance in the prior bail recoveries, the court concludes that Plaintiffs are entitled to the reasonable inference that BPD officers did provide some level of assistance in one or more of the prior instances. And BPD officials in those prior instances might have failed to ascertain that Mr. White was not licensed as a bail enforcement agent in New York. But White's testimony undermines the conclusion that these failures occurred so frequently as to be "persistent and widespread." Mr. White stated that the times where he was asked for identification occurred in precincts other than the precinct where he usually operated because the officials there had "never seen me" or were "not used to dealing with me." (Doc. 173-16 at 99.) Thus, the evidence indicates that officials did ask for verification in precincts where Mr. White was unknown, and that in many of the remaining instances the officials did not make inquiries because they were already familiar with Mr. White.

In any case, Mr. White's lack of a New York license did not by itself violate anyone's constitutional rights, nor can the court reasonably infer that a constitutional violation resulted from any of the prior instances where Mr. White notified BPD that he would be carrying out a bail recovery operation. Of course, the absence of harm in any of the prior instances is not

41

necessarily determinative. *See Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 409 (1997)

("[E]vidence of a single violation of federal rights, accompanied by a showing that a

municipality has failed to train its employees to handle recurring situations presenting an obvious

potential for such a violation, could trigger municipal liability."). The court addresses one

instance of prior harm and the failure-to-train question next.

### 2.    Failure to Train

Although Plaintiffs have not supplied evidence that any of Mr. White's prior bounty

hunting activities in the City resulted in any harm to constitutional rights, Plaintiffs have

identified a prior incident where BPD involvement with other bounty hunters resulted in an

officer's death. As then-Buffalo Police Commissioner R. Gil Kerlikowske testified at a hearing

in Congress:

> On Wednesday, February 25, 1998, our officers answered a call about an individual
> who was wanted in Maryland and was riding on a city bus, further, that he was
> possibly armed. The call came through a cell phone and was from a bounty hunter
> and his assistants who were following the bus.
>
> The officers met the bus and the wanted person fled on foot, our officer [Robert
> McLellan] chased him across the expressway. Tragically, the officer was struck and
> killed by a car. The wanted individual was eventually arrested, however, in
> researching the Maryland warrant, it was determined that extradition applied only
> to surrounding states. In other words, we would not have arrested the suspect.

*Applying Federal Law to Bailbondsmen & Bounty Hunters: Hearing on H.R. 3168 Before the*

*H. Judiciary Comm. Subcomm. on the Constitution*, 105th Cong. (1998), 1998 WL 117553

[hereinafter Kerlikowske Testimony] (statement of R. Gil Kerlikowske, Comm'r of Police,

Buffalo, N.Y.).

Plaintiffs assert that, based in part on Officer McLellan's death in 1998, the State of New

York enacted General Business Law § 74-a, which took effect in 2001. Plaintiffs contend that

BPD failed to train its officers on the procedures required under § 74-a, and that Officer

McClellan's death put the City "on notice of the need for such training." (Doc. 180 at 19.) The City maintains that Officer McLellan's death more than 20 years before the incidents in this case cannot trigger liability because that event "had nothing to do with searches of homes or the Fourth Amendment." (Doc. 181 at 29.)

The Supreme Court has held that, consistent with *Monell*, "the inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton v. Harris*, 489 U.S. 378, 388 (1989); *see also, e.g.*, *Drawbridge v. Schenectady Cnty. Dep't of Soc. Servs.*, No. 23-1214, 2024 WL 1152524, at *1 (2d Cir. Mar. 18, 2024) (noting deliberate indifference requirement); *Little v. City of Saginaw*, 674 F. Supp. 3d 376, 389 (E.D. Mich. 2023) (same). Analyzing the examples discussed in *Canton*, the Second Circuit discerned "three requirements that must be met before a municipality's failure to train or supervise constitutes deliberate indifference to the constitutional rights of citizens": (1) "a policymaker knows 'to a moral certainty' that her employees will confront a given situation"; (2) "the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation"; and (3) "the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights." *Walker v. City of New York*, 974 F.2d 293, 297–98 (2d Cir. 1992).

Here, the court agrees with the City that the evidence—even in the light most favorable to Plaintiffs—does not support a conclusion that any City policymaker knew "to a moral certainty" that BPD officers would confront a scenario like that which occurred here. The evidence supports the general proposition that, in Commissioner's Kerlikowske's words, "irresponsible

bounty hunting" poses "a significant danger to innocent citizens and law enforcement agents."
Kerlikowske Testimony, *supra*. But nothing about Officer McLellan's death in 1998 or the
enactment of General Business Law § 74-a in 2001 suggested that BPD officers would
necessarily encounter the scenario that occurred in this case. To the contrary, the evidence of a
vanishingly small number of BPD interactions with bounty hunters that resulted in any physical
or constitutional harm suggests that this case was something of an outlier, not a "moral
certainty." There was no identifiable "pattern" of similar constitutional violations before the
events in this case. *See Drawbridge*, 2024 WL 1152524, at *1 ("Notably, '[a] pattern of similar
constitutional violations by untrained employees is ordinarily necessary to demonstrate
deliberate indifference for purposes of failure to train.'" (alteration in original; quoting *Connick
v. Thompson*, 563 U.S. 51, 62 (2011)).

Plaintiffs correctly note that the court in *Little* found the defendant city liable on a failure-
to-train theory. 674 F. Supp. 3d at 390. The court determined, among other things, that the
plaintiff in that case provided "ample 'evidence suggesting that the City [of Saginaw] did not
train or inadequately trained its officers that it is illegal to search a residence or individual based
on false information.'" *Id.* at 389 (alteration in original; quoting *Austin v. Mosley*, No. 20-CV-
12938, 2023 WL 2696202, at *4 (E.D. Mich. Mar. 29, 2023)). The city also failed to train the
defendants "on how to determine probable cause [and] to establish an exception to the warrant
requirement." *Id.*

The *Little* case is undoubtedly an example of the potential for municipal liability on a
failure-to-train theory. But the facts of that case are entirely different from the facts here. *Little*
did not involve any police interaction with bounty hunters. Instead, *Little* arose out of a situation
where, after receiving calls about a Black man in a tan coat breaking windows, officers followed

footprints in the snow at night and, without a warrant, entered the apartment of a white man with

a gray coat, arresting him for malicious destruction of property. *Id.* at 380. Failure to properly

make a probable cause determination—the kind of decision that arises routinely in police work—

is very different than the failures that occurred in this case with the bounty hunters. The court is

not persuaded that the conclusions about failure to train in *Little* control that issue in this case.

Although not discussed in the City Defendants' motion, Plaintiffs' motion for summary

judgment raises three additional grounds for *Monell* liability. (*See* Doc. 173-78 at 39.) The

court considers those next for completeness.

### 3.    Failure to Implement Regulations and Oversight

Plaintiffs contend that their *Monell* claim is also supported by "the City's failure to enact

basic oversight measures for bounty hunters that were legally required and necessary to prevent

constitutional abuses." (Doc. 173-78 at 44.) Plaintiffs assert that, if the City had been in

compliance with General Business Law § 74-a, then that law's "verification procedures would

have revealed the bounty hunters' complete lack of legal authority." (*Id.* at 45.) The City

concedes that it did not have the form required by General Business Law § 74-a at the time of the

incidents in this case. (Doc. 181 at 30.) But the City maintains that this failure was no more

than negligent; that there is no evidence that any policymaker made a conscious choice not to

create the form; and that the absence of the notification form did not cause the alleged Fourth

Amendment violation. (*Id.* at 30–31.)

The court agrees with the City on the question of mental state. As the Second Circuit has

stated, "mere negligence is insufficient to establish a *Monell* claim." *Garcia v. Bloomberg*,

662 F. App'x 50, 54 (2d Cir. 2016) (summary order) (citing *Amnesty Am. v. Town of W.

Hartford*, 361 F.3d 113, 128 (2d Cir. 2004)); *see also, e.g.*, *D.J. ex rel. Comfort v. Corning-*

*Painted Post Area Sch. Dist.*, 722 F. Supp. 3d 148, 166 (W.D.N.Y. 2024) ("Outside of a *Monell* claim for a policy of negligent hiring or retention, a general claim of negligence is not actionable under § 1983."). In the court's view, the undisputed fact that the City was not in compliance with § 74-a at the time of the incidents in this case establishes no more than negligence. Even though Officer McLellan's death in 1998 underscored the potential for harm in police interactions with bounty hunters, the City's failure to be in compliance with § 74-a does not amount to deliberate indifference to the possibility of constitutional violations such as occurred here.

### 4.    "Policymaker Admissions"

Plaintiffs assert that Lieutenant Nigro's statements to Mr. Reinhardt on the day after the search at 31 Oakdale Place—and Commissioner Lockwood's later testimony agreeing that there were failures at BPD in connection with the events here—constitute a concession that "deficient supervision of both the police and bounty hunters caused the constitutional violations in this case." (Doc. 173-78 at 45–46.) The City Defendants maintain that these statements are legal conclusions that are entitled to no weight at summary judgment. (Doc. 181 at 31.) Plaintiffs disagree, arguing that the police officials' statements are "factual admissions" and should also be considered as "part of a body of factual evidence demonstrating the City's deliberate indifference." (Doc. 187 at 21.)

The court agrees that Lieutenant Nigro and Commissioner Lockwood's statements are admissions that BPD erred in this case. But the court is not persuaded that the admitted errors in this case—alone or in combination with other evidence—are sufficient to prove a pattern of misconduct or deliberate indifference. Even in the light most favorable to Plaintiffs, and insofar

as the admissions might be "factual" as opposed to impermissible legal conclusions, the BPD leaders' statements do not support *Monell* liability.

### 5.     Deficient IAD Investigation and Failure to Discipline

Plaintiffs argue that there is further evidence of deliberate indifference based on Captain Rinaldo's media interviews "prematurely exonerating" the officers, an alleged "sham" IAD investigation, and BPD's failure to timely impose discipline after the determination that Officers Keenan and George should attend an office "conference." (Doc. 173-78 at 48.) The City maintains that the evidence does not support Plaintiffs' characterization of the IAD investigation as a "sham," and that, while the office conference was delayed, BPD promptly reacted to the incident by issuing the bounty hunter policy in March 2021. (Doc. 181 at 32.) Plaintiffs reply that the "sequence of events demonstrates a clear pattern of deliberate indifference," representing a "systematic failure to address known constitutional violations." (Doc. 187 at 22–23.)

The facts do not support Plaintiffs' characterization of the IAD investigation as a "sham." To the contrary, Plaintiffs concede that IAD "recommended and Commissioner Lockwood sustained findings against Officers Keenan and George for illegally entering and searching plaintiffs' homes." (*Id.* at 22.) To the extent that Captain Rinaldo suggested the officers on the scene acted properly, the IAD process correctly exercised its own judgment and reached a different conclusion. The delay in the disciplinary "conference" is perhaps inexplicable, but in the court's view it does not support deliberate indifference, particularly where BPD responded to the incident by promptly issuing a policy prohibiting officers from assisting bail enforcement recoveries or even being visibly present during such operations.

For all of the above reasons, the court concludes that the City is entitled to summary judgment on Count 6.

47

II.     **Plaintiffs' Motion for Partial Summary Judgment (Doc. 173)**

Plaintiffs seek partial summary judgment on nine issues. Mindful of the obligation to analyze this motion separately and to construe the evidence in the light most favorable to the non-moving parties, the court considers each of the nine issues in turn. Because default has already been entered against Mr. White and Mr. Bryant, the court focuses on the claims as against the remaining defendants.

A.     **State Action; Joint and Several Liability**

1.     **Summary Judgment for Plaintiffs as to State Action**

Plaintiffs first seek summary judgment on their contention that the bounty hunters were state actors who were jointly liable with the City Defendants. (Doc. 173-78 at 11.) The court has already concluded that the City Defendants are not entitled to summary judgment on their argument against finding state action as to the events at 31 Oakdale Place. As stated above, Plaintiffs have adduced sufficient facts to prove that the bounty hunters should be deemed state actors. Based on the analysis above, the court concludes that—even considering the evidence in the light most favorable to Defendants—Plaintiffs are entitled to summary judgment on the question of joint action between the bounty hunters and the BPD officers at 31 Oakdale Place.

Determining the presence of state action is factually intensive. *Int'l Soc'y for Krishna Consciousness*, 727 F.2d at 255. However, the relevant facts are undisputed, particularly because many of the events in this case are captured on multiple audio and visual recordings. And the court rejects the City Defendants' suggestion—based on *United States v. Poe*, 556 F.3d 1113 (10th Cir. 2009)—that they can avoid summary judgment on this issue because BPD did not instigate the searches and because the bounty hunters "did not intend to assist law enforcement." (Doc. 181 at 19.)

The question in *Poe* was whether "bounty hunters constitute state actors for purposes of the Fourth Amendment when they conduct a search in the course of seeking out a bail-jumper." 556 F.3d at 1117. The *Poe* court applied a two-part test, inquiring: (1) "whether the government knew of and acquiesced in the [individual's] intrusive conduct" and (2) "whether the party performing the search intended to assist law enforcement efforts or to further his own ends." *Poe*, 556 F.3d at 1123 (alteration in original; quoting *United States v. Souza*, 223 F.3d 1197, 1201 (10th Cir. 2000)). The court concluded that "bounty hunters do not qualify as state actors when, as here, they act without the assistance of law enforcement and for their own pecuniary interests." *Id.* at 1117.

Of course, *Poe* is factually distinguishable because the bounty hunters in this case did act with the assistance of law enforcement. Moreover, the test applied in *Poe* and *Souza* can be traced to the Ninth Circuit's observation in *United States v. Walther* that "two of the critical factors in the 'instrument or agent' analysis are: (1) the government's knowledge and acquiescence, and (2) the intent of the party performing the search." 652 F.2d 788, 792 (9th Cir. 1981). The "instrument or agent analysis" appears to be synonymous with the "state action" inquiry. *See Hines*, 140 F.4th at 112 (citing *Skinner v. Ry. Lab. Execs. Ass'n*, 489 U.S. 602, 614 (1989)). And the two factors identified in *Walther* (and ultimately imported in *Poe*) may indeed be important in many inquiries as to state action.

But, in the court's view, it would be contrary to Second Circuit law to insist that state action is present only when the putatively private actor intended to assist law enforcement efforts, and never the other way around. *See Grogan*, 768 F.3d at 264 (eschewing "rigid" criteria for state action inquiry). The fact pattern here—where the putative private actor, himself appearing to be a government agent, recruits and obtains the assistance of law enforcement—fits

comfortably among the set of cases where the acts of a private entity are attributed to the government.

### 2. Joint and Several Liability

Plaintiffs assert that, when private parties act jointly with police to violate an individual's civil rights, "the municipality is jointly and severally liable for the resulting constitutional injury." (Doc. 173-78 at 18.) Plaintiffs seek summary judgment holding the City Defendants jointly and severally liable with Mr. White and Mr. Bryant. (*Id.* at 21.) The City Defendants raise two arguments against granting summary judgment to Plaintiffs on that issue. First, they assert that the requested relief is unavailable on procedural grounds because "the plaintiffs' second amended verified complaint does not seek to impose joint and several liability on the defendants." (Doc. 181 at 16.) In addition to that procedural argument, the City Defendants oppose summary judgment on joint and several liability on a variety of substantive grounds. (*Id.* at 16–21.)

The court rejects the City Defendants' procedural argument. It is true that the Second Amended Complaint does not expressly mention joint and several liability. While a specific assertion of joint and several liability might have eliminated any doubt on this issue, the defendants opposing Plaintiffs' motion do not cite any authority indicating that joint and several liability is unavailable unless that phrase is used in the complaint. The authority the court has found indicates the contrary. *See, e.g., Cayuga Indian Nation of N.Y. v. Pataki*, 79 F. Supp. 2d 66, 70 n.7 (N.D.N.Y. 1999) ("[T]he fact that the plaintiff parties were not explicit in pleading this theory [joint and several liability] does not preclude the United States from making that argument on this pre-trial motion."); *Friedman v. Lawrence*, No. 90 Civ. 5584, 1991 WL 206308, at *3 (S.D.N.Y. Oct. 2, 1991) ("[P]laintiff does not specify whether he seeks to impose

joint or joint and several liability on the defendants, although the *ad damnum* clause of the complaint suggests that the liability sought is indeed joint and several.  In fact, plaintiff's allegations amount[] to an assertion of joint and several liability on all of its claims.").  Here, as in *Cayuga Indian Nation*, "[i]t is possible to infer from [the Second Amended Verified Complaint], particularly when read as a whole, that [Plaintiffs] are asserting joint and several liability." 79 F. Supp. 2d at 70 n.7.

The court also rejects the City Defendants' various substantive arguments that joint and several liability is unavailable.  The City Defendants correctly note (Doc. 181 at 17 n.3) that the consensus in the Second Circuit is that "there is no right to contribution in lawsuits brought pursuant to § 1983." *Bingham v. Rynkewicz*, No. 16-CV-06829, 2019 WL 275826, at *4 (W.D.N.Y. Jan. 22, 2019) (citing cases).[23] And the right of contribution evolved to alleviate the potentially harsh rule of joint and several liability.  *See Koster v. Perales*, 903 F.2d 131, 139 (2d Cir. 1990) (recognizing that joint and several liability can be "unjust" where the responsibility of the defendants is "significantly unequal"); Paul F. Kirgis, *Apportioning Tort Damages in New York: A Method to the Madness*, 75 St. John's L. Rev. 427, 429 (2001) (noting perceived harshness of traditional joint and several liability and subsequent reform efforts, including recognition of an action for contribution); *cf. United States v. Alcan Aluminum Corp.*, 755 F. Supp. 531, 542 (N.D.N.Y. 1991) (noting in context of toxic tort litigation that Congress

---

[23] *See also Davis-Guider v. City of Troy*, No. 17-CV-1290, 2019 WL 1101278, at *12 (N.D.N.Y. Mar. 8, 2019) ("[T]he federal courts in New York 'have generally held that there is no right to contribution in § 1983 actions.'" (quoting *Thomas v. City of Troy*, 293 F. Supp. 3d 282, 301 (N.D.N.Y. 2018))); 1 Sheldon H. Nahmod, *Civil Rights & Civil Liberties in Litigation: The Law of Section 1983*, § 4:8 (WL updated Sept. 2024) (reasoning that Supreme Court precedent "strongly suggests that defendants do not have a right of contribution under § 1983 as a matter of federal law").

had enacted a right of action for contribution "to help ameliorate the potential harshness resulting from a determination that a defendant's liability is joint and several").

But the court is not persuaded by the City Defendants' argument that the absence of a right to contribution in § 1983 actions necessarily means that "joint and several liability should not be applied in § 1983 litigation as a matter of federal law." (Doc. 181 at 17 n.3.) The City Defendants cite no authority for that proposition. To the contrary, federal courts, including this court, have endorsed joint and several liability in § 1983 cases. *See Watts v. Laurent*, 774 F.2d 168, 179 (7th Cir. 1985) ("Federal common law principles of tort and damages govern recovery under section 1983. It is axiomatic that where several independent actors concurrently or consecutively produce a single, indivisible injury, each actor will be held jointly and severally liable for the entire injury. In such a case the injured party may proceed to judgment against any or all of the responsible actors in a single or in several different actions." (citations omitted)); *Sowell v. Northrop*, 820 F. Supp. 2d 475, 477 (W.D.N.Y. 2011) (the "general rule" in this district is that "liability is joint and several" in § 1983 cases (citing *Beechwood Restorative Care Ctr. v. Leeds*, 811 F. Supp. 2d 667, 675–76 (W.D.N.Y. 2011))). The court therefore rejects the City Defendants' contention that joint and several liability is unavailable in § 1983 cases where there is no right of contribution.

The City Defendants further argue that joint and several liability is inappropriate because, in their view, "the bounty hunters do not qualify as state actors, a prerequisite to any viable § 1983 claim." (Doc. 181 at 17.) But the court has already concluded that Plaintiffs are entitled to summary judgment on the issue of whether the bounty hunters were state actors. The court therefore rejects the City Defendants' argument that this prerequisite is absent.

Anticipating the possibility of that conclusion, the City Defendants also contend that "even if the bounty hunters could be state actors, joint and several liability should not attach in this case because the culpability of the City defendants, if any, is significantly less than that of the bounty hunters." (Doc. 181 at 19.) For that argument, the City Defendants rely upon *Koster v. Perales*, 903 F.2d 131 (2d Cir. 1990). The defendants in that § 1983 case appealed from a judgment awarding attorney fees to the plaintiff class "to be satisfied jointly and severally by the defendants in their official capacities pursuant to 42 U.S.C. § 1988." *Id.* at 133. Affirming that award, the *Koster* court stated that district courts "may allocate the fee award between the responsible parties, setting the percentage for which each is liable where the claims against the defendants are separate and distinct or where culpability is significantly unequal . . . or it may hold the responsible parties jointly and severally liable for the fee award." *Id.* at 139. The court found no abuse of discretion in the district court's imposition of joint and several fee liability, in part because "the responsibility of the two defendants in this case is not significantly unequal as to make joint and several liability unjust." *Id.* at 139.

*Koster* is distinguishable. The appeal in that case involved only a question of apportioning liability for *attorney fees*; the court did not discuss apportionment of liability for damages. Moreover, even if *Koster* can be read as suggesting that district courts have discretion to elect to impose joint and several damages liability or instead to apportion damages liability, the court is not confident that it can weigh the significance of any inequality in responsibility as between the City Defendants and the other defendants to decide here as a matter of law that joint and several liability is (or is not) appropriate.

It is true that the BPD officers' intrusion on the home was far less than that of the bounty hunters. And the BPD officers did not draw their weapons, touch any of the plaintiffs, or

damage any of Plaintiffs' property.  On the other hand, Mr. Reinhardt has stated that the officers'

visible presence at the scene while the bounty hunters were banging on his door "made me

believe it was safe to open the door, as I thought there must be some misunderstanding that I

could resolve."  (Doc. 173-72 ¶ 17.)  According to his declaration, he "would not have opened

the door if I had not seen the Buffalo police officers outside."  (*Id.*)  A jury crediting that

testimony could find that the officers' presence was a cause of the search that followed.  And if a

jury finds for Plaintiffs on the failure-to-intervene claim, joint and several liability would

potentially be available.  *Cf. Richman v. Sheahan*, 512 F.3d 876, 885 (7th Cir. 2008) (Posner, J.)

(if officers "should have realized that their colleagues were using excessive force they had a duty

to intervene, for they were part of the arresting force").  As in *Beechwood*, "[w]hether defendants

should be held jointly and severally liable for [the] injury is an issue that can better be addressed

at trial."  811 F. Supp. 2d at 675.

   The City Defendants also attempt to invoke a possible exception to the general rule of

joint and several liability.  As stated in *Beechwood*, "liability among defendants in a § 1983 case

is joint and several—*at least in the usual case of one plaintiff with a single indivisible injury*."

*Beechwood*, 811 F. Supp. 2d at 675 (emphasis added; quoting *Thomas v. Cook County Sheriff's

Dep't*, 604 F.3d 293, 315 (7th Cir. 2010) (Sykes, J., dissenting in part)).  Plaintiffs assert that

they suffered an indivisible harm: "the violation of their Fourth Amendment rights."  (Doc. 173-

78 at 19.)  The City Defendants disagree, asserting that "there are five plaintiffs with divisible

injuries that are allegedly attributable to the actions of specific defendants, including the City

itself."  (Doc. 181 at 20.)  Plaintiffs reply that: (1) the presence of multiple plaintiffs does not

preclude joint and several liability; (2) their injuries, even if individualized, "stem from the same

coordinated and unconstitutional conduct"; and (3) joint and several liability can be appropriate even if damages need to be calculated separately for each plaintiff. (Doc. 187 at 6.)

Ultimately, nothing in *Beechwood*, or in Judge Sykes's description of the "usual case," limits joint and several liability to only the situations where there is one plaintiff with a single indivisible injury. This case might be "unusual" in that (as Plaintiffs concede) there are multiple plaintiffs, some of whom may have suffered individualized harms. But that is not a sufficient basis to rule out the possibility of joint and several liability.

Finally, this court's decision in *Boyd v. City of Buffalo*, No. 22-cv-00519, 2025 WL 262152 (W.D.N.Y. Jan. 22, 2025)—and *Boyd*'s discussion of *Restivo v. Hessemann*, 846 F.3d 547 (2d Cir. 2017), *cert. denied* 583 U.S. 1053 (2018)—prompted additional filings from the parties on the question of joint and several liability. (*See* Docs. 190, 191, 192.) The City Defendants assert that *Boyd* and *Restivo* both support their position that there is no joint and several liability in § 1983 cases. (Doc. 190 at 1.) Plaintiffs disagree (Doc. 191), and the City Defendants have filed a reply (Doc. 192).

*Restivo* was an appeal of a § 1983 case brought by two men after DNA evidence excluded them from contributing the DNA in a rape and murder for which they were convicted in 1986. A jury found for defendants on all counts, but the district court granted a new trial after finding prejudicial error related to a confession. The case proceeded to a second trial on § 1983 claims of malicious prosecution and deprivation of a fair trial against homicide detective Joseph Volpe, and also against an evidence technician involved in the criminal case. The State of New York was not a defendant at any stage of the civil proceedings. The jury in the second trial returned a verdict in the plaintiffs' favor and, after a separate damages trial, awarded $18 million in damages. The district court denied a post-trial motion to reduce the damages award based on

55

a prior $2.2 million settlement between the plaintiffs and the State of New York under New York's Unjust Conviction and Imprisonment Act. The executrix of the estate of Mr. Volpe (who passed away in 2011) appealed. *See Restivo*, 846 F.3d at 552–69.

Among other things, the estate argued on appeal that the jury's damages award should be set off by the $2.2 million settlement with the State of New York. *Id.* at 581–82. The Second Circuit rejected that argument, concluding that the district court correctly denied the setoff request. *Id.* at 587. Beginning with the initial question of the applicable law, the Second Circuit held that "federal law is deficient with respect to a scenario in which an absent settling party settles a claim distinct from the claim which is sent to the jury, the jury was never asked to consider or determine the liability of the absent settling party, and the full amount of loss is unknowable." *Id.* at 584. The court thus proceeded to consider "New York state law and the question whether New York law is inconsistent with federal policy underlying Section 1983." *Id.* The court found that New York law, "which provides for either a pro tanto (dollar for dollar) setoff or a setoff of the settling tortfeasor's equitable share of damages, whichever is greater, is inconsistent with federal policy underlying Section 1983." *Id.* at 585. The court explained that New York law on this issue was inconsistent with the deterrent goal of § 1983 because "it allows nonsettling tortfeasors to bear less than the full cost of the harm they inflicted if settling tortfeasors settle for more than their proportional share of liability." *Id.* at 586.

Having found that federal law was deficient in the scenario and that New York law was not available to fill the gap because it was inconsistent with federal policy, the *Restivo* court then considered "whether the district court was correct in applying a policy of proportional reduction based on the nonsettling party's proportionate share of liability." *Id.* Noting that "[e]lemental notions of fairness dictate that one who causes a loss should bear the loss," the court reasoned

that a nonsettling party was therefore "entitled to a setoff only of a settling tortfeasor's proportionate fault," rather than a dollar-for-dollar setoff. *Id.*  Considering whether Volpe was entitled to a proportionate reduction, the court noted that the jury is tasked with deciding the relative faults of the tortfeasors, but that the State of New York was not a defendant in the jury trial and was never found to have been at fault. *Id.*  The court concluded that "there is no basis for applying a setoff to the damages awarded on [the plaintiffs'] Section 1983 claims." *Id.* at 587.

The plaintiffs in *Boyd* were two men who brought civil rights claims against the County of Erie, the City of Buffalo, and individual Buffalo Police Department detectives after a 2021 New York Supreme Court decision vacated their convictions for a 1976 murder.  All of the defendants except for the County of Erie settled; the only remaining claims against the County were the plaintiffs' claims under *Monell v. New York City Department of Social Services*, 436 U.S. 658 (1978).  In light of the settlement, the County sought to amend its answers to include additional affirmative defenses, including a defense for "apportionment of liability." *Boyd*, 2025 WL 262152, at *1, 5.  The plaintiffs objected, arguing that "the Second Circuit, in *Restivo* or otherwise, has not explicitly addressed whether liability under § 1983 is joint and several." *Id.* at *9.  The plaintiffs cited cases holding that "defendants are jointly and severally liable under § 1983 and that apportionment of damages was reversible error." *Id.*

The *Boyd* court concluded that the *Restivo* decision, "though falling short of explicitly mentioning 'joint and several liability,' runs counter to the application of joint and several liability to Plaintiffs' *Monell* claims." *Id.*  The court reasoned that *Restivo*'s discussion of the circumstances under which apportioning damages could have been feasible was "a moot analysis if such apportionment was barred as a matter of law in § 1983 cases due to defendants' joint and

several liability." *Id.* at *9.  According to *Boyd*, *Restivo* supports the conclusion "that a defendant in a § 1983 action should be financially responsible for its fault, and only its fault, in causing a plaintiff's injuries." *Id.* at *7.  The court therefore allowed the County to add the "apportionment of liability" defense.

The court agrees with *Boyd* that *Restivo*'s discussion of the possibility of apportioning damages would not make sense if apportionment was barred as a matter of law in § 1983 cases due to defendants' joint and several liability.  But nothing in *Restivo* indicates that joint and several liability is, as a matter of law, categorically unavailable in § 1983 cases.  If, as contemplated in *Restivo*, the jury in this case "decide[s] the relative faults of the tortfeasors," 846 F.3d at 586, and if, as in *Koster*, those relative faults are not "significantly unequal," 903 F.2d at 139, then joint and several liability may be appropriate in this case.  The court cannot decide the question of joint and several liability on summary judgment.  As in *Beechwood*, "[w]hether defendants should be held jointly and severally liable . . . can better be addressed at trial."  811 F. Supp. 2d at 675.

### B.    Liability for Unlawful Searches, False Imprisonment

The court concluded above that the City Defendants are not entitled to summary judgment on the search-and-seizure and false-imprisonment claims in Counts 1 and 2.  The flip side of the coin is whether *Plaintiffs* are entitled to summary judgment on those claims.  Because of the audio and video recordings in this case, many of the relevant facts as to what occurred at the residence are undisputed.  However, there are disputes as to what the BPD officers (or what any reasonable officer) believed on the issues of the existence of a warrant and the applicability of the various exceptions to the warrant requirement discussed above.  Because the court

concludes that the qualified immunity defense must be decided in the context of evidence at trial, Plaintiffs are not entitled to summary judgment against the City Defendants on Counts 1 and 2.

### C.    Liability for Excessive Force; Failure to Intervene

The court has already concluded that the excessive-force claim against the City Defendants rises or falls with the failure-to-intervene claim. Whether the individual City Defendants are liable for failure to intervene and excessive force[24] depends on the outcome of the qualified immunity defense which, as noted above, the court cannot decide in favor of either party at this stage of the case. Plaintiffs are not entitled to summary judgment against the City Defendants on Counts 3 and 4.

### D.    Liability for Conspiracy

For the reasons discussed above, the City Defendants are entitled to summary judgment on the conspiracy claim. Plaintiffs' cross-motion for summary judgment against those defendants on the conspiracy count is therefore denied.

In addition to naming Mr. White and Mr. Bryant (against whom the clerk has entered a default) and the City Defendants, the conspiracy claim in Count 4 names Bail Shop, Mikheail, and BBBA. However, Plaintiffs' summary judgment motion as to Count 4 focuses entirely on the City Defendants; the motion offers no analysis as to how Bail Shop, Mikheail, or BBBA might be liable for conspiracy. To the extent Plaintiffs have not abandoned Count 4 as against Bail Shop, Mikheail, and BBBA, the court will deny this aspect of the motion without prejudice as inadequately briefed. *See Perfetto v. Erie Cnty. Water Auth.*, No. 03-CV-0439, 2006 WL

---

[24] Officers Kurdziel and Reed are not named as defendants in Count 3's excessive-force claim.

1888556, at *7 (W.D.N.Y. July 7, 2006) (denying summary judgment without prejudice due to inadequate briefing).

### E.    Qualified Immunity

Plaintiffs seek summary judgment in their favor on the City Defendants' qualified immunity defense. The court cannot decide that issue in favor of either party at this stage of the case. This aspect of Plaintiffs' motion is denied.

### F.    *Monell* Liability

For the reasons discussed above, the City Defendants are entitled to summary judgment on the *Monell* claims. Plaintiffs' cross-motion for summary judgment on that issue is therefore denied.

### G.    New York Claims Against Bail Shop, Mr. Mikhaeil, and BBBA

Finally, Plaintiffs seek summary judgment on the New York claims against Bail Shop, Mikhaeil, and BBBA on a vicarious liability theory. According to Plaintiffs:

> While bounty hunters Dennis White and Wayne Bryant were independent contractors rather than employees of Bail Shop LLC, Adel Mikhaeil, and Buffalo Bail Bonds Agency, Inc., the undisputed evidence establishes that these defendants are nevertheless vicariously liable for White and Bryant's torts under two exceptions to the general rule of non-liability for independent contractors' actions: (1) the "inherently dangerous activity" exception and (2) the "negligent hiring" exception.

(Doc. 173-78 at 50.) BBBA has filed an opposition (Doc. 182) and also has pending its own motion (now converted to summary judgment) seeking a ruling in its favor (Doc. 64). After counsel for Mikheail and Bail Shop withdrew, Mikheail entered an appearance on his own behalf. (*See* Docs. 179, 188, 189.) No attorney has since appeared on behalf of Bail Shop. Mikheail appeared at the April 2025 hearing and argued that he should not be held liable. Plaintiffs and BBBA have filed post-hearing briefs regarding liability and the legal positions of the corporate defendants. (*See* Docs. 203, 204.)

As the court previously ruled in this case, "an individual who hires an independent contractor is generally not liable for the torts of the independent contractor or the independent contractor's employees." (Doc. 65 at 26); *see also, e.g., Tesillo v. Emergency Physician Assocs., Inc.*, 376 F. Supp. 2d 327, 330 (W.D.N.Y. 2005) (citing cases). But there are exceptions to this general rule, including an exception for negligent hiring and an exception for assigning work that is inherently dangerous. (Doc. 65 at 26–27.) The court has already concluded—and it is now the law of this case—that "bail enforcement activities are inherently dangerous." (*Id.* at 32–33.) However, applicability of this exception would not support liability against BBBA, Mr. Mikheail, or Bail Shop if they never hired the bounty hunters (as employees or independent contractors) in the first place. The court considers that threshold issue as to Mr. Mikheail and the corporate defendants in turn.

### 1.    BBBA

BBBA asserts that "Dennis White and Wayne Bryant were not employees of BBBA, and neither did BBBA retain the services of these two defendants as independent contractors." (Doc. 182 at 2.) Nothing in Mr. Mikheail's testimony, recited above, definitively establishes the relationship between BBBA and the bounty hunters. However, Mr. White testified that he was never an employee of BBBA, and that BBBA's business as a bail bonds agency was distinct from the business of his bail enforcement company, the "U.S. Fugitive Apprehension Department." (Doc. 173-16 at 107, 139–140.) He also testified that he expected that Bail Shop (not BBBA) would be the source of any payment in connection with his work locating Luke Reinhardt. (*Id.* at 111–13.)

Tweneboa Saow, the brother of BBBA's owner Mr. Adu-Gyamfi, testified that Mr. White was not a BBBA employee, and that Mr. White was an "independent contractor" that BBBA had

contacted in the past when it needed his services. (Doc. 173-27 at 71.) But according to Mr. Saow, Mr. White was not acting as BBBA's independent contractor in this case, and instead BBBA merely referred Mr. White to Mr. Mikheail. (*See id.* at 71–72.) Mr. Adu-Gyamfi similarly stated that Mr. White was not a BBBA employee—and was, on information and belief, a Bail Shop employee—and that he "was not acting on behalf of [BBBA] with regard to the searches" at issue in this case. (Doc. 64-1 at 65, ¶¶ 4, 6.)

Mr. Bryant testified that he knew Mr. White since they were friends in high school. (Doc. 173-32 at 43–44.) Mr. White occupied the lower unit and Mr. Bryant occupied the upper unit of Mr. Bryant's mother's two-unit house. (*Id.* at 13, 80, 111–12.) Mr. Bryant knew that Mr. White was involved in bounty hunting. (*Id.* at 45.) Mr. Bryant was also interested in bounty hunting, and he testified that he attended a bounty hunter training course in March 2021. (*Id.* at 47.) The associate of Mr. White who accompanied him to 1329 Clinton Street was wearing a dark coat or overshirt bearing the letters "W Bryant" in white. (*See* Doc. 183, Ex. D, 5:51–54.) Mr. White testified that the individual who accompanied him to 1329 Clinton Street was the same individual who accompanied him to 31 Oakdale Place. (Doc. 173-16 at 121.)

Mr. Bryant testified, however, that he never assisted Mr. White with any bounty hunting. (Doc. 173-32 at 46, 101.) He testified that he did not recognize any of the individuals captured on the video or audio footage of the incident at 31 Oakdale Place. (*Id.* at 90, 99.) Based on the above evidence, there appears to be a dispute about whether Mr. Bryant was the individual who accompanied Mr. White during the search of 31 Oakdale Place. But there is no evidence sufficient to support the conclusion that either Mr. White or Mr. Bryant (if Mr. White's associate was Mr. Bryant) were acting as employees or contractors for BBBA.

The evidence on which Plaintiffs rely includes Mr. White's testimony that BBBA was the only bail bond company for which he took bail enforcement assignments. (Doc. 173-16 at 140.) Mr. Saow testified that he was aware that BBBA worked with bounty hunters other than Mr. White in the past, but that Mr. White was the only bounty hunter that he ever contacted while working at BBBA. (Doc. 173-27 at 12, 36.) According to Mr. Saow, Mr. White would use the fax machine at BBBA's office. (*Id.* at 76.) BBBA paid Mr. White's company "WNY Bail Enforcement Agency"[25] with six checks in 2019 for "skip tracing"/bounty hunting services. (Doc. 173-69.)

The court concludes that this evidence is insufficient to support a conclusion that BBBA engaged Mr. White or his company for bounty hunting services in connection with the search for Luke Reinhardt. The fact that BBBA paid Mr. White in the past for bounty hunting services does not prove that BBBA intended to pay Mr. White for any services in this case. Mr. White's occasional use of the fax machine at BBBA's office and the fact that BBBA was the only bail bond company for which he provided services similarly do not support a conclusion that his involvement in the search for Luke Reinhardt was on behalf of BBBA. The testimony of Mr. White himself, plus the statements from Mr. Saow and Mr. Adu-Gyamfi, all confirm that BBBA put Mr. Mikheail in touch with Mr. White, but that BBBA did not itself engage Mr. White to search for Luke Reinhardt on behalf of BBBA.

Notwithstanding the above, Plaintiffs offer another basis for holding BBBA liable. They assert that BBBA can be liable "for negligently referring Dennis White." (Doc. 203 at 10.) BBBA maintains that there can be no duty of care on this theory and that the court should not

---

[25] Mr. White testified that "WNY Bail Enforcement" was his company, in addition to his "U.S. Fugitive Apprehension Department" company. (Doc. 173-16 at 166.)

expand the law to recognize it. (*See* Doc. 204.) Before Plaintiffs advanced this "negligent referral" theory, the court perceived no "novel or complex issues of state law" in this case. (Doc. 65 at 24.) Plaintiffs now concede that their "negligent referral" theory of liability "appears to be a matter of first impression." (Doc. 203 at 5.) The court approaches Plaintiffs' request for expanding New York law with caution. *See Sullivan v. Saint-Gobain Performance Plastics Corp.*, 431 F. Supp. 3d 448, 452 (D. Vt. 2019) ("The federal courts do not serve as engines for change of state common law.").

Even the New York Court of Appeals "proceed[s] cautiously and carefully in recognizing a duty of care." *Davis v. S. Nassau Communities Hosp.*, 46 N.E.3d 614, 624 (N.Y. 2015). "Courts resolve legal duty questions by resort to common concepts of morality, logic and consideration of the social consequences of imposing the duty." *Id.* at 618 (quoting *Tenuto v. Lederle Labs., Div. of Am. Cyanamid Co.*, 687 N.E.2d 1300, 1302 (N.Y. 1997)). "A critical consideration in determining whether a duty exists is whether 'the defendant's relationship with either the tortfeasor or the plaintiff places the defendant in the best position to protect against the risk of harm.'" *Id.* (quoting *Hamilton v. Beretta U.S.A. Corp.*, 96 N.Y.2d 222, 233, 750 N.E.2d 1055 (2001)).

On that point, Plaintiffs assert that BBBA "was in the best position to verify White's qualifications before recommending him to Bail Shop." (Doc. 203 at 10.) The court is not persuaded. BBBA had no relationship with Plaintiffs. *Cf. Hamilton*, 96 N.Y.2d at 233 (duty may arise where relationship between defendant and plaintiff "requires defendant to protect plaintiff from the conduct of others"). And, as discussed above, BBBA's relationship with the bounty hunters in this case was neither an employment nor a contractor relationship, and certainly did not involve BBBA's control over the bounty hunters' actions. *Cf. id.* (duty may

64

arise where there is a relationship "between defendant and a third-person tortfeasor that encompasses defendant's actual control of the third person's actions"). New York courts in similar contexts have declined to impose a duty. *Cf. Cohen v. Wales*, 518 N.Y.S.2d 633, 634 (N.Y. App. Div. 1987) ("The mere recommendation of a person for potential employment is not a proper basis for asserting a claim of negligence where another party is responsible for the actual hiring.").

### 2.    Adel Mikheail & Bail Shop

It remains to consider whether Mr. Mikheail or Bail Shop hired the bounty hunters as independent contractors to search for Luke Reinhardt. If they did, then the "inherently dangerous activity" exception to the rule of nonliability would be available. The court concludes, however, that the evidence does not support Plaintiffs' contention that Mr. Mikheail engaged the bounty hunters to search for Luke Reinhardt on Mr. Mikheail's behalf. As discussed above, Mr. Mikheail connected Bail Shop with BBBA (and, in turn, with Mr. White), but Mr. Mikheail testified that his communications with BBBA and Mr. White were done as a "favor" to Bail Shop and that he was involved between Bail Shop, BBBA, and Mr. White because "sometimes bail bondsmen help each other" and it was "a matter of being kind." (*See* Doc. 173-14 at 97, 100, 101.) Even in the light most favorable to Plaintiffs, the evidence does not support a conclusion that Mr. Mikheail engaged the bounty hunters to perform services for him. The court therefore concludes that Plaintiffs are not entitled to summary judgment against Mr. Mikheail on a vicarious liability theory.

As to Bail Shop, the court has considered whether to analyze Plaintiffs' summary judgment motion on the merits as against that defendant, or instead whether Bail Shop's failure to comply with the court's order to appear via an attorney should result in default judgment.

(*See* Doc. 188; Doc. 196 at 2.)  The court concludes that Bail Shop's failure to respond to the summary judgment motion is not alone a sufficient basis to enter a default judgment. *See Jackson v. Fed. Exp.*, 766 F.3d 189, 197 (2d Cir. 2014) ("[W]hen a party, whether *pro se* or counseled, fails to respond to an opponent's motion for summary judgment, a district court may not enter a default judgment.  Rather, it must examine the movant's statement of undisputed facts and the preferred record support and determine whether the movant is entitled to summary judgment.").

On the other hand, Bail Shop's failures go beyond merely not filing an opposition to Plaintiffs' summary judgment motion.  In a text order dated January 22, 2025, court expressly ordered Bail Shop to enter an appearance via an attorney within 30 days.  (Doc. 188.)  In an Order dated April 4, 2025, the court noted that Bail Shop had not complied with the January 22 order and further suggested that a remedy for noncompliance might include default judgment. (Doc. 196 at 2.)  Neither Bail Shop nor an attorney for Bail Shop appeared at hearing on April 21, 2025.  The court therefore concludes that an order of default and a default judgment on liability should be entered against Bail Shop—not because it failed to file an opposition to the summary judgment motion, but because it failed to comply with the court's orders to appear by counsel.  *See Kiewit Constructors, Inc. v. Franbuilt, Inc.*, No. 07-CV-121, 2007 WL 4405029, at *2 (W.D.N.Y. Dec. 14, 2007) (granting default judgment on liability against corporate defendant that failed to comply with court order to appear by counsel).

## III.    Buffalo Bail Bonds Agency, Inc.'s Motion for Summary Judgment (Doc. 64)

The court has concluded that Plaintiffs are not entitled to summary judgment on their claims against BBBA.  And the court's analysis of Plaintiffs' summary judgment motion as to the claims against BBBA establishes that Plaintiffs cannot recover against BBBA.  The court

will therefore grant BBBA's summary judgment motion. Plaintiffs' motion to strike exhibits from BBBA's reply memorandum in support of its summary judgment is denied as moot.

### Conclusion

The City Defendants' Motion for Summary Judgment (Doc. 174) is GRANTED IN PART and DENIED IN PART. The motion is granted with respect to the conspiracy claim against the individual City Defendants in Count 5 and the *Monell* claim against the City in Count 6. The motion is otherwise denied.

Plaintiffs' Motion for Partial Summary Judgment (Doc. 173) is GRANTED IN PART and DENIED IN PART. The motion is granted insofar as Plaintiffs are entitled to summary judgment that the events at 1329 Clinton Street and 31 Oakdale Place constituted state action. Plaintiffs are also entitled to an order of default and a default judgment on liability against Bail Shop. The motion is otherwise denied.

Buffalo Bail Bonds Agency, Inc.'s Motion for Summary Judgment (Doc. 64) is GRANTED.

Plaintiffs' Motion to Strike (Doc. 165) is DENIED as moot.

The jury trial in this case remains scheduled to begin on December 1, 2025.

Dated this 21st day of August, 2025.

Geoffrey W. Crawford, Judge
United States District Court