1                    **UNITED STATES DISTRICT COURT**
                     **WESTERN DISTRICT OF NEW YORK**
2

3    JAKE M. REINHARDT, et al.,        )
                                       ) Case No. 1:21-CV-00206
4                                      )                   (GWC)
                     Plaintiffs,       )
5                                      )
     vs.                               ) April 21st, 2025
6                                      ) 1:33 p.m.
     THE CITY OF BUFFALO, et al.,      )
7                                      )
                     Defendants.       )
8

9                    **TRANSCRIPT OF MOTION HEARING**
            **BEFORE THE HONORABLE GEOFFREY W. CRAWFORD**
10                  **UNITED STATES DISTRICT JUDGE**

11
     APPEARANCES:
12
     For the Plaintiff:   DAVENPORT LAW PLLC
13                        BY:  CHAD A. DAVENPORT, ESQ.
                          New York
14                        6384 Deanna Drive
                          Hamburg, NY 14075
15
                          RUPP PFALZGRAF LLC
16                        BY:  MATTHEW GABALSKI, ESQ.
                               R. ANTHONY RUPP, III, ESQ.
17                        1600 Liberty Building
                          424 Main Street
18                        Buffalo, NY 14202

19   For the Defendant:   CORPORATION COUNSEL
                          THE CITY OF BUFFALO
20                        BY:  DAVID M. LEE, ESQ.
                          1100 City Hall
21                        65 Niagara Square
                          Buffalo, NY 14202
22
                          LAW OFFICE OF JOY A. KENDRICK
23                        BY:  JOY A. KENDRICK, ESQ.
                          107 Statler Towers, Suite 1534
24                        Buffalo, NY 14202

25

1    APPEARANCES CONTINUED:

2    Court Reporter:        MEGAN E. PELKA, RPR
                            Robert H. Jackson US Courthouse
3                           2 Niagara Square
                            Buffalo, NY 14202
4                           Meganstranscripts@gmail.com

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE CLERK:  Your Honor, we are here in case number

2   21-CV-206, Reinhardt, et al. vs. The City of Buffalo, et al.

3   for a motion hearing.  Counsel and any pro se person, please

4   state your name for the record.

5          MR. RUPP:  Good afternoon, Your Honor.  R. Anthony

6   Rupp, III, Rupp Pfalzgraf.  I'm joined by my colleagues today,

7   Chad Davenport and Matthew Gabalski.

8          THE COURT:  Mr. Rupp and?

9          MR. RUPP:  This is Mr. Davenport.

10          THE COURT:  Davenport.

11          MR. RUPP:  And this is Mr. Gabalski.  I understand he

12   hasn't noticed his appearance.  He won't be arguing here

13   today, Judge, but he's here to provide moral support.

14          THE COURT:  Absolutely.  I'm sure it will be welcome.

15     And, Mr. Rupp, you're going to take the laboring order?

16          MR. RUPP:  Judge, we have it broken down a little bit

17   by topic.  It depends how Your Honor wants to run oral

18   argument.

19          THE COURT:  Okay.

20          MR. RUPP:  I'm going to be handling the joint action,

21   joint and several liability Monell aspects of our affirmative

22   summary judgement motion.

23          THE COURT:  Right.

24          MR. RUPP:  My colleague, Mr. Davenport, will be

25   handling the rest of the motions, and most of the rest of the

1    arguments, but we're happy to freeform it any way Your Honor

2    would like.

3              THE COURT:  Yeah.  No.  That's fine.

4              MR. RUPP:  Okay.  Thank you, Judge.

5              THE COURT:  Yeah.  Good.  Thank you.

6         All right.  And for the defense?

7              MR. LEE:  Good afternoon, Your Honor.  David Lee,

8    Assistant Cooperation Counsel for the City of Buffalo

9    defendants.

10             THE COURT:  So, that's all the police officers and

11   the City itself?

12             MR. LEE:  Correct, Your Honor.

13             THE COURT:  Anybody else?  That's it, I think.

14             MR. LEE:  That covers it.  Yeah.

15             THE COURT:  That's enough.  All right.

16             MS. KENDRICK:  Good afternoon, Your Honor.  I'm Joy

17   Kendrick and I'm representing Buffalo Bail Bonds Agency, the

18   defendant -- one of the defendants.

19             THE COURT:  Before we dive in, I -- just some

20   housekeeping and -- oh, and we have Mr. Mikheail on Zoom.  I

21   don't see him.

22        Mr. Mikheail, are you there?  He's probably mute.

23             THE CLERK:  Sir, could you please speak into your

24   microphone?  Mr. Mikheail, could you hear us?  Sir, are you

25   able to hear us?  Mr. Mikheail, we seem to have a bit of a bad

1  connection.  Sir, could you please exit the Zoom hearing and

2  ring back in, and we will allow you to come back into the

3  meeting?  We seem to have a bad connection.

4  (An off-the-record discussion was held.)

5          THE COURT:  All right.  So, Mr. Mikheail, it's

6  Judge Crawford.  Can you hear me okay?

7          THE DEFENDANT:  Yes, Your Honor.  I can hear you.

8          THE COURT:  I'll grant motion 197, your motion to

9  appear remotely, allow you to participate by telephone, and

10  appreciate your cooperation coming today.

11     Couple of defendants are missing in action, and I'm going

12  to make sure you weren't looking for anything from the Court.

13  I think you have a clerk's certification for the two

14  individuals, White and Bryant.  They're default.  Is that

15  right?

16     Oh, no, Mr. Mikheail, it's not for you.  I'm talking to

17  the lawyers.

18          MR. DAVENPORT:  Yes, Your Honor.  It's my

19  understanding that those have been sent over to Mr. Mikheail,

20  and that any other paperwork associated with Your Honor's

21  orders have been sent over as well.  That's my understanding

22  from Your Honor.

23          THE COURT:  Yeah.  I meant more on the substance of

24  default against people who haven't appeared.

25          MR. DAVENPORT:  Oh, that's substantive?  We have

 1   taken default against them.  That is correct, Your Honor.

 2   Yes.

 3            THE COURT:  Okay.  Do you need anything from the

 4   Court, like a damages hearing, or are you just going to put it

 5   off?

 6            MR. DAVENPORT:  Well, no.  We would like a damages

 7   hearing on that including, I guess, determining how we would

 8   proceed.  Would it be, you know, a full trial with all the

 9   other defendants after the summary judgement motions --

10            THE COURT:  Right.

11            MR. DAVENPORT:  -- or in terms of a damages-only

12   hearing against just those specific defendants?  I'm not -- we

13   haven't, I guess, made a final determination.  I think it

14   would kind of depend on what the outcome of the summary

15   judgement motion is as well.

16            THE COURT:  Yeah.  Fair enough.

17            MR. DAVENPORT:  Okay.

18            THE COURT:  Maybe we could do it after a trial?

19            MR. DAVENPORT:  Yes.  That is certainly an option as

20   well.

21            THE COURT:  Would you, kind of, give that some

22   thought?  Because we get all dressed up and here for a day and

23   maybe not much consequence.  So, we'll, kind of, follow your

24   lead on that, but I think it might make sense to put any kind

25   of default proceeding, like a damages hearing, after a trial

 1  only involving the defendants who have come.

 2     Bail Shop LLC, I wasn't sure where that one stood.

 3          MR. DAVENPORT:  So, Your Honor, we never received a

 4  response to our summary judgement motion.

 5          THE COURT:  Right.

 6          MR. DAVENPORT:  It's my understanding that there has

 7  been no response that has been filed by Bail Shop, LLC, and

 8  that no appearance has been filed by any attorneys --

 9          THE COURT:  Right.

10          MR. DAVENPORT:  -- regarding their appearance as

11  well.

12          THE COURT:  So, is it, really, the same question?  Do

13  you need anything from me regarding a default?

14          MR. DAVENPORT:  I think so, Your Honor.  I think what

15  we're going to have to ask for is, based on their failure to

16  respond to default judgements, with our summary judgement

17  motion being granted against them.

18          THE COURT:  Okay.

19          MR. DAVENPORT:  Well --

20          THE COURT:  I guess it's a little odd to do that, to

21  grant summary judgement against someone who has never

22  appeared, but --

23          MR. DAVENPORT:  Oh, they did appear, Your Honor.  So,

24  they initially were represented by Matthew Weisberg.

25          THE COURT:  I remember.

1          MR. DAVENPORT:  And so, he ended up withdrawing his

2     appearance, I believe, back in the fall of last year.  And

3     Your Honor ended up --

4          THE COURT:  Yeah.

5          MR. DAVENPORT:  -- entering an order saying enter a

6     new appearance within 30 days, but no one ever entered a new

7     appearance for Bail Shop.  So, they haven't responded to the

8     summary judgement motion.

9          THE COURT:  I'm with you.  Okay.  So, I could wait

10    for a motion from you telling me that you would like to move

11    forward on that one?

12         MR. DAVENPORT:  Yes, Your Honor.

13         THE COURT:  All right.  Anybody else who is in the

14    missing group?

15         MR. DAVENPORT:  No, Your Honor.  I actually think

16    that everyone else has appeared and responded to the motion.

17         THE COURT:  All right.  Good.  Thank you.

18      Finally, so I don't forget to do it, two things.  I will

19    speak with Magistrate Judge McCarthy, and I think there was a

20    little confusion, more on my part than none on his, because I

21    don't work in a district court that uses this referral process

22    so commonly, but I'll take back from him all of the pending

23    summary judgement motions that we're hearing today.  That's

24    why I'm here, and I'll get an entry in so that is clear.

25      He'll remain, I'm sure, on the case as your settlement

1   judge.  I'll stay out of that conversation, let you all have

2   it with him privately.  And I suppose it must be at the end of

3   discovery.  But if there were issues, he, I know, will step

4   forward and hear those.  But I'll take the summary judgement

5   part back and deal with it directly.

6       And I was looking for a trial the first week in December

7   for whatever remains after all of the summary judgement

8   briefing and decision by the Court.  It may be that the

9   defendants are -- win on everything, in which case it's

10  unnecessary, but I wanted to save that time if we can.  How

11  does that work for the plaintiffs?

12          MR. RUPP:  Judge, that preliminarily looks good for

13  me.

14          MR. DAVENPORT:  And for me as well.

15          THE COURT:  Okay.  It's kind of an odd time to take a

16  vacation.  It's a good time to come get some work done.

17      How about from the defense?

18          MR. LEE:  Judge, I don't have my trial calendar in

19  front of me right now, but as long as I have no other trials

20  in December, yes, I'm available.

21          THE COURT:  Okay.

22          MS. KENDRICK:  Did you say December, Your Honor?

23          THE COURT:  I'm sorry?

24          MS. KENDRICK:  Did you say in December?

25          THE COURT:  In December, yeah.  But if I set a date

1    now, gosh, at my age, every time I look up, it's Christmas.

2    And we'll be there before we know it.

3         MS. KENDRICK:  Yes.

4         THE COURT:  And you'll have saved it on your

5    calendars, and we won't have the problem of people with --

6         MS. KENDRICK:  I don't foresee a problem with it at

7    this point.

8         THE COURT:  Good.  So, let's all write in December 1.

9    I'm a visitor here, so I'll have to go get, you know, a

10   permit, but I think we can probably plan on that.  It looked

11   like, kind of what I'd call, a week-plus trial, like seven to

12   eight trial days; more than a week, less than two, but I'm

13   just kind of guessing.  You guys both know better.

14        MR. RUPP:  Yeah, I think so, Judge.  We're agreeing

15   that maybe eight sounds about right, probably closer to the

16   two-week mark than the one week, but eight sounds about right.

17        THE COURT:  Those weekends and the prospect of coming

18   back on the third Monday tend to --

19        MR. RUPP:  Yes, yes.  As a plaintiff, we have to be

20   cognizant of that.

21        THE COURT:  How about for you guys?  Do you think we

22   can get this done in two weeks?

23        MR. LEE:  Yes, Judge.

24        THE COURT:  Yeah.  I kind of thought so.

25        MS. KENDRICK:  Two weeks I think is good.

1          THE COURT:  Good.  That's what we'll save for you,

2    and we'll get it all down in writing, and I think that takes

3    us to the main events, which would be motion for summary

4    judgement, yours.  Ms. Kendrick, you've been very patient with

5    the Court, for which I'm grateful.  You have pleading 64,

6    which was a motion to dismiss converted to summary judgement

7    briefed in 162, 163, and 164.  And I'll give you the floor.

8          MS. KENDRICK:  You'd like me to speak with you in

9    regard to my motion?

10          THE COURT:  Yes.  Exactly.  That's what I mean.

11          MS. KENDRICK:  Okay.  Your Honor, we had requested --

12    as you said, we initially started with a motion to dismiss,

13    which was converted to a summary judgement motion.  And it's

14    clear from all of the evidence that has been presented and

15    what's on the record that my client should be entitled to

16    summary judgement in regard to this matter.

17      I think if we look at the facts here, they were not

18    involved in this particular incident.  We know that

19    Mr. Mikheail, Defendant Mikheail, had -- he's a retired bounty

20    hunter in Pennsylvania -- had contacted my clients, Buffalo

21    Bail Bonds Agency seeking a bounty hunter.  Of course, my

22    clients are bail bondsmen.  And I think one of the significant

23    things here in this case is the fact that the law is different

24    in Pennsylvania in regard to how they handle the bails.

25      And I think that was the issue that was a problem for the

 1   Pennsylvania defendant there.  I guess, in Pennsylvania, it is

 2   the bail bondsmen that secure the bail piece which brings the

 3   fugitive back into the court.  And then, the recovering agent

 4   then works under the bail bondsman.  That is not the case here

 5   in New York State, basically.

 6      My clients, as you know, are bail bondsmen, basically.

 7   And they are licensed, and they are registered with the New

 8   York financial agency that licenses those type of agencies.

 9   And anybody that's licensed there does have to -- any company

10   that's there does have to be licensed with the state.

11      And Mr. -- and I'll just call him Adel because it's a

12   little difficult to pronounce his last name -- he had

13   contacted -- he indicated that he had used Google to search

14   out bail bonds company.  And, of course, Bail Bonds' business

15   being -- beginning with a B, that was an agency that he

16   reached pretty quickly, and he indicated that they were the

17   first ones that had answered the call, basically.

18      So, as a professional courtesy, my clients have testified

19   that they had referred the person that they had used to him,

20   basically.

21         THE COURT:  That's Mr. White?

22         MS. KENDRICK:  That's -- yes.  That's Mr. White.

23   Correct.  And there, the -- my client had testified that there

24   was, like, a two-minute conversation that had been -- they had

25   gone through and he had mentioned Dennis White because he had

1  used them, whatever.  He had a situation where there was

2  recovery required.

3     So, he gave them the information, they got in contact with

4  them, and that was pretty much the extent of the conversation,

5  basically, that they had.  It was, basically, a two-minute

6  conversation, maybe a little longer, but there was not a lot

7  of contact between Bail -- my client, Buffalo Bail Bonds, and

8  then the bond bail shop out of Pennsylvania.

9           THE COURT:  And was any money paid?

10          MS. KENDRICK:  There was never any money paid between

11 my clients and Bail Shop or Adele.  There was never a contract

12 entered into by them at all, and they were not present at the

13 scene.  There was never any indication that my clients were

14 present at the scene where this incident occurred.

15    It was indicated that Dennis White was there, and the

16 plaintiff had indicated that there was a bounty hunter there

17 that had the emblem that Dennis White's company was -- his

18 company name was on the back of the jacket of one of the --

19          THE COURT:  Right.

20          MS. KENDRICK:  -- recovering agents there.

21          THE COURT:  This U.S. Fugitive Task Force?

22          MR. LEE:  That's correct, Your Honor.

23          THE COURT:  Okay.  So, if I can interrupt?  You see

24 it, you know, my friends at home often call me for a referral

25 for a plumber, because we've lived in the community for a long

 1  time, and I give them my -- well, some I give my plumber's

 2  name, some not.  A plumber is --

 3          MS. KENDRICK:  Right.

 4          THE COURT:  I don't want to give my plumber to

 5  anybody.

 6          MS. KENDRICK:  Correct, Your Honor.

 7          THE COURT:  But you see it as a kind of referral,

 8  just like passing along the name of a good caterer or plumber

 9  or anybody else providing a service?

10          MS. KENDRICK:  Yes.  I mean, there's certain law that

11  I practice, and if I don't, then I would refer a client to

12  another attorney.

13          THE COURT:  Sure.

14          MS. KENDRICK:  And then, maybe I'll follow up and see

15  did such-and-such contact you?  It was that type of situation

16  that was going on there.

17          THE COURT:  Okay.

18          MS. KENDRICK:  And, again, no money was -- there was

19  no compensation by -- between the parties, no contracts or

20  anything.  And the plaintiffs, they did file charges against

21  Dennis White.  I think it's significant that they did not file

22  any charges against Buffalo Bail Bonds Agency.  And

23  Dennis White was convicted and pled -- well, he pled guilty to

24  the charges that was brought against him in regard to this

25  incident that had happened.

1           THE COURT:  He actually served a sentence?

2           MS. KENDRICK:  I think he did.

3           THE COURT:  I'll hear from Mr. Rupp about the

4   details, but --

5           MR. RUPP:  He did, Your Honor.  A brief one.  They

6   were misdemeanors, but he did serve a brief sentence.

7           THE COURT:  How long did he serve?

8           MR. RUPP:  I want to say it was 60 days.  I'm not

9   sure he served the entire 60 days.  He might have gotten some

10  time for good --

11          THE COURT:  Yeah, good behavior.

12          MR. RUPP:  -- the way it's calculated in state court.

13          THE COURT:  Hey, I figure one day would be a long

14  time for me.

15          MR. RUPP:  Well, for me as well.

16          THE COURT:  Yes.  All right.  Good enough.  I think I

17  understand your perspective and I'll give you the last word.

18  Okay?

19          MS. KENDRICK:  Well, Your Honor, again, I think the

20  evidence here indicates that my clients were not involved in

21  this situation.  They did not -- they testified that Dennis

22  White was not an employee of theirs.

23          THE COURT:  Right.

24          MR. RUPP:  And Dennis White also testified he did not

25  work for them, and I think all the evidence indicates that.

1           THE COURT:  Okay.  I think I get it, and I'll hear

2   from Mr. Rupp and then, as I say, I'll give you the last word.

3   Okay?

4           MS. KENDRICK:  Okay.  Thank you.

5           THE COURT:  Before I do that, is there anything that

6   you wanted to add on this issue, Mr. Mikheail?

7           THE DEFENDANT:  Of course, Your Honor.  Of course.

8   The first one -- the first thing, I want to thank you for

9   allowing me to appear by phone.  And -- hang on.  I just want

10  to say a few things.  The first thing that I'm asking is, I

11  know that the plaintiff attorney has an obligation to the

12  Court to the truth.  And if he knows that his client is lying

13  in the complaint, and he knows that this was not true, he's

14  accomplice to his client.

15          THE COURT:  Okay.

16          THE DEFENDANT:  So, it's (inaudible) here has any

17  objection to say that Adel Mikheail was never in Buffalo, New

18  York.

19          THE COURT:  I hear you.

20          THE DEFENDANT:  I was never in Buffalo, New York.  I

21  have provided proof that the plaintiffs lie on the complaint

22  on 145 and 155 that I was there (inaudible), the plaintiff's

23  wife, or 144 or I drive blacked out.  This is completely,

24  straight up, lies.  And the lawyers needs to be hold

25  accountable.  I've never been in Buffalo, New York in my

 1  entire life.  There was investigation done by the police.

 2  Attorney file for the district attorney.  I could apply to my

 3  answer to the motion what I was doing.

 4      And also, also, I have never worked that case in New York.

 5  When I was told the case, that the defendant is in Buffalo,

 6  New York, I just wanted the Court to listen to this and

 7  especially my co-defendant, okay?  When I was working the

 8  case, the fugitive -- by the way, he's still a fugitive after

 9  five years.  The fugitive, Ryan Hart, is still a fugitive

10  until this day in the safe haven New York State, okay?

11      So, when I work the case, I spoke to the girlfriend up

12  here, the one she signed for his bail.  They told me to get in

13  touch with his brother and his family.  They have your phone

14  number.  They going to tell him to come back.  But if family

15  member go to the police, the plaintiff doesn't like cops,

16  doesn't like bounty hunters, and he's going to be creating a

17  scene.  He's going to be so-and-so.  This was planned.  This

18  was planned by the plaintiff to be con artist and that bounty

19  hunter states -- to start a case.  I was never in Buffalo, New

20  York.

21          THE COURT:  Okay.

22          MR. RUPP:  The plaintiff and his attorneys lied.

23          THE COURT:  Mr. Mikheail, I think I hear you loud and

24  clear.  Thank you.  Why don't I give Mr. Rupp a chance?

25          MR. DAVENPORT:  Thank you, Your Honor.  May it please

1   the Court.  So, just to respond briefly, in terms of the

2   arguments that were raised by Mr. Mikheail, in terms of what

3   we alleged at the beginning and the outset of this case, it

4   was based off of information that we had at the time.

5       So, we had sued the case based off of there being

6   Pennsylvania license plates that had been spotted around the

7   location of where our client's house was where the break-in

8   had taken place.  We have since clarified, and in our summary

9   judgement motions, we make very clear that any potential

10  liability against either Mr. Mikheail or a Pennsylvania Bail

11  Shop would not be based on any events or any actions that took

12  place in New York.

13      What we are alleging is actions that took place in

14  Pennsylvania that had a negative impact on our clients here in

15  Buffalo, New York.  When we look at the chain of events, and

16  when we look at what happened here, Ms. Kendrick is right that

17  in terms of Buffalo Bail Bonds and their involvement in this

18  case, it was minor.  It was a short conversation.

19      But, at the same time, that short conversation wasn't

20  based off of just one referral.  This Buffalo Bail Shop is

21  licensed.  They have claimed that they are licensed to be able

22  to engage in this business, licensed to retain bounty hunters

23  such as Dennis White.

24      And so, based off of their licensure, they have an

25  obligation to make sure that the people that they recommend

1    for this line of business, and the people that they use

2    consistently for this line of business, are safe, and meet the

3    minimum qualifications of a bounty hunter who can operate and

4    work here in New York State.

5        One of those basic obligations is simply being licensed to

6    be a bounty hunter.  And we know that Buffalo Bail Shop, from

7    the discovery that we took, this was undisputed.  We ended up

8    taking a deposition of -- I believe his name was Twen Swoba.

9    He stated during his deposition that they had used Dennis

10   White on a number of prior occasions.

11       And Dennis White admitted, during his deposition, that he

12   has never been licensed to practice and operate as a bounty

13   hunter here in New York State.  Those facts are undisputed.

14       And so, it's not based off of just one phone call.  It's

15   based off of them providing Dennis White, even though he may

16   have been an independent contractor, referring him out, giving

17   him business where he could go and continue to operate, and

18   continue to work as an unlicensed bounty hunter, unchecked by

19   the City of Buffalo, unchecked by the Buffalo Bail Bonds

20   Agency Corporation, unchecked by Adel Mikheail, who certainly

21   had the opportunity to be able to check New York State's

22   license system to see if the person that he was recommending

23   to the Pennsylvania bail shop was actually qualified to work

24   as a bounty hunter in New York State.  He did none of those

25   things.

1       Instead, what we know from the evidence is that Adel

2  Mikheail and Dennis White, they corresponded with each other

3  by email.  They exchanged faxes.  They exchanged information

4  about Luke Reinhardt.  They exchanged information about Jake

5  Reinhardt.  They exchanged information about other family

6  members of Luke Reinhardt.  But at no time did they ever do a

7  simple investigation, either Adel Mikheail or Bail Shop, LLC,

8  which we know, again, from the evidence, from the testimony,

9  that Adel Mikheail had made the recommendation to Bail Shop,

10  LLC, and Bail Shop, LLC representatives and agents ultimately

11  signed off on using Dennis White for their operation in

12  Buffalo, New York.

13       There's a web of people making selections, people taking

14  actions, and making decisions without proper oversight and

15  without proper investigation, which ultimately led to Dennis

16  White showing up at our client's house on January 9th and 10th

17  of 2021 in the middle of the night, rousting them using a gun.

18       And even though Bail Shop, LLC, Adel Mikheail,

19  Buffalo Bail Shop, even though their roles may have been

20  minor, they each played a part.  And they are liable.  Even

21  though they are selecting independent contractors, we have

22  identified exceptions to New York's independent contractor --

23  selection of independent contractor rule where, normally, a

24  selection of an independent contractor does not render you

25  liable.

1      But, in this case, we have an inherently dangerous

2  activity.  I did not hear Ms. Kendrick discuss that exception

3  at all.  I know that she brought up the general rule about not

4  being liable for independent contractors, but it was never

5  discussed about whether or not bounty hunting is an inherently

6  dangerous activity, and we believe that we meet that exception

7  easily.

8          THE COURT:  Wait, wait, wait.  Just slow down just a

9  second.  The independent contractor exception would apply if

10  Mr. White was an independent contractor for Buffalo Bail Bonds

11  Agency.  But you don't, as I understand the facts at summary

12  judgement, you don't say that's the case.  You say it was, as

13  Ms. Kendrick says, a referral of one name to the other.

14      But what I think you're telling me is you don't think

15  Mr. White, at this point, was either a direct employee of

16  Buffalo Bail Bonds Agency or an independent contractor acting

17  for Buffalo Bail Bonds Agency.  He was something like my

18  plumber whose name has been passed to someone else in the

19  business; is that fair?

20          MR. DAVENPORT:  Well, so, I guess that's -- there's

21  two different questions there, Your Honor.  And in terms of

22  whether or not Dennis White was acting as an independent

23  contractor for Buffalo Bail Bonds, I believe that there's a

24  question of fact there.

25      And the reason why I believe that there's a question of

1  fact is because we know from the depositions and all the

2  depositions that we took, with everyone who is involved in

3  this industry, there's no formal contracts that are signed.

4  There's no formal discussion about what the exchange of money

5  will be.  There's, I guess, general guardrails and general

6  thoughts as to what appropriate compensation would be for a

7  bounty hunter, but those are not typically things that they

8  discuss early on.

9      Buffalo Bail Bonds, as well as Bail Shop, LLC, are

10  receiving portions of whatever these recoveries are.  They are

11  paying -- as part of a portion of the recovery, if it's a

12  $5,000 recovery, right, they'll pay about five to ten percent

13  to the bounty hunters as their independent contractors.  But

14  then those bounty hunters end up making side agreements with

15  each other, especially in situations like these, where they

16  need assistance from somebody in another state, who is

17  qualified in another state, and that's what happened here with

18  Adel Mikheail.

19      They talked about how there would be -- Adel Mikheail and

20  Dennis White, how there would be an exchange of money between

21  the two of them.  Dennis White also talked about, during his

22  deposition, that, sometimes, portions of these proceeds would

23  have to be paid back to Buffalo Bail Bonds or if there's a

24  referral, but he only talked about working with Buffalo Bail

25  Bonds.

1      So, I believe that there's a question of fact there.  But

2  I also believe there, at least is a question of fact.  If not,

3  I believe it's summary judgement in our favor that

4  Dennis White was acting and was at all relevant times an agent

5  for Buffalo Bail Bonds, because they talked about Buffalo Bail

6  Bonds, the fact that they've never used another bounty hunter.

7  So, even though he's not a direct employee of Buffalo Bail

8  Bonds, by virtue of the fact that he wasn't working for any

9  other bail shops, it was just Buffalo Bail Bonds, and by

10  virtue of fact that they didn't work with any other bounty

11  hunters, it was just Dennis White.

12          THE COURT:  Right.  Had a desk in the place.

13          MR. DAVENPORT:  Yes.

14          THE COURT:  Yes.  No, I get that.

15          MR. DAVENPORT:  Okay.

16          THE COURT:  So, is it your position that Buffalo Bail

17  Bonds actually was on the job, had some kind of contract with

18  the Pennsylvania bail bond agency to do this work?

19          MR. DAVENPORT:  I believe, yes, when you look at it

20  from a perspective of less of a contractor, more of an

21  agreement, an implied agreement, because that's the way that

22  this industry was, I call you up, I'm referring this job to

23  you, you're going to do it and there's going to be a cut of

24  the proceeds that will be paid to you.

25          THE COURT:  Right.

1          MR. DAVENPORT:  And, yes, by virtue of Dennis White

2    showing up at the job, being an agent of Buffalo Bail Bonds,

3    Buffalo Bail Bonds would have been involved in this as well,

4    vicariously liable.

5          THE COURT:  And then, where would I find the record

6    evidence for that relationship?

7          MR. DAVENPORT:  From the depositions, Your Honor.

8    So, for example, you would go to Dennis White's deposition

9    where he talked about only working with Buffalo Bail Bonds.

10   There were no other bail agencies.

11         THE COURT:  Yeah.  I get that they have a long, deep

12   relationship, but it's the piece that connects Bail Bond

13   agency to this case as a principal, if you will.

14         MR. DAVENPORT:  Sure.

15         THE COURT:  In this particular transaction, where

16   would I find the record evidence for that?

17         MR. DAVENPORT:  So, you would also look to Mr. Sow

18   (phonetic) deposition as well.  He is the individual who

19   testified on behalf of Buffalo Bail Bonds.

20         THE COURT:  Right.

21         MR. DAVENPORT:  He talked about his knowledge and,

22   specifically, the fact that he referred Dennis White -- Adel

23   Mikheail to Dennis White, provide him with the contact

24   information as well.

25      And also, Mr. Sow testified that it was only Dennis White

1  that he had ever worked with at Buffalo Bail Bonds Agency, and

2  that he wasn't aware of any other bounty hunter that Buffalo

3  Bail Bonds had ever worked with other than Mr. White.  So, it

4  would be those two depositions.  And I believe, Your Honor, I

5  believe that we also had submitted records of payment as well,

6  yes, as Exhibit YYY.  We have checks that were written to

7  Dennis White from Buffalo Bail Bonds; not specifically for

8  this case, because there was no recovery.  Really, the only

9  reason why there was no money exchanged was because it was an

10  unsuccessful recovery.  But for every successful recovery,

11  Exhibit YYY has those checks and exchange of money between

12  Buffalo Bail Bonds and Dennis White.

13          THE COURT:  All right.  And do you agree with

14  Ms. Kendrick that if she were right on the facts, that this

15  was simply a referral, like a plumber or a lawyer by Buffalo

16  Bail Bonds to the Pennsylvania company, that that alone

17  wouldn't give rise to liability?

18          MR. DAVENPORT:  You know, I don't think so, Your

19  Honor.  And the reason why I say that is this.  With your

20  example of a plumber, you are not specifically credentialed

21  and qualified to recommend a plumber.

22          THE COURT:  Right.

23          MR. DAVENPORT:  Now, in a scenario where you may be

24  recommending an attorney where you are specifically

25  credentialed or licensed, I do believe that that is a

1  different situation.  And I believe that Ms. Kendrick's

2  client, being specifically credentialed and licensed to work

3  in this operation of bounty hunters, holds her and her client

4  to a heightened standard when they make these recommendations.

5  And we pointed that out as well for an exception to the

6  negligent -- to the independent contractor should Your Honor

7  find that these are independent contractors, for negligent

8  hiring, retention, and supervision as well.

9          THE COURT:  Okay.  Fair enough.  Thank you.

10          THE DEFENDANT:  Your Honor, I would like to correct

11  the record because --

12          THE COURT:  Give me just a sec.  I will let you do

13  that, Mr. Mikheail, but I want to finish up with -- help me

14  out -- Mr. Davenport?

15          MR. DAVENPORT:  Yes, Your Honor.  Thank you.

16          THE COURT:  Is that everything in?

17          MR. DAVENPORT:  I believe so, Your Honor.

18          THE COURT:  All right.  All right.  Mr. Mikheail,

19  I'll give you a turn, I'll give Ms. Kendrick a turn, and then

20  we'll move on.

21          THE DEFENDANT:  Okay.  So, what I'm saying,

22  Your Honor, is, I did this for 35 years.  I have worked over

23  3,500 fugitive cases.  I have never won a civil class action

24  over that.  I told the bail bondsman, the guys in New York, I

25  am not licensed in New York.  I am not going to New York to

1   commit a crime.  They said, I understand.  We need to find a

2   bail bondsman in New York that has a bounty hunter that works

3   for him.

4       I was told that Dennis White is a licensed bounty hunter,

5   worked with Buffalo Bail Bonds.  Buffalo Bail Bonds and Bail

6   Shop, they are licensed under the same insurance company to

7   provide bail.  That was confirmed.  Anything after that, my

8   job was over.

9       Second, that the plaintiff is hiding deposition from my

10  son, Michael James Mikheail, United States military sergeant,

11  military police.  They told him, my father told Bail Shop our

12  job is over, we're not going to New York, and he gave a

13  statement that I never went to New York.

14      This complaint was based on a lie.  When it was filed, it

15  was based on a lie.  And the Court accepts the lie to continue

16  until this day.  I was never in New York.  I was never in -- I

17  was never a licensed bondsman.  I didn't bill the bondsman.

18      Second, the bondsman's name not in a civil action.  The

19  name of Demore (phonetic) is a bondsman that released -- and

20  got out of jail.  She's the one -- has that.  Bail Shop closed

21  the store three years ago.  They out of business.  They move

22  out of the country.  They no longer exist.  That's why the

23  lawyer filed a motion to get off the case because he didn't

24  get paid.

25      So, I don't know what the plaintiff wants.  He wants my

 1  medication or he wants to -- what do you exactly want from me?

 2          THE COURT:  All right.

 3          THE DEFENDANT:  They trying to hide the truth.  I

 4  tell the bounty hunter that I say I'm not going to New York

 5  because New York wanted the state to -- you got to be a

 6  licensed bounty hunter.  You got to be this to live in New

 7  York --

 8          THE COURT:  Okay.  Mr. Mikheail, I'm going to cut you

 9  off because I understand what you're saying and I get your

10  perspective.

11     Ms. Kendrick, I'll give you the last word and then we'll

12  move on to the other motion.

13          MS. KENDRICK:  Your Honor, just in regard to a couple

14  of things that opposing counsel had stated.  He made the

15  analogy in regard to if you were to refer somebody -- a

16  plumber to somebody.

17          THE COURT:  Right.

18          MS. KENDRICK:  That you're not a professional in that

19  field.

20          THE COURT:  I'm a homeowner.  Yeah.

21          MS. KENDRICK:  Okay.  So, I mean, in regard to my

22  example, as an attorney, when I refer a client to another

23  attorney, I'm not going to be liable for what that attorney

24  does.  I mean, that attorney is responsible for serving the

25  client.  I'm not -- even though I referred that, and I think

1    that, again, is the situation here.

2       My client, as indicated, did not receive any type of

3    compensation in this case.  And now he's saying that he thinks

4    it's the -- in the industry, that they talk to each other and

5    go back and forth.  That's not the case.  There's nothing in

6    the file, nothing on the record, to indicate that was any type

7    of payment or any type of an agreement.  In fact, Dennis White

8    indicated that there was no agreement for compensation as well

9    as Mr. Adele.  He testified that there was no compensation

10   agreement between the parties either.  So, that's not the case

11   here.

12           THE COURT:  All right.  Well, I'll scour the records

13   we have.  We finished discovery.  The facts are in, as best we

14   can, and I will look to see if there is some evidence that

15   Buffalo Bail Bonds Agency was, in some respect, hired, paid,

16   expected compensation to work on the case, and I'll give some

17   thought to Mr. Davenport's analogy of a negligent referral by

18   one professional to another to see if New York law would

19   support liability.

20           MS. KENDRICK:  And then just -- I reiterate the

21   point, if they felt that they were responsible, they did bring

22   charges against Dennis White.  Why didn't they do that with

23   Buffalo Bail Bonds Agency if they thought that were the case?

24           THE COURT:  Prosecutors do what prosecutors do.  I've

25   learned that --

1          MS. KENDRICK:  And sometimes prosecutors

2   overexaggerate things too.

3          THE COURT:  All right.  Fair enough.  Thank you.

4          MS. KENDRICK:  Thank you, Your Honor.

5          THE COURT:  I think that completes this chapter.

6   Anything more on the summary judgements regarding the bail

7   bond community?

8          MR. DAVENPORT:  Just, Your Honor, the one thing that

9   I would say is, when you're looking at the analogy, you know,

10  I think I'd like to clarify and say it would be like an

11  attorney recommending an unlicensed attorney and having reason

12  to know that.

13         THE COURT:  Understood.

14         MR. DAVENPORT:  Thank you.

15         THE COURT:  That's how I would have played with

16  your -- or a -- the family doctor who knows the cardiologist

17  he's suggesting has been disciplined, something like that.

18         MR. DAVENPORT:  Thank you, Your Honor.

19         THE COURT:  Yeah.  I get it.  I mean, there are

20  probably cases, right?  Have you looked?

21         MR. DAVENPORT:  Well, you know, Your Honor, no.  I

22  can't say that I'm aware of any cases as I sit here right now.

23         THE COURT:  Right.

24         MR. DAVENPORT:  But the general principles in front

25  of Your Honor -- but this a very unique set of factual

1   circumstances here, but we can certainly provide supplemental

2   briefing on that issue as well, because I think it's an

3   important one.

4        THE COURT:  Yeah.  Because, as we started out, I had

5   thought your position was that Buffalo Bail Bonds Agency was

6   a, kind of, subcontractor to the Pennsylvania company, but

7   it's not quite that.  It's a looser, softer, less-direct

8   relationship.

9        MR. DAVENPORT:  That's correct, Your Honor.  We

10  certainly did endeavor to -- and that was initially what our

11  thought would be, was that it would be part of the payment,

12  but we did receive lots of discovery on it.  And so, we didn't

13  find any evidence of agreements or payments for this specific

14  case.  Yes.

15       THE COURT:  Yeah.  All right.  Fair enough.  Why

16  don't we move on then to -- I think the plaintiff filed the

17  first motion, yeah, this motion -- plaintiff's motion for

18  summary judgement.  And that will be -- looking for the

19  number.  I think it's 173.

20       MR. RUPP:  Thank you, Your Honor.  And may it please

21  the Court.  I very much, on behalf of my team, appreciate

22  Your Honor riding the proverbial circuit down to Buffalo from

23  your normal locale.  Thank you for that and giving us the

24  opportunity for oral argument.

25       Judge, we highlighted in our initial memorandum of law in

1   support of summary judgement that we think that the most

2   important issue and factor in this case is really whether the

3   bounty hunters, at the time of the raids, particularly on

4   Mr. Reinhardt's home, the duplex, were engaged in -- were

5   acting under color of state law.  And, as part of that

6   analysis, we briefed the Court on, really, all the case law we

7   could find, including a case that Your Honor had pointed out

8   to us in a motion to dismiss decision, which was *Jackson v.*

9   *Pantazes*, I believe.

10      And all of the law, of course, in the Second Circuit, and

11  starting with caselaw from the United States Supreme Court in

12  *Dennis v. Sparks*, under what circumstances will private actors

13  become public actors, essentially, under color of state law

14  when they have coordinated their efforts with, in this case,

15  law enforcement.  It could be, really, anyone who actually is

16  employed by a municipality or government.  In this case, we

17  have officers of the Buffalo Police Department.

18      And, as Your Honor is, I'm sure, aware, not only from the

19  motion to dismiss standard, but from whatever pre-work has

20  been done in this motion, it's a spectrum.  When a state

21  action can be conferred on private individuals, when their

22  coordination with the, example, the police is so limited, that

23  the police are just kind of there to keep the peace, or when

24  they've engaged in, really, joint and concerted action.

25      And we understand, Judge, as the plaintiffs, that it's not

1   typical that those cases result in summary judgement in favor

2   of a plaintiff.  The joint action is often a factually-

3   intensive inquiry.  We believe here, Judge, that this is one

4   of the rare cases where summary judgement should be granted in

5   favor of the plaintiff against the bounty hunters on the

6   theory that they were engaged in under color state law

7   activity at the time of the raids.  This case has features,

8   Judge, that are different from, and stronger than, just about

9   every other case we were able to find on joint action.

10      In the first instance, point out to the Court, that all of

11  this was captured on video, was captured on the body cams of

12  the officers.  It was captured on Mr. Reinhardt's surveillance

13  camera.  And, as the Supreme Court has said, you know, that is

14  very conclusive.  It's hard to raise issues of fact when the

15  Court can look with its own two eyes and see exactly what

16  happened.

17      And here, Judge, when the Court does that, the concerted

18  action, the joint action undertaken by these private,

19  unlicensed bounty hunters and the official under color of

20  state law officers, the Buffalo Police Department, was off the

21  scales in terms of revealing the joint action.

22      And I would point out that the caselaw started again with

23  that *Dennis v. Sparks* case way back from the U.S. Supreme

24  Court from 1980 said that the touchstone of joint action is

25  often a plan, a pre-arrangement, a conspiracy, a customer

1  policy shared by the private actors and the police.

2     The Second Circuit has picked up half the time and gone on

3  and found that there's a spectrum of police involvement that

4  is along the lines of what could be or could not be the joint

5  action.

6     But one of the principal touchstones is affirmative

7  assistance and participation by the police officers in the

8  private conduct can transform that conduct in a state action.

9  That's the *Lopez* case from the Eastern District.  And the

10 crucial question is often whether the police officer was

11 present simply to stand by, in case there was a breach of the

12 peace, which would be the non-state action part of the

13 spectrum, or take --

14        THE COURT:  It would be like when I hire a sheriff to

15 help with the parking at my daughter's wedding.

16        MR. RUPP:  That could be.  Yes, Judge.  Now, where

17 that becomes problematic, though, is when the sheriff starts

18 taking direction and control from a private actor and is told,

19 well, I don't like that guy, so he can't park here, move him

20 over there, I want him arrested because he mouthed off to my

21 daughter on the day of her wedding.

22        THE COURT:  Yeah.

23        MR. RUPP:  Something like that, Judge.  So, it's

24 taking an active role to either affirmatively assist in the

25 private action or -- over the plaintiff's objection, or

 1  intentionally intimidates the plaintiff.  And that was the

 2  *Barrett* case out of the Second Circuit.

 3      Judge, here, here, captured on video for all the world to

 4  see, we have the private actors, the unlicensed bounty

 5  hunters, collaborating, conspiring, planning, joining action

 6  with acting in a concerted fashion with the Buffalo Police

 7  officers.  And I'll just briefly highlight why I think this is

 8  a summary judgement worthy case that shows that the bounty

 9  hunters were acting under color of state law.

10      First, we have on video, and we have testimony, unrebutted

11  testimony from everybody involved, that there was extensive

12  coordination between the bounty hunters and the officers

13  before the raid and during the raid.  We have video of them

14  walking down the street together like a company of soldiers

15  getting ready to array themselves around the residence to make

16  sure that nobody could escape if the fugitive were to be

17  present.

18      We actually even have the officers saying, oh, gee.

19  There's only two of them.  That's certainly not enough for

20  this raid.  And the other officer says, well, I guess that's

21  why we're here.  They knew they were helping, Judge.  They

22  went there to help.  They were dispatched to help.  They did

23  help.

24      We have active participation by the police officers, not

25  just in surrounding the property and preventing escape from

1   it, but we actually have the officers going in the property.

2   We have two separate internal affairs investigations that

3   found that BPD officers transgress the curtilage of the

4   property, went inside it, shined flashlights, and engaged in

5   their own Fourth Amendment violations separate and apart from

6   the more egregious violations of the allegedly private actors.

7       We had, Judge, and this was highlighted in the opposing

8   papers as a sort of a reason why they shouldn't be found

9   liable here, Judge, they said, well, we thought we were

10  assisting another police agency.  To which I would say

11  exactly, Judge.  Exactly.  That issue, that concession by the

12  City, which I think they have to concede, is so important on

13  so many factors.  And I'll get to the Monell factor in a

14  moment.

15      They thought they were dispatched to assist bounty

16  hunters.  That's what the dispatch records came across, and I

17  have the citation there if Your Honor needs it.  It's one of

18  our exhibits.  But when they got there, they thought they were

19  assisting a fellow police agency.  That's not far from the

20  City's contention that that, sort of, changes the character of

21  their assistance.  No, Judge.  It reflects it.

22      It validates that exactly what the cases say is on the

23  extreme side of the spectrum where you're actually -- the

24  public entities, the state actors, are actually assisting the

25  private actors.  Believing that you're assisting a fellow

1  police agency is really -- shows us why the police were so

2  heavily involved in this particular raid.

3      So, then we have, Judge, in addition to that, we have the

4  absolute -- this, again, is part of the Monell theory, failure

5  to verify and authenticate the credentials of these obviously

6  unlicensed bounty hunters who were engaged in multiple

7  violations of New York State law at the time they were

8  undertaking this raid.

9      They were wearing badges and insignia, which violates the

10  law.  They were unlicensed, which violates the law.  They were

11  holding, by their own testimony, loaded long guns, pointing

12  them at people, brandishing them, committing multiple

13  felonies, Judge, by their own testimonial admissions at their

14  depositions.

15      Now, the DA's office charged them only with misdemeanors

16  because they said, well, we can't prove that the guns were

17  loaded.  Well, when we deposed them, they go, oh, yeah.  Those

18  guns were loaded.  They were locked and loaded and they were

19  ready to discharge.

20          THE COURT:  That's a privilege the prosecutor doesn't

21  get.

22          MR. RUPP:  That's true, Judge.  That's true.

23  Although, had the prosecutor been interested, we would have

24  happily provided them with that additional information.

25          THE COURT:  So, let me sort of jump to the chase,

1  which is, you know, I get the perspective, but I'm worried

2  about buying a pig in a poke here.  Where does that take you?

3  Does that mean that the City of Buffalo is responsible for

4  everything that these bounty hunters did on the property?

5           MR. RUPP:  It does, Judge.  It does.  And not just

6  because of this joint and several liability issue, which I

7  think the City is wrong on that as well, because Section 1983

8  does embody tort standards.  One of the tort standards in

9  New York is joint and several liability.

10     There is an exception, Judge.  New York is a 51 percent

11  state for non-economic damages, but not -- again, this

12  dovetails with the argument I just made, not when the action

13  is concerted action.  That's when you have a tortfeasor over

14  here, maybe a products liability defendant who had a product

15  that wasn't safe, and somebody over here, who maybe sort of

16  misused the product a little bit too, and then the plaintiff

17  is in the middle and says, hey, you guys are both jointly and

18  severally liable.

19           THE COURT:  Yeah.  Plaintiff is a passenger or

20  something.

21           MR. RUPP:  Something like that, and gets injured

22  because of totally different torts by these two individuals.

23  Here, it's the same action, Judge.  It's the same raid.  It's

24  the same tort.  It's the same behavior.  It's the same

25  unauthorized, unwarranted entry into the home.

1          It's the same surrounding the property of BS-ing the

2     owner, if you don't mind my French, Judge, that there was a

3     warrant which couldn't have been issued to -- even licensed

4     bounty hunters would not have had an arrest warrant.  They

5     wouldn't have had a search warrant.

6          Again, I keep foreshadowing where I'm going to go on the

7     Monell theory, Judge, because, again, the lack of training and

8     the official policy of the City of Buffalo not to have a

9     bounty hunter policy for 20 years led to these --

10               THE COURT:  Yeah.  Let's say that.

11               MR. RUPP:  Yeah.  We'll say that.

12               THE COURT:  And I'll give Mr. Lee a chance to respond

13     on this point so we sort of --

14               MR. RUPP:  Sure.

15               THE COURT:  -- otherwise you guys can talk for an

16     hour and I'll forget.

17               MR. RUPP:  No, no.  Fair enough, Judge.  I will save

18     the Monell theory.  But to answer Your Honor's question on the

19     pig and the poke, we do believe that this is joint.  It is

20     joint and several under multiple different theories.

21          Just -- if Your Honor were to find joint action, it's all

22     part of the same injury imposed on all of my plaintiff clients

23     by all of them acting in a concerted way.  And that would meet

24     the joint and several liability test under New York State law.

25     It would meet the exception to what we call Article 16 here,

1    which is that, yes, it's non-economic.  It's only if you're

2    over 51 percent.

3        And I would probably concede that no individual officer's

4    going to exceed that threshold.  But when the action is the

5    same action, when it's concerted action, which is what we

6    contend here, then that exception applies and enter jointly

7    and severally across the board.

8        But it really starts, Judge, with the analysis in the

9    *Barrett* case and in the *Dennis* case, which is that if we can

10   prove, on summary judgement or at trial -- I believe we have

11   proven it with undisputed fact on summary judgement -- that

12   the action undertaken by the private individuals in concert

13   with, and as part of, a comprehensive plan with the under

14   color of state law defendants, when it's so intertwined, when

15   it's so obvious, when it's so undisputed, this Court has the

16   authority to find, as a matter of law, that the action was

17   concerted, which would give rise to joint and several

18   liability.

19       And the reason for that, Judge, is there is simply no way

20   a rational jury could come to any other conclusion viewing

21   those videos, reading the undisputed testimony of the

22   officers, seeing the body cam footage and, again, listening to

23   the City's rationale why the officers provided all of this

24   assistance.

25       They thought they were assisting a federal agency.  And

 1  because of that, they rendered full, unfettered, concerted

 2  assistance to private actors, thus rendering the private

 3  action -- putting it all under the umbrella of the under color

 4  of state law.  And that's why we feel that we are entitled to

 5  summary judgement on this issue, Judge, even though,

 6  typically, it a factual inquiry.  The video and the undisputed

 7  testimony gives rise to no possible way that a jury could come

 8  to a different conclusion.  So, I'll yield.

 9          THE COURT:  Can solve one of your practical problems,

10  which is, probably White and his assistant are judgment proof.

11          MR. RUPP:  Well, exactly, Judge.  But we've kind of

12  known that from the start.

13          THE COURT:  Of course.

14          MR. RUPP:  I mean, if you're unlicensed, you're

15  probably not going to have insurance.  And we, of course, did

16  our due diligence of that.  But we didn't go into this, Judge,

17  thinking that anything other than the City of Buffalo is

18  really the culpable party here.  And I will yield to Mr. Lee,

19  but I do look forward to arguing the Monell theory as to why

20  as well.  Thank you, Judge.

21          THE DEFENDANT:  Your Honor, could I have a --

22          THE COURT:  No, no.  Your motion was already heard.

23  I'm thinking about it.  This involves different parties, the

24  City of Buffalo defendants.

25          THE DEFENDANT:  Yes.  I just --

1        THE COURT:  Mr. Mikheail, I'm going to give the floor

2   to Mr. Lee.

3        THE DEFENDANT:  Okay, Your Honor.

4        THE COURT:  Thanks.  Mr. Lee, you got it.

5        MR. LEE:  All right.  Good afternoon, Your Honor.

6        THE COURT:  Good afternoon.  Thank you for your

7   patience.

8        MR. LEE:  Absolutely.  Thank you for coming to

9   Buffalo.

10      On the issue of joint and several liability, Your Honor,

11   there was a lot discussed about it in the City as well in

12   plaintiff's principal brief, and then in the City's opposition

13   brief.  But then after that, the *Boyd* decision came out in the

14   Western District of New York finding that there is no joint

15   and several liability under 1983.  And the *Boyd* decision

16   relied on a Second Circuit decision that at least Judge Vacca,

17   who decided *Boyd*, thought was binding.

18      So, we can sit up here and debate, I suppose, all day

19   about all the other arguments that were made before the *Boyd*

20   decision.  But I think that settles that issue right now and,

21   yeah.  I would be really concerned if I was the plaintiffs

22   about there being no joint and several liability under 1983,

23   because it's quite clear who the primary culpable parties are

24   here, and it's the bounty hunters, not the police officers who

25   were tricked by these rogue bounty hunters.

1          THE COURT:  You know, I thought about that a lot.  I

2    know you have, too.  These are the police officers I want to

3    meet when I was stopped for speeding, because I just tell

4    these guys, my name is James Bond, and my license is at home

5    in my hotel.  How can they not ask for paper?

6          MR. LEE:  Well, I think you start with the fact,

7    Your Honor, that they were dispatched to this call.  So, this

8    isn't, like, a situation where, let's say if, like, Jake

9    Reinhardt made the phone call or something like that, and was

10   like these guys are on my front porch, they have guns.

11         THE COURT:  Right.

12         MR. LEE:  That situation, I'm going to presume is

13   handled totally differently than it was handled here because

14   the police officers, they're responding to a police call.  And

15   then they get there, and they see that these bounty hunters

16   are attired in gear to impersonate law enforcement.  One of

17   them says that I have a search warrant for this house.  White

18   says, I have a search warrant.

19     Could the situation have been handled differently?  It

20   could have.  Plaintiffs will certainly argue that it should

21   have been handled differently, but that would certainly be a

22   nice segue into the City's qualified immunity argument, which

23   is that, okay, even if these police officers could have

24   handled the situation better, maybe they should have done

25   things differently, and I'll bet if you ask them today they

1  absolutely would probably say that.

2      But, at the time, you know, based on those facts I just

3  mentioned, they thought that this was a legitimate law

4  enforcement agency and they were -- who had a search warrant

5  in search of a fugitive.  Now, they were mistaken, but

6  qualified immunity is designed to cover that.

7          THE COURT:  Yeah.  And I'll give you a full hearing

8  on qualified immunity after we kind of finish up with the

9  plaintiff's motion.  But were they in cahoots with these guys

10  or some different relationship?

11          MR. LEE:  Absolutely not.  They weren't in cahoots at

12  all.  They thought they were assisting a legitimate law

13  enforcement agency.  Now, if they thought they knew that these

14  guys were not -- they were unlicensed bounty hunters, and they

15  had no search warrant, this would be a totally different case.

16      But, Your Honor, these police officers were duped by these

17  bounty hunters.  And I think, you know, start tying in the

18  joint and several arguments for police officers, I would be

19  responsible for bounty hunter's actions.  I mean, I think the

20  plaintiff would have to establish -- plaintiffs would have to

21  establish their conspiracy cause of action for that to be

22  true.

23          THE COURT:  Right.

24          MR. LEE:  And, to have a conspiracy, you need to have

25  an actual agreement to violate someone's constitutional

1    rights.  The police officers had no idea that these bounty

2    hunters were not licensed, that they didn't have any search

3    warrant.  There was no agreement.  There was no meeting of the

4    minds to violate Jake Reinhardt's constitutional rights.  So,

5    the conspiracy cause of action, to me, fails as a matter of

6    law.  And that's another reason why the police officers are

7    not going to be, the City's position, should not be

8    responsible for what these bounty hunters did.

9        And you just look at even the actions of the two sets of

10   parties, this contrast, the behavior of the bounty hunters

11   versus the behavior the police officers, the bounty hunters

12   are the ones with the guns that are drawn.  Police officers,

13   they don't take out their guns ever.  The bounty hunters are

14   the ones that go into the -- really go into the residence.

15   Now, we acknowledge that Officer Keenan was between in that

16   sort of front hallway area --

17            THE COURT:  We call it the foyer.

18            MR. LEE:  The foyer.

19            THE COURT:  Yeah.

20            MR. LEE:  Yeah.  And then, Officer George thought he

21   heard a noise, so he stepped into the back of the premises.

22   But, I mean, as far as the invasion of Mr. Reinhardt's rights,

23   I mean, it's the bounty hunters who are the ones in the house

24   with guns searching all over the place for Luke Reinhardt.

25   The police officers are just sort of standing by to monitor

1   the situation and, again, with the understanding and the

2   belief that they are actually assisting a legitimate law

3   enforcement agency.

4           THE COURT:  I mean, they thought they were working

5   with the Marshals Service, is that what they thought?

6           MR. LEE:  I don't think they really knew who the were

7   working -- I mean, you know, admittedly, I think they thought

8   they were working with the U.S. Fugitive Task Force, I think.

9   You know, agent --

10          THE COURT:  Because a guy wears a plastic jacket you

11  can buy at Kmart, right?  I don't want to give you a hard

12  time, but --

13          MR. LEE:  And that's how it turned out, that

14  Dennis White did have some phoney -- well, yeah.  Wherever he

15  got it, it wasn't issued by the -- there's no even such thing

16  as that.  It just seems like it would be manifestly unfair in

17  this case, Your Honor, for the police officers to be held

18  responsible for what happened here.  I mean, I have a lot of

19  police cases.  And sometimes they're, you know, not -- they're

20  just not all like this.

21      And I think what really happened here is these police

22  officers got tricked by the bounty hunters.  And could they

23  have handled the situation differently?  Maybe.  But that's

24  why qualified immunity exists, in my view, is to sort of

25  protect police officers when their actions aren't undertaken

 1   in bad faith.  And maybe a decision or two they could have

 2   done differently, but I think that's why qualified immunity

 3   exists.

 4           THE COURT:  Yeah.  We'll get there.  But on this

 5   issue, which is raised in plaintiff's motion for summary

 6   judgement, is it mainly your perspective that they're -- they

 7   have a factual burden they can't make at summary judgement and

 8   this is -- should be a trial issue, the extent of which these

 9   guys were in -- acting in concert?

10           MR. LEE:  I don't think so, Your Honor.  I don't

11   think it's a factual issue in this case because this is also

12   one of the rare cases where I really don't think there are any

13   disputes about material facts here.  In large part, that might

14   be based on the video evidence we have.

15           THE COURT:  Right.

16           MR. LEE:  So, we know exactly what happened.  And

17   then, I think if you look at the testimony of the police

18   officers, there's no --

19           THE COURT:  We know what they did.  We don't know

20   what they thought.

21           MR. LEE:  We don't know what they thought.  That's

22   true, Your Honor.

23           THE COURT:  And we probably don't know much about

24   what they said, to which I don't know if it was recorded or

25   not.  I haven't been through them yet.

1          MR. LEE:  Well, yeah.  It's all on body cam, too.

2     So, you've got -- we do know what was discussed --

3          THE COURT:  Okay.

4          MS. KENDRICK:  -- at least in certain events.  So, we

5     have Jake Reinhardt's camera.  We have the police body cam.  I

6     mean, there are no disputes about the facts here.  And, as far

7     as what the police officers were thinking, I mean, I guess,

8     when I said we don't know what they were thinking, that's sort

9     of, like, we're never going to truly know what, I guess,

10    someone is thinking inside their head.

11         THE COURT:  Well, we have inferences.

12         MR. LEE:  Right.  And they what -- they did say what

13    their thought process was.

14         THE COURT:  Right.

15         MR. LEE:  They all testified to that.  And, you know,

16    I don't know if this matters or not, but I think the Fourth

17    Amendment analysis is an objective inquiry to be -- so, what

18    they were thinking, I don't know if that's particularly

19    relevant or not.

20         THE COURT:  Right.  I mean, this was an obvious

21    violation of the Fourth Amendment, right?  It was a -- no

22    warrant, no consent, no exigent circumstances.

23         MR. LEE:  I wouldn't concede that -- as the city

24    attorney here representing these officers, I would not concede

25    that.  They thought that these bounty hunters had a search

1  warrant.  As far as -- I think there were exigent

2  circumstances here because look at what was going on on that

3  front porch.  You got Dennis White, he's got a gun out.

4  You've got Jake Reinhardt.  He's really ticked off, and

5  understandably so.  He's got his little girl in the house.

6     Yeah, the bounty hunters have guns.  Jake Reinhardt says

7  he owns a firearm.  I think it would have been wrong for

8  Officer Keenan not to go up on that front porch and hopefully,

9  sort of, make sure that things don't get worse than they

10  already are.  I think Officer Keenan did exactly what he

11  should do.  It would be unreasonable for him not to go on the

12  front porch and make sure that, you know, this situation

13  doesn't get any more out of control.

14        THE COURT:  They don't seem to have done much to make

15  sure the situation didn't get out of control.  They just kind

16  of let it run until it was over, right?  The upstairs tenant's

17  door was broken down.  Both apartments were searched without

18  warrants.  The families were held at gunpoint, and the

19  fugitive wasn't there, and everybody shook hands and left.  I

20  didn't see much protection from them.  Did I miss something?

21        MR. LEE:  I think their presence probably offered

22  some form of protection, and that's where we get into, sort

23  of, the varying degrees of police participation in this joint

24  action analysis.  I mean, I think their mere presence there,

25  you know, they probably believe that that was enough, but no.

1    But, again, why did they get involved?  They thought they

2    were working with a real law enforcement agency.  I mean,

3    clearly, if they knew -- if the police officers knew that

4    these bounty hunters were rogue at the time, the situation

5    obviously would have been handled differently.  They didn't

6    know that.  They got totally tricked here.  And it seems like

7    that shouldn't -- there shouldn't be civil liability for that

8    in the case.

9         THE COURT:  Yeah.  Okay.  Fair enough.  Why don't we

10   move onto your next issue.  Thank you, both.

11        MR. RUPP:  Judge, may I have a brief rebuttal of

12   that?  Just a couple of points?

13        THE COURT:  Sure.  Sure.

14        MR. RUPP:  I don't think it matters at all what they

15   are thinking.  It's a question of what they did.  There's not

16   a case out there in the joint action spectrum that says the

17   Court has to make a separate inquiry into what the officers

18   were thinking.  It's what they did, manifested by actual acts,

19   which have we have here.

20     But, Judge, also, the dispatch records, the bounty hunters

21   didn't fool anyone.  The dispatch records, and I will

22   reference them now at Exhibit JJ to our motion is the dispatch

23   records and they say, bail enforcement needs assistance with a

24   search warrant.  That's what went across the officers'

25   computers in each one of their squad cars.

1      They were told these guys were bail enforcement.  The went

2    to the scene believing they were bail enforcement.  Any

3    trick -- there was no trick.  There was just a complete lack

4    of follow-up by these officers.

5      Well, okay.  Can I see your search warrant?  Can I see

6    your paper?  Can I see your license?  Why are you here?

7      What -- you know, the raid the night before, Judge, I

8    think, is actually kind of instructive on the other residents

9    because, there, the officers stood back.  Now, they did

10   ornament their vehicles and their -- and they did stand close

11   enough that the woman let the bounty hunters into the house

12   believing it was a police action, and that's been found to

13   give rise, at least, to an issue of fact of concerted action.

14     But they stood back.  They didn't go up on the porch.

15   They didn't engage.  They didn't tell the homeowner, oh, they

16   have a warrant, they're allowed to go in.  They did that in

17   this case.  They vouched for a warrant that they never even

18   saw.  They vouched for a warrant and said that they had a

19   right to go in the house to the homeowner.  Now, Mr. Reinhardt

20   wasn't buying, but that was the level of their concertedness,

21   their joint action, with these private, unlicensed bounty

22   hunters.

23     So, to me, Judge, the caselaw all speaks to an objective

24   assessment of the degree to which the state actors engaged in

25   joint action with the allegedly private actors.  And if it was

1   sufficient --

2           THE COURT:  Right.

3           MR. RUPP:  -- which I think this one is off the

4   charts, then it becomes joint action, Judge, and then the

5   joint several liability issue goes away, and we have a single

6   injury occasioned by people working together to achieve it.

7   That's the only issue that's relevant.  So, I think some of

8   those are red herrings.

9           THE COURT:  That issue, if you don't win summary

10  judgement, like any judge that's done this for a while, I have

11  my summary judgement scars that I'll take to my retirement

12  party.

13          MR. RUPP:  Right.

14          THE COURT:  But the -- where I've gotten it wrong.

15  But you still, if it was denied here, it would still be part

16  of your proof at trial?

17          MR. RUPP:  It absolutely would, Judge.  And I get

18  that.  And I, as I said in my initial presentation, most of

19  these, and even the use of the word spectrum from the *Barrett*

20  decision on Second Circuit applies, in many cases, it's going

21  to be an issue of fact.

22     But, again, two things strongly distinguish this case;

23  three really.  One; every minute of it was captured on video.

24  There are no issues of fact here.  The spectrum is purely a

25  matter of law for Your Honor at this point.  Because, as

1   Mr. Lee has conceded, there are no issues of fact.

2          THE COURT:  Right.

3          MR. RUPP:  It's not something for a jury to

4   speculate.  These are legal issues now.

5      Number two, Judge, well, I'll leave it there.  I'll get

6   onto the Monell theory.  But it is clearly, in my view, Judge,

7   a summary judgement issue that is begging for resolution, I

8   suppose one way or the other, because there's just no room for

9   factual dispute here.  And there just aren't any.

10     But, Judge, that leads me, then, to the Monell theory.

11  And we've done quite a bit of discovery on the Monell theory

12  since the motion to dismiss hit Your Honor's desk a number of

13  years ago.  And, over the course of discovery in this case, we

14  learned of the, again, extreme culpability of the City on a

15  Monell theory basis in the sense that a young police officer

16  was killed in the line of duty assisting bounty hunters,

17  again, in a situation very similar to this.

18     Now, it was a number of years before, but the City of

19  Buffalo didn't sit on its -- it didn't just let that go.  They

20  lost a young officer.  The police commissioner at the time,

21  Bill Kurlalowski (phonetic), testified before Congress to try

22  to change the laws to try to make it so bounty hunters would

23  have to identify themselves, show their licensure, show their

24  paperwork.  He testified and went to Albany to lobby the New

25  York State legislature.

1     And, unfortunately, Judge, and this is where the comedy of

2   errors sets in, he was elevated to a position within

3   Department of Homeland Security by, I believe at the time,

4   President George W. Bush.  He left before the legislation came

5   out of Albany that gave the City of Buffalo exactly what it

6   had lobbied for, exactly what it had asked for.  And that is

7   now set forth in General Business Law Section 74A of the

8   consolidated statutes, and it gave the City exactly what it

9   claimed.

10     Now, I don't actually think it needed to have legislation

11   to be able to tell its officers; ask bounty hunters to show

12   their licenses, ask bounty hunters to show their paperwork, or

13   even just to train their officers, hey, private bounty hunters

14   don't get search warrants, guys.  Private bounty hunters don't

15   get arrest warrants, either.  Those are limited to the sphere

16   of law enforcement.

17     So, training, Judge, did not need legislation.  But the

18   City said, well, we need legislation.  We need Congressional

19   legislation or we need state legislation so that we can have

20   the ability to deal with these bounty hunters the proper way.

21     And Bill Kurlakowski spent a lot of his last year in

22   office as the police commissioner, and he know this because he

23   testified about it, lobbying for these changes, and he got

24   them.  And he got them, and the City of Buffalo did nothing.

25   They didn't change their policy or procedures, their manual,

1  their police procedures manual.  They didn't train the

2  officers.  The new Commissioner did not put out a new training

3  mechanism.

4      So, fast forward years later to the Reinhardt situation

5  and we have the same set up.  We have private bounty hunters.

6      Now, in the case of Officer McLellan, there was no basis

7  to arrest that gentleman in New York.  The Buffalo Police

8  said -- would not have been available to arrest him because

9  the warrant was only for contiguous states, and it was out of

10 Maryland, as I recall.

11     But, here, we have an even worse situation because they

12 never followed the new statute that they had lobbied for

13 because they never trained the officers to ask for the

14 appropriate paperwork or have the bounty hunters fill out a

15 form.

16     Take what Mr. Lee just told us about why the bounty

17 hunters thought they were working with a federal agency; an

18 unspecified, non-existent federal agency, Judge.  It's because

19 they were not trained on -- not only were they not trained at

20 all, again, I don't think it required legislation.  After

21 Officer McLellen gave his life in service, they didn't train

22 officers on how to deal with bounty officers to avoid that

23 happening again.

24     When the legislation they lobbied for came out and gave a

25 mechanism to train the officers, hey, create a form.  Ask for

1  them to fill out their -- show us your paperwork.  Show us

2  your license.  And we see now, Judge -- and New York is not a

3  post-accident repair state, so we can rely on this for

4  evidence -- in 2021, in response to the publicity on this

5  case, the Commissioner of Police did put out a training

6  bulletin, did tell police to comply with 74A of the General

7  Obligations law, and did give them a basis for dealing with

8  officers.

9      Unfortunately, it was too late for the Reinhardts.

10  Fortunately, it wasn't a tragedy here.  This, obviously, could

11  have gone a much more tragic direction, and it didn't.  All of

12  that, Judge, is why I believe that this is a very, very strong

13  case for the imposition of Monell liability on a couple of

14  theories, Judge.

15      One is the policy and procedure.  The policy here was not

16  to have any method or any mechanism for dealing with bounty

17  hunters.  Now, usually, in those cases, it become an issue of,

18  you know, if that's -- if the policy is a negative policy not

19  to have one, you have to show that the municipality was on

20  notice that bad things could happen if you didn't have a

21  policy.

22      Judge, there's nothing more tragic.  I actually am a

23  supporter of the police, even though I sometimes sue the bad

24  ones.  Officer McLellan died in 1998 because of the lack of

25  this policy.  And the City of Buffalo, again, off the charts

1    in cases where people are asking for summary judgement on

2    Monell liability, not only acknowledged that the lack of a

3    policy was, in part, contributed to the death of that young

4    officer, but actually then went out and lobbied for what it

5    thought was the right corrective move to be made.  And then,

6    having acknowledged the importance of it -- and I can quote,

7    Judge, and I will because I think it's so --

8              THE COURT:  I get the drift.  I see what you're

9    saying.

10             MR. RUPP:  Well, there is one thing, Judge.  You

11   know, when Commissioner Kurlakowski testified before Congress,

12   a House subcommittee, he testified that bounty hunters pose a

13   significant danger to innocent citizens and law enforcement.

14   That is the highest police official in the City of Buffalo

15   telling Congress that they fully understood the risk of not

16   having sufficient policies to deal with bounty hunters.

17       I could go on.  In the interest of time I won't, Judge,

18   with this testimony, but I'd ask the Court to review it

19   because it's very much part of the picture here of why I can

20   say to the Court, and ask for summary judgement, that the City

21   knew what the problem was.  If it didn't have sufficient

22   policies for its officers to deal with bounty hunters, it knew

23   it.  It testified to Congress about it.  It asked for it in

24   Albany.

25       It got it, and then it continued to have no official

1    policy whatsoever for its officers to deal with bounty

2    hunters.  And that was reflected in what happened on the two

3    raids on my client's property.  Now, Judge, that's one and

4    only one basis for Monell liability here, is the lack of a

5    policy and a clear and manifest need for it.

6        The second common way to achieve Monell liability against

7    a municipality like the City here is to show a complete and

8    utter lack of training.  And, Judge, this is why I kept

9    alluding to it, as Mr. Lee was saying, well, the officers were

10   duped.  Judge, they weren't duped.  These bounty hunters

11   called up dispatch and said, we're bounty hunters and we want

12   to achieve the arrest of this -- we want to collar this

13   fugitive.

14       The training was so deficient at the City that none of

15   these officers, not one of them, thought to ask the bounty

16   hunters to see their paperwork.  Not one of the officers, and

17   there were seven of them, Judge -- five at the raid of the

18   Reinhardt property and two the night before -- not one of them

19   asked to see the licenses of either of the bounty hunters.

20       Not one of them thought to challenge the bounty hunters

21   for wearing badges and insignia in violation of New York State

22   law that says that bounty hunters cannot wear badges and other

23   things to emulate police officers.  Not one of them did that.

24       We're oh for seven in challenging their paperwork; oh for

25   seven challenging their licensure; oh for seven challenging

1  the badges and insignias that they were flaunting.  Judge,

2  they didn't do anything because they weren't trained.

3      And so, this idea that they were duped, Judge, I mean, if

4  you absolutely receive no training whatsoever, and you don't

5  know a bounty hunter from a federal officer, and you don't

6  know that bounty hunters can't even be issued search warrants

7  or arrest warrants because they are not state actors, and

8  those are only issued to police, you can then come into court

9  when something like this happens and say, Judge, I should get

10 out of jail free on this one because my people were so poorly

11 trained that they couldn't even do the basics of verifying

12 what they were doing as they stood by and watched children,

13 young toddlers, getting held at gunpoint screaming, people

14 screaming for help, screaming for the police to help them, and

15 they just stood by, Judge -- which, again, relevant to our

16 failure to intervene claim, which Mr. Davenport will handle if

17 we get there today.

18     But, Judge, all of these facts are undisputed.  All of

19 them, I believe, have been conceded because, as Mr. Lee says,

20 well, if they were duped, they were duped for lack of

21 training.  If they were duped, Judge, they were duped for lack

22 of a policy.

23          THE COURT:  I get the drift.

24          MR. RUPP:  Okay.

25          THE COURT:  And you really want to forgo a rather

1    stirring argument in front of the jury on this issue in

2    exchange for a bloodless statement from the judge that this

3    issue has been resolved in favor of the plaintiffs?  That's

4    your call of course, but I'm surprised.

5            MR. RUPP:  We have thought about it a little bit,

6    Judge.

7        Look, I think there are several theories that would still

8    go to the jury where the jury would hear everything and see

9    everything that happened.  I'm not -- we didn't even ask for

10   summary judgement on some of our other theories that I think

11   would go.  I do think, though, that it would significantly aid

12   the possible resolution of the case if the City were not still

13   laboring under the assumption that, somehow, it did nothing

14   wrong here.

15       So, yes, we did make the strategic decision, Judge to move

16   for summary judgement on these theories.

17           THE COURT:  Thank you.

18           MR. RUPP:  Thank you, Judge.

19           THE COURT:  Why don't we hear from you on Monell, and

20   I'm going to give our court reporter a break because I know

21   she's working hard.

22       Where we left off, the guys were tricked and maybe they

23   were naive, maybe they were smart guys that just got tricked

24   like smart guys do, but would training have been of assistance

25   to them; like the training that U.S. Marshals carry badges

1  and --

2          MR. LEE:  Training would have been of assistance to

3  them, but I think the first question before you get there is

4  was any training actually necessary.  And that's why

5  plaintiffs want to emphasize this other incident with

6  Officer McLellan that happened, whatever, 20-some years before

7  our incident.  But this isn't a situation -- I'll get to the

8  McLellan incident in brief detail, but this isn't an incident

9  where the City of Buffalo failed to train in an area that you

10 knew officers would be facing on a regular basis.

11     So, in other words, if the City of Buffalo failed to

12 train -- gave police officers a gun, but then failed to train

13 the officers on the use of deadly force, that would be,

14 admittedly, a problem under Monell on the training theory.

15 Here, though, the plaintiffs can only cite to one other

16 incident involving bounty hunters, and it was absolutely

17 tragic.  And I'm not going to say --

18          THE COURT:  Yeah, no.  I agree.  I looked it up and I

19 think the poor young man was struck by a motorist.

20          MR. LEE:  Yes.  And that happened a long time ago.

21 There is one other incident, and it's really the only sort of

22 common denominator between the McLellan incident and this

23 incident, is the fact that both involved bounty hunters.  But

24 they were totally different in the sense that this was sort of

25 a fleeing -- the McLellan incident, the way I understand it,

1   was more of a fleeing felon situation.

2          THE COURT:  I thought the common factor was they both

3   involved bounty hunters that didn't have the authority to do

4   what they wanted to do.

5          MR. LEE:  Yes.  Yes, Judge.  They -- that -- but how,

6   you know, you -- I don't think you can compare the McLellan

7   incident to our incident because it didn't involve the Fourth

8   Amendment in terms of searching -- illegal searches.

9          THE COURT:  Right.

10          MR. LEE:  And even if Your Honor believes that, yeah,

11   there are some pretty strong similarities between these

12   incidents, it only happened one other time.  So, this isn't a

13   situation where, like, the Buffalo Police Department knew, oh,

14   we have a serious problem in the City of Buffalo with these

15   unlicensed rogue bounty hunters coming in.  We need to provide

16   our officers with training about this.  It's just not that

17   type of situation.

18      I think what illustrates that is, we only know about -- of

19   two incidents that -- and Dennis White, you know, I should say

20   this for the record for the sake of completeness.  He did

21   testify that he did other raids in the City of Buffalo, but

22   there's no evidence on those other times that there was any

23   police involvement in those raids, other than him calling this

24   non-emergency hotline or whatever.  And there's no evidence

25   that those other situations were under circumstances similar

1    to ours here.

2       So, really, as far as the facts that we have key facts on,

3    it's the McLellan incident.  It was a long time ago, and it's

4    just not an issue that arose in the City of Buffalo on a

5    regular basis.  If this was constantly happening, yeah, there

6    should have absolutely been training.  But it's not.  It's not

7    that type of situation.  It's not like the deadly force

8    situation I raised earlier where it's like, okay, you know

9    that a police officer is going to encounter this in his day-

10   to-day operations, so you have to train them on it, City, but

11   it's just not -- this is a very unusual case.

12      I think that might be about all I want to say on the

13   Monell claim, Your Honor, unless you have any other questions.

14   I mean, you know what I would say to you on that -- on a form

15   that the City of Buffalo now has?

16      I know I'm jumping around a little bit here, but that's

17   column 2, right, Judge?  So, as soon as this incident happens,

18   then the City does address it head-on.  There's a policy that

19   comes out two months after this incident and a form that, I

20   believe, is required by the General Business law, is created

21   by the City.  So, they do --

22              THE COURT:  Available by your office?

23              MR. LEE:  I do believe our office.  It wasn't me

24   personally, Judge, but yeah, I do believe our office had some

25   role in it.  And if you look what the General Business law

1  says, and I think I can probably close with this, but it's

2  very, sort of, basic information that the form is required to

3  have.  It says -- now, it does say information including, but

4  not limited to.  So you could have more information in this.

5  But it says, name, address, motor vehicle registration of said

6  agent.

7      So, there is a proximate cause issue I think plaintiffs

8  have here too, where if the form actually was in place in the

9  City of Buffalo, what would that have done to actually stop

10 these bounty hunters from doing what they did?  Mr. Rupp said

11 something about licenses, but that's not actually what's

12 required on -- at least --

13         THE COURT:  All it is, just you have to show your ID?

14         MR. LEE:  It says -- I think the statute requires

15 information including, but not limited to, name, address,

16 local address, and motor vehicle registration of said agent.

17 So, the City now, on this form, requires more information than

18 the form that came out about two months after this incident.

19         THE COURT:  Right.

20         MR. LEE:  But the form that was actually required and

21 that information needs to be in there, well, if that

22 information was supplied by Mr. White, it wouldn't have

23 actually done anything to actually stop this particular

24 incident.  You know, these cops -- something struck me that

25 Mr. Rupp said about how he respects law enforcement, but he

 1  sues bad cops.

 2          THE COURT:  Yeah.

 3          MR. LEE:  These are not bad cops in this case.  They

 4  got tricked by a criminal who went to jail over this.  These

 5  are not bad cops.

 6          THE COURT:  All right.  Why don't we take ten minutes

 7  and give our staff a break and I'll come back.  What do you

 8  guys have left, because I want to make sure I have time for

 9  the City.  Are those the main points?

10          MR. DAVENPORT:  Well, they were, Your Honor.  I think

11  in rebutting the City of Buffalo's arguments on the Fourth

12  Amendment claims and conspiracy claim, failure to intervene, I

13  think we're getting our arguments in as well.

14          THE COURT:  All right.  So, it will be your turn up

15  next.

16          MR. RUPP:  Judge?

17          THE COURT:  Yes.

18          MR. RUPP:  Can I just have literally two minutes to

19  respond to some of what Mr. Lee just said on that motion?

20          THE COURT:  Sure.

21          MR. RUPP:  I really won't take long.  The main thing

22  I want to point out is that the form that the City did come up

23  with in compliance with General Obligations Law 74A does, at

24  the very top of the form, as one might expect, ask for the

25  bail enforcement agent's license.

1           THE COURT:  Sure.

2           MR. RUPP:  Which would have been -- and so, I think

3    the Court -- and I think that's significant --

4           THE COURT:  The game warden asks for no less.

5           MR. RUPP:  Right.  In addition, Judge, Exhibit HH,

6    which is Dennis White's testimony, which I believe is

7    unrebutted --

8           THE COURT:  Right.

9           MR. RUPP:  -- he said that he contacted that non-

10   emergency line several times, many times, and was aided by

11   Buffalo Police in performing, well, unlicensed bail

12   enforcement operations many times.  So, it is simply and

13   factually inaccurate based on the record before the Court to

14   contend that there was just these two episodes.

15       In fact, you know, anybody who is calling the police

16   between the McLellan incident and the Reinhardt incident is

17   getting the same treatment.  It's just -- we don't know who

18   all of these licensed and unlicensed bounty hunters are, and

19   we would have been deposing people until, you know, 2031.  But

20   the one that we did depose said I called and I was aided by

21   Buffalo Police many times.

22       So, I don't even think it's relevant, Judge, when the

23   Commissioner of Police goes around to Washington, D.C., and

24   Albany, New York, and says this is so vitally important to us

25   that we know it's going to happen again if you don't pass

 1   legislation, I don't think we have to hear Corporation

 2   Counsel's office say they didn't recognize its importance.

 3         THE COURT:  Okay.

 4         MR. RUPP:  Thank you.

 5         THE COURT:  All right.  Ten minutes.

 6   (A recess was taken from 3:02 p.m. to 3:14 p.m.)

 7         THE CLERK:  Back on the record in case number

 8   21-CV-206, Reinhardt et al. v. The City of Buffalo et al.  All

 9   counsel and parties are present.

10         THE COURT:  All right.  Let me give you the floor.

11   We're on the City's motion for a summary judgement, that's I

12   think docket 174.

13         MR. LEE:  Thank you, Your Honor.  I'd like to start

14   with just briefly touching on the joint action and the joint

15   and several liability issue, because they are absolutely

16   separate issues.

17         THE COURT:  Right.

18         MR. LEE:  I think if plaintiffs were able to

19   establish joint action, that would mean the bounty hunters

20   could be held liable under 1983, but it would not affect the

21   joint and several liability analysis that there is no joint

22   and several liability under 1983.

23      In other words, there would still need to be an

24   apportionment, I believe, between the bounty hunters'

25   culpability and the police officers' liability even if there

1   is some joint action.  I think for --

2          THE COURT:  I thought it would be more like -- and

3   I'm making this up, so I may be wrong -- more like civil

4   conspiracy where everybody involved in the scheme is liable,

5   not for reasons of joint and several liability, but because of

6   their involvement in an illegal action.

7          MR. LEE:  I think that's right.  There would need to

8   be a conspiracy, actually.  If there was an overt act in a

9   conspiracy, then I assume any one of the conspirators --

10         THE COURT:  Right.

11         MR. LEE:  -- or all of them are liable.  But I think

12  the conspiracy issue is also separate from the joint --

13         THE COURT:  Yes.

14         MR. LEE:  -- action.

15         THE COURT:  I appreciate that.

16         MR. LEE:  Yeah.  Okay.  And as far as -- now, real

17  briefly on Article 16 of the CPLR, which is the New York State

18  loss limitation on joint and several liability, doesn't apply

19  in this case because there is no state law cause of action.

20     These are all 1983 causes of action, and that's where the

21  *Boyd* decision comes into play, only that there is no joint and

22  several liability under 1983.  And I also believe the *Boyd*

23  decision does address Article 16 of the CPLR and say that -- I

24  think it doesn't apply because it's a state law.

25         THE COURT:  Oh, I see what you mean.  The state law

1    claims are only against the, what I would call, the bounty

2    hunter defendants?

3            MR. LEE:  Exactly, Judge.

4            THE COURT:  Only 1983-type claims against the City

5    and its employees.

6            MR. LEE:  Yes.  Exactly.  And we know from the *Boyd*

7    decision, at least in Judge Vacca's opinion relying on the

8    Second Circuit opinion, that there is no joint and several

9    liability under 1983.

10       And I guess while we're on it, because I'll be brief on

11   the conspiracy claim, and this is in the City summary

12   judgement motion because I already addressed it, but there has

13   to be an actual agreement between the parties.  And we cite

14   cases in our papers about that, Judge.  There has to be an

15   agreement like we're going to go violate this person's

16   constitutional rights.  There was certainly no agreement here.

17       I would concede that, had the police officers known that

18   this was not a legitimate law enforcement agency, then that

19   would be a totally different situation.  But they -- the

20   police thought they were actually assisting a legitimate law

21   enforcement agency.  They didn't think they were violating

22   Mr. Reinhardt's constitutional rights.  They thought these

23   bounty hunter folks had a search warrant and they were a

24   legitimate law enforcement agency.  There is no conspiracy

25   here.

1        So, on the illegal search claim, Your Honor, the police

2    officers, they believe that they were responding to a call

3    of -- something about --

4            THE COURT:  Bail enforcement?

5            MR. LEE:  Yeah.  For the Oakdale incident, it's, bail

6    enforcement needs assistance with a search warrant.  And I'd

7    like to pick up on something that Mr. Rupp said, how search

8    warrants aren't issued by private entities.  Well, that just

9    bolsters the City's argument that the police officers believed

10    that they didn't know they were dealing with private entities,

11    because he's right.

12        If there's a search warrant involved, which is what the

13    dispatch call says, you're automatically assuming it's a

14    police officer, that this is a legitimate, you know, law

15    enforcement agency because, you know, I, as a lawyer, I can't

16    go get a search warrant.  It has to be a -- bounty hunters

17    can't get a search warrant, right?  It has to actually be a

18    law enforcement agency.

19            THE COURT:  Yeah.

20            MR. LEE:  So, they think they're going to Oakdale to

21    assist a bail -- it doesn't say bounty hunter, either.  That

22    could be important.  It says a bail enforcement agent.  And --

23    in aid of a search warrant.

24        So, they go there.  And as far as the officers alleged

25    constitutional violations, it has to do with Officer Keenan

1    being in the foyer, and Officer George being in the back of

2    the house.  But these officers believe that these bounty

3    hunters have a search warrant.

4        And we know from -- there's a case cited in our papers,

5    Judge, that other law enforcement agencies can help the law

6    enforcement agency that actually got the search warrant.  So,

7    that's one argument as to why we think there's no

8    constitutional violation.  Well, they didn't have a search

9    warrant.  So, I don't know how that -- that might be where the

10    qualified immunity analysis actually has to --

11            THE COURT:  Your qualified immunity analysis requires

12    that they think all the way through this event that they

13    actually are dealing with some unnamed federal agency,

14    something like a marshal?

15            MR. LEE:  I think a marshal, yeah.  Because --

16            THE COURT:  But, you know, here's what -- you and I

17    work with police officers all the time.  I get on the elevator

18    with marshals and I know it, right?  They got a look.  They

19    got a -- you just know that these young men, who could be

20    linebackers, but actually are marshals, are marshals.  And

21    police officers know this, too.  I know they say this, but how

22    could they not know there was something squirrely about these

23    men?

24            MR. LEE:  Because there was nothing really in the

25    facts that would lead them to that conclusion, at least

1  arguably so.

2        THE COURT:  Right.

3        MR. LEE:  And that's where the qualified immunity

4  would come in again, too.  Unless there was no reasonable

5  officer -- but that's the qualified immunity standard, right?

6  No other reasonable officer would have acted the way these

7  officers did.  I don't think that can be said here because,

8  again, they were dispatched -- this is an official police

9  call.  They were dispatched to the actual scene.

10        THE COURT:  Yeah.

11        MR. LEE:  And they get there and this guy is in a

12  Crown Vic, which is not, you know -- a car that's typically

13  driven by law enforcement.  Law enforcement, you know, he's

14  trying to hold himself out to be.  He's trying to trick police

15  officers.

16        THE COURT:  What's that?

17        MR. LEE:  He's actually trying to, like, legitimize

18  himself as a law enforcement person, even though he's not, and

19  it worked in this case.

20        THE COURT:  Right.  Right.

21        MR. LEE:  And -- no.  But I don't think I can justify

22  actually Officer Keenan's or Officer George's entry into the

23  home based on the warrant, because there was no warrant, so

24  that doesn't really make any sense.  So, it would have to be,

25  I think, the -- an exception to the warrant requirement, which

1    I think, in this case, would be the exigent circumstances,

2    which I touched on earlier with, you know, Dennis White and

3    his gun drawn.  I mean, look at Mr. Reinhardt's behavior on

4    the video.  I mean, understandable, but very irate.

5                THE COURT:  Right.

6                MR. LEE:  And there's a -- you know, there's people

7    inside, including a little girl.  So, Officer Keenan goes up

8    to the door, and I think it would have been unreasonable for

9    him not to do that, given the situation.  If anything, maybe

10   the argument is he should -- I think this is the argument, he

11   should have done more, but --

12               THE COURT:  Both sides could agree on he should have

13   removed the bail hunters and sent everybody packing and

14   deescalated the situation.

15               MR. LEE:  Right.  And as far as him stepping into

16   that little foyer area, I mean, I think that was perfectly

17   reasonable and necessary.  And that's what he should have done

18   as a police officer.

19       Now, as far as Officer George is concerned, he thinks that

20   there's a fugitive inside.  So does Officer Keenan.  They

21   think that -- they were told that by Mr. White that --

22               THE COURT:  Right.

23               MR. LEE:  -- I think Luke's here, he was here in the

24   last hour, or something.  And Officer George thinks he hears a

25   noise, so he goes in there, and I think that would be covered

1   by the exigent circumstances exception to the warrant

2   requirement as well.

3       But, you know, truthfully, Your Honor, we don't have to

4   get there because I think the main point I want to make, and

5   maybe I'll wrap up, is that qualified immunity should apply in

6   this case.  And that's because the officers made a reasonable

7   mistake.  This was not a totally unreasonable mistake.  It

8   cannot be said that no other officer, reasonable officer,

9   would have acted the same or similarly under these

10  circumstances.  And that's what the plaintiffs would have to

11  show to overcome qualified immunity.

12      The other way the qualified immunity analysis goes is that

13  plaintiffs, you have to come forward with a case, not maybe

14  directly on a point, but sufficiently analogous showing that,

15  on similar facts, officers violated the constitutional rights

16  of the plaintiffs.  So, it can't just be some broad general

17  proposition that searches of a home are unreasonable unless

18  there's a warrant.  That's not good enough under the qualified

19  immunity analysis.

20      You need to come forward with a particular case on point

21  that says, oh yeah, you know, officers, sort of, in a similar

22  situation here acted the way you did and they were found to

23  have violated the plaintiff's constitutional rights.

24      Theirs is no case like that that I'm aware of, and there's

25  been no case in the record cited by plaintiffs, that I'm aware

 1  of, where officers acting under similar circumstances were

 2  held to have violated the plaintiff's constitutional rights.

 3  That, alone, should end the qualified immunity analysis.  I

 4  think that's all I have, unless you have questions.

 5          THE COURT:  No, I'll give you the last word.  I'm

 6  sure that your friends here will say some things that you want

 7  to respond to, and I'll give you that opportunity.

 8          MR. LEE:  Okay.  Thank you, Judge.

 9          MR. DAVENPORT:  Thank you, Your Honor.  Responding

10  first to the arguments raised by Mr. Lee and the City of

11  Buffalo as they pertain to qualified immunity, I just want to

12  get back to what we believe is an incorrect recitation of what

13  the standard is for qualified immunity.

14     First, speaking to the idea of when a right is clearly

15  established, we believe that that was set forth by the Supreme

16  Court in *Ashcroft* 563 US 731 (2011).  For a right to be

17  clearly established, its contours must be, quote, sufficiently

18  clear that every reasonable official would have understood

19  that what he is doing violates that law -- or that right.

20  Excuse me.

21     And then, continuing onto page 741 of the decision, the

22  Supreme Court states, while there need not be a case directly

23  on point, existing precedent must took place the statutory or

24  constitutional question beyond debate.  And that's the first

25  part of when we're defining what the right is.

1      And I believe that we also need to take a step back and

2  evaluate exactly what that right is here.  And I don't believe

3  that it's a right for somebody to be free from unreasonable

4  searches and seizures as it pertains to bounty hunters.

5      These bounty hunters were not licensed.  There was no

6  reasonable belief by the City of Buffalo that they were

7  working with actual licensed bounty hunters that day.  And the

8  record doesn't reflect that as well.  And in terms of when a

9  right is clearly established, you don't have to look to just

10  caselaw as well.

11      We cited a few decisions including one from the District

12  of Connecticut, *Chipperini v. Crandall*, 253 F. Supp. 2d 301,

13  District of Connecticut, 2003.  And the Court there said,

14  while most cases defining the analysis of a clearly-

15  established right focus on whether decisional law adequately

16  defines the contours of the right at issue, statutes can

17  certainly be a source, including state statutes.

18      We have a state statute here, two of them, 70A and 74A.

19  Seventy A required that bounty hunters be licensed to practice

20  in New York State.  Seventy-four A gave the City of Buffalo

21  and these police officers a mechanism to be able to check

22  that.  It's the first thing that was asked on this new form

23  that was created by the City of Buffalo after this incident

24  took place.  And yet, the City of Buffalo did not follow that

25  clearly established law.

1     And that's just as it pertains to bounty hunters.  But we

2   also can look to the right of somebody to be free from -- of

3   warrantless search and seizure.  And that's a very clearly

4   established right as well.  We know that from Supreme Court's

5   decision in *Payton v. New York* 445 US 573, (1980).  The

6   Supreme Court stated it's a basic principle of Fourth

7   Amendment law that searches and seizures inside a home without

8   a warrant are presumptively unreasonable.  And that's since

9   1980.  And it's stating that it's a basic principal.

10     And the shocking part is that we know from

11   Spencer George's deposition, Colin Keenan's deposition, others

12   who were there that day, that they did not know that basic

13   principle of Fourth Amendment compliance.

14     We actually heard from Spencer George in response to my

15   question on when a search warrant is required, he could not

16   tell me, based on the training that he received, whether or

17   not a search warrant was required before a search takes place

18   or after a search takes place.  He could not tell me that.

19   And when you are looking in this specific circumstance --

20               THE COURT:  I suppose the answer is both.

21               MR. DAVENPORT:  The answer could be both, Your Honor.

22               THE COURT:  Not either or, but it's good to have it

23   before, and you definitely want it after.

24               MR. DAVENPORT:  Fair, Your Honor.  I certainly agree

25   with that.  But the point is, I guess, is that they had

 1   neither here, and no one thought to check for it either.

 2        THE COURT:  Right.

 3        MR. DAVENPORT:  And the problem that we have as well,

 4   you know, when you start looking at some of the specific

 5   constitutional violations that we're raising, for example, the

 6   unreasonable search and seizure was discussed by Mr. Lee in

 7   his arguments, exigent circumstances for Spencer George, we

 8   know from the video he was standing at the back.  So, if

 9   you're facing the house, he was standing at the back left

10   portion outside of that door.  According to Mr. Lee in his

11   arguments, Mr. George heard a sound and walked inside, and

12   that that was the exigent circumstances that allowed him to

13   remain in the home.

14        But the problem is, is that after he stepped into the

15   home, he performed a search, and looked down into the

16   basement.  He stayed in the home for another two or three

17   minutes despite the fact that our client, Jake Reinhardt, was

18   coming down the stairs from the upstairs apartment telling

19   Spencer George to leave his home, telling him leave the home,

20   and there was nothing that was happening between bounty

21   hunters.

22        It was Officer George and Jake Reinhardt who were standing

23   in that stairway.  There were no other sounds.  There were no

24   other noises.  Officer George refused to leave the home at

25   that point, telling our client, Jake Reinhardt, that he didn't

 1  have to listen to him, that he didn't have to do what Jake

 2  Reinhardt told him to do.  That's what not what the law says.

 3  That's not what the Supreme Court says.

 4        THE COURT:  Setting your concerted action arguments

 5  aside, the damages for that encounter, that incursion, would

 6  be $10?

 7        MR. DAVENPORT:  If you're looking just at what

 8  Spencer George's interaction was with our client that day, I

 9  would agree with you, Your Honor, that the damages are

10  minimal.  But Spencer George's conduct that day is more so the

11  product of a failure to train by a municipality, a complete

12  failure to provide its officers with the resources, training,

13  and knowledge and expertise that they needed to do their jobs

14  that day.  And it lead to a horribly tragic situation.

15    It also led to, because I know that it was also brought up

16  by Mr. Lee in his argument, the conspiracy claim, about there

17  being no evidence of a specific agreement.  I would submit,

18  Your Honor, I mean, I haven't done a deep dive on this, but I

19  would have to say there's probably not a case that's out there

20  where somebody has admitted that they had an agreement to

21  violate somebody's constitutional rights.

22        THE COURT:  It would be uncommon.

23        MR. DAVENPORT:  It would be extremely uncommon.

24  That's not something that happens.  But we can look to the

25  actions that these officers took.  We can look to the actions

1  of the bounty hunters that day because, again, they're all

2  captured on video.

3      And we know that Colin Keenan and some of the police

4  officers who were there that day made statements to the

5  homeowners and made statements indicating their support and

6  agreement with what the bounty hunters were doing that day

7  stating that, you know, there were only two bounty hunters

8  that were there that day.  Why did they show up with only two

9  people?

10      And you've heard Jay Murphy and Colin Keenan say on the

11  front porch, well that's why we're here.  We're here to

12  provide a perimeter.  We're here to block -- and they didn't

13  say this part, but they did say that's why we're here.

14      But we know from the deposition testimony when we asked

15  the police officers, Spencer George, Jay Murphy, Colin Keenan,

16  why were you there that day?  What was your purpose?  They

17  admitted that their purpose was to set up a perimeter and make

18  sure that no one left the house while these bounty hunters

19  were inside searching the home.

20      So, they provided the extra support and the extra manpower

21  that was necessary for these bounty hunters to do what they

22  did that day.  They could have not have done it without these

23  police officers.  So, I understand that the police officers

24  themselves may have taken what they felt to be innocent

25  actions, but they were also there to protect.  They are sworn

1  to protect --

2          THE COURT:  Right.  What about the qualified immunity

3  part now?

4          MR. DAVENPORT:  Okay.  So, in terms of the qualified

5  immunity argument, Your Honor, again, these are -- we provide

6  Supreme Court precedent showing that the constitutional rights

7  are clearly established, such as the unreasonable search and

8  seizure claim, which I know Your Honor noted at the beginning.

9  It seems that this is -- the facts support that there were no

10  exigent circumstances, no search warrant, and all of that fits

11  within the contours of the clearly established Fourth

12  Amendment right.

13      The same can be said for the excessive force claim as

14  well, and the failure to intervene.  And both of those should

15  be evaluated by Your Honor together.  And the reason being is

16  because the excessive force mostly was committed by these

17  bounty hunters who were inside pointing their shotguns,

18  pointing their weapons, and commanding the innocent citizens

19  inside to not leave and to basically allow the search to take

20  place.

21      But the police officers stood behind, heard all of that

22  going on, and did absolutely nothing to stop it, even though

23  they had all of the information and reasonable investigation

24  steps that they could have taken beforehand to make sure that

25  these were properly licensed, safe -- that this was going to

 1  be a safe operation ran by licensed, credentialed individuals.

 2  But they didn't do any of those things.

 3      And, again, when we're talking about whether or not a

 4  right is clearly established, we're not talking about an

 5  individual's right to -- or a police officer's, you know,

 6  whether it's an odd situation, to interact with bounty hunters

 7  because you could have replaced bounty hunters with a

 8  landlord.  You could have replaced bounty hunters with a

 9  repossession agent.

10      These are all situations that officers commonly have faced

11  from the caselaw.  And there is a limited amount of caselaw on

12  bounty hunters -- or police officers interacting with bounty

13  hunters, but the constitutional principles are exactly the

14  same no matter who that person is.

15      And, again, there's not even truly a bounty hunter who is

16  here.  This was an unlicensed vigilante individual who the

17  police officers stood by and allowed to rouse individuals out

18  of their home.  That is the constitutional right that we're

19  dealing with here; not whether or not there was uncertainty

20  for a police officer and how they should interact with bounty

21  hunters.

22      But to the extent that Your Honor does find that that's

23  the constitutional right at issue, that is where we would turn

24  back to New York's General Business Law 70A and 74A to state

25  that there were statutes that were in place requested by the

1   City of Buffalo Police Department, and the police officers

2   should be held to the standard of needing to follow the law.

3   We can't allow police officers to say, you know, I wasn't

4   trained on this, I wasn't aware on it, so, therefore, I get a

5   free pass on this.

6       We need to make sure that we're putting the proper

7   training in place, putting the proper information in front of

8   the officers so, that way, they can do their job safely and

9   effectively.  And I think if that had happened here, we

10  wouldn't be here talking about this case, but we are.  And

11  it's because it took a second incident that happened almost

12  20 -- over 20 years later that made national TV, and it was

13  just a few months later that the City --

14          THE COURT:  Right.  This is the Monell argument.

15  Okay.

16          MR. DAVENPORT:  And so -- but that, Your Honor, is

17  why we're saying that this qualified immunity analysis -- it's

18  being turned on its head a bit by the City of Buffalo.

19      And I do want to just -- before I allow Your Honor with

20  any other questions that you may have, this idea that the

21  standard is that no officer of reasonable competence would

22  have acted the same way, that basically plaintiff is required

23  to prove the negative that no other officer, no other

24  reasonable officer would have acted the same way as they did,

25  that's an impossible standard to me.  And it's also not

 1   correct.

 2        Again, if you look at Ashcroft, the correct standard, as

 3   articulated by the Supreme Court, is whether every reasonable

 4   official would have understood that what he is doing violates

 5   a constitutional right.

 6        And, again, if you look at it from the perspective of

 7   officers knowing that they need to have a search warrant, or

 8   should have known that they need to have a search warrant to

 9   enter into somebody's home, or exigent circumstances, and not

10   having any of those circumstances present, I believe that it

11   makes it where the qualified immunity analysis is not a

12   difficult barrier to overcome.  And I also believe that that

13   is consistent with the caselaw from the Supreme Court on how

14   the contours of that clearly established right should be

15   viewed.

16        And, Your Honor, unless you have any other further

17   questions, I think that's all that I want to specifically

18   address from Mr. Lee's argument.

19            THE COURT:  Okay.  Thank you.

20            MR. DAVENPORT:  Thank you.

21            THE COURT:  Both very helpful.

22            MR. LEE:  I'll be brief, Your Honor.  And I'm

23   certainly aware that defendants in cases don't admit to

24   engaging in conspiracies, and that it is often shown through

25   circumstantial evidence.

1          THE COURT:  Right.

2          MR. LEE:  This case is very different because all the

3   evidence shows that the police officers thought that they were

4   engaging with a legitimate law enforcement agency.  So, I'm

5   probably not articulating this the best way I could, but there

6   is a clear difference in this case between -- okay.  So,

7   there's no agreement that we know about, because why would a

8   defendant agree to a conspiracy?

9      First, the evidence in this case, which is, there's -- all

10  the evidence shows that the police officers thought they were

11  working with a legitimate law enforcement agency.  There was

12  no agreement to violate the plaintiff's constitutional rights

13  because they thought that they were actually dealing with bail

14  enforcement agents, legitimate bail enforcement agents.

15     So, this isn't the normal case, I think, where you could

16  prove conspiracy through circumstantial evidence when all the

17  officers testified, look, we had no idea these guys were rogue

18  bounty hunters.  We thought that they were a legitimate law

19  enforcement agency.

20          THE COURT:  Couple years ago in a different case

21  called outlaw, which I tried, it was a police excessive force

22  case.  What we did with the qualified immunity was to --

23  because it raised, in that case, factual issues, to postpone

24  it.  I heard the testimony -- the jury did not hear about

25  qualified immunity at all, and then we had an opportunity for

 1   more evidence, but there wasn't any because everything

 2   relevant to qualified immunity had come in in the principle

 3   trial.  And we had a second hearing and a second round of

 4   decisions on qualified immunity.

 5      Is that a good way to go in this case if there is a

 6   factual question about what these officers understood and

 7   whether there was some kind of factual support that they

 8   believed that they were assisting a federal fugitive agency?

 9          MR. LEE:  Yeah, I don't -- I guess that's probably

10   the point I was trying to articulate earlier.  There really is

11   no factual issue on that.  I mean, all the officers testified

12   that they believed they were assisting a law enforcement

13   agency, and all the facts supported that as well, which I

14   think we have already covered.

15      But to get to Your Honor's point, I suppose, yeah.  I

16   think the best way to handle qualified immunity at trial, in

17   my understanding, is sort of what you just described, Judge,

18   where if there are factual issues, then they need to be

19   submitted to the jury, and they need to be answered.  And then

20   I think ultimately it's up to you, though, to make the legal

21   determination on whether qualified immunity applies to the

22   facts as determined by the jury, but I don't know what facts

23   the jury would really need to determine here.

24          THE COURT:  Whether the officers are telling the

25   truth.

1          MR. LEE:  Yeah, but that's not really a summary

2   judgement issue, right?  I mean, that's --

3          THE COURT:  That's why I'm saying if we get as far as

4   a trial and qualified immunity is still in the air, one way to

5   deal with it, which we did in Outlaw and got blessed by the

6   circuit, was to put all the fact-finding -- the jury did not

7   come back with those special questions related to qualified

8   immunity.  I just went and made a decision later after hearing

9   from the lawyers.  It's early days.  You don't have to -- I

10  just raise it as one way to proceed.

11         MR. LEE:  No, I appreciate the question, Your Honor.

12  When I said that's not a summary judgement issue, what I

13  really mean is that I don't think that you can defeat summary

14  judgement by saying, oh, the jury might not believe you.

15  That's not my understanding of summary judgement.  There needs

16  to be actual other evidence that contradicts what the

17  testimony is.

18     So, in this case, for example, if Dennis White said

19  something like, oh, no.  I told these cops that I was

20  unlicensed, and the cops said, no, you didn't tell us that, we

21  thought you were licensed, there's your questions of fact.

22         THE COURT:  Right.

23         MR. LEE:  And that has to go to the jury, however

24  Your Honor wants to handle it with respect to qualified

25  immunity, but I don't think that the plaintiffs can defeat

1    summary judgement by saying, oh well, all the officers'

2    testimony about how we believed that we were assisting a

3    legitimate law enforcement agency, a jury might not believe

4    that.

5        Well, that can't be the standard of summary judgement

6    because a summary judgement would never be granted if you

7    could just simply come in and say, well, you know, there has

8    to be evidence, actually, to contradict what the officers

9    testified their belief was.

10       On the failure to intervene claim, Judge, I think what I

11   want to do is just address the -- or bring up the *Gregg*

12   decision.  I think it's Gregg.  I think it's G-R-E-G-G.  But,

13   in any event, hopefully I'm referring to the right case, but

14   the officer in that case, similar to here, pointed a gun at

15   that plaintiff and threatened to shoot the plaintiff unless

16   the plaintiff cooperated or something like that.

17       This is a Second Circuit case, and the Second Circuit gave

18   that officer qualified immunity on the excessive force claim

19   because there was no case -- and this is sort of what I was

20   discussing earlier -- that held that an officer's actions, in

21   that circumstance, constituted excessive force because there

22   was no physical contact.

23       So, on the excessive force claim, should the officers have

24   intervened and that -- and stopped the bounty hunters from

25   pointing the guns at Jake Reinhardt?  I think the Second

 1  Circuit already said no, because that's not -- that's actually

 2  not excessive force.  So, I don't think the failure -- I think

 3  the failure to intervene claim fails for that reason.

 4      And I suppose, Judge, I'll just close on this, which is

 5  the Second Circuit sort of described the standard for

 6  qualified immunity, because there seems to be some

 7  disagreement here about whether there can be some broad,

 8  general proposition out there about, you know, you can't

 9  search a home without a warrant or there needs to be a

10  warrant --

11          THE COURT:  Right.

12          MR. LEE:  So, this is what the Second Circuit said in

13  Figueroa, which is F-I-G-U-E-R-O-A, that's 825 F.3d, 89,

14  Second Circuit from 2016.  And this is a quote.  When a

15  plaintiff alleges that a law enforcement officer's official

16  conduct renders him personally liable in damages, our inquiry

17  is not whether the officer should have acted as he did; nor is

18  it whether a singular hypothetical entity exemplifying the

19  reasonable officer, a creature akin to the reasonable man of

20  the law of torts, would have acted in the same way.  It is,

21  instead, whether any reasonable officer, out of the wide range

22  of reasonable people who enforce the laws in this country,

23  could have determined that the challenged action was lawful.

24      So, I think that's what I was saying earlier.  If any

25  reasonable officer -- any reasonable officer -- could have

 1   conducted him or herself in the same manner as these officers,

 2   then qualified immunity is appropriate.  And I think to

 3   overcome that, the plaintiffs really have to, sort of, come

 4   forward with a case not directly on point, but pretty close to

 5   what we have here, and there just isn't that case, that I am

 6   aware of.

 7          THE COURT:  I was trying to think like the plaintiffs

 8   of analogues to law enforcement assistance to bail recovery

 9   agents.  I thought, like as they did, about auto repossession

10   and eviction, but you're closer to this world than I am.  Are

11   there other analogues?  I'm trying to think of other times

12   when police assist private economic agencies in their efforts.

13          MR. LEE:  Yeah.  There really is not -- I don't

14   recall a case name, but there is a case in the paper, Judge,

15   where the police assist -- I think it's an auto repossession

16   person.

17          THE COURT:  Right.

18          MR. LEE:  And that actually talks about that joint

19   action test and sort of the level of police involvement --

20          THE COURT:  Right.

21          MR. LEE:  -- when does private action become, you

22   know, action under color of law?  And I think, you know, what

23   differentiates those cases, though, is that -- I think in all

24   those cases, the law enforcement agency actually knows that

25   they're assisting a private entity.

1     And that's why this case is just a little -- it's

2    different.  I mean, because they -- you know, these cops

3    actually think that these bail agents are actually, you know,

4    legitimate law enforcement personnel.  And I -- so, I think

5    that's another thing I wanted to mention that distinguishes

6    our case from some of the other joint action cases.

7         THE COURT:  I suppose they moonlight as security for

8    shoplifting and weddings and a variety of functions.  I was

9    just sort of thinking of other places to look for analogues.

10         MR. LEE:  Right.  They do do that, yeah.  There are

11    definitely police officers who engage in that additional

12    employment in that -- like, in that line of work, yeah.

13         THE COURT:  Yeah.  Department store security, that

14    kind of thing.

15         MR. LEE:  Right.  Yeah.  Grocery stores.  Yeah.

16         THE COURT:  All right.  Thank you.

17         MR. LEE:  Okay.  Thanks, Judge.

18         THE COURT:  I think that's a day.  All right.  You

19    know what?  What I'll do is come down and say hi and I want to

20    talk off the record, you know, generally about the progress of

21    your discussions.  I don't need to get into details or put it

22    on the record, but I'll just come down and say hi for a

23    second.  Okay?

24         MR. LEE:  All right.  Thank you.

25         THE COURT:  Is -- Mr. Mikheail, has he left us or

1    should I say goodbye to him?

2            THE DEFENDANT:  I am right here, Your Honor.

3            THE COURT:  All right.  Mr. Mikheail, thank you for

4    your patience and joining us for this hearing.  I appreciate

5    it.  Are you going to get an attorney at some point do you

6    think?

7            THE DEFENDANT:  I can't afford one, Your Honor.  I am

8    on Social Security Disability.  I am retired.

9            THE COURT:  I hear you.  Okay.  All right.  Fair

10   enough.  Thank you.

11           THE DEFENDANT:  You're welcome.

12           THE COURT:  All right.  That's the end of the hearing

13   and we'll talk just for a second.

14   (Proceedings concluded at 3:46 p.m.)

15

16

17

18

19

20

21

22

23

24

25

1                    *     *     *     *     *     *     *

2

3                I certify that the foregoing is a

4        correct transcription of the proceedings

5        recorded by me in this matter.

6

7

8

9                                    s/ Megan E. Pelka, RPR

10                                   Official Court Reporter

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25